# 13-2340-cv

## United States Court of Appeals
## for the Second Circuit

SHIMON LAOR, BANCO GENERAL, S.A., EL PRADO TRADING, JULIA ANWAR,
ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED
INVESTORS IN THE GREENWICH SENTRY, L.P. PRIVATE INVESTMENT LIMITED
PARTNERSHIP, INTERAMERICAN TRUST, ELVIRA 1950 TRUST, BONAIRE
LIMITED, CARLOS GAUCH, LOANA LTD., WALL STREET SECURITIES, S.A.,
HARVEST DAWN INTERNATIONAL INC., OMAWA INVESTMENT CORPORATION,
CARMEL VENTURES LTD., TRACONCORP, BLYTHEL ASSOCIATED CORP.,

*(caption continued on inside cover)*

On Appeal from the U.S. District Court
for the Southern District of New York (The Hon. Victor Marrero)
No. 1:09-CV-00118-VM-FM

### BRIEF OF DEFENDANTS-APPELLANTS
### AND SPECIAL APPENDIX (SAP1-66)

Timothy A. Duffy, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
(312) 862-2000

Christopher Landau, P.C.
Emily P. Hughes
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC  20005
(202) 879-5000

*Counsel for Defendant-Appellant PricewaterhouseCoopers, LLP*
(additional counsel listed on signature block)

### ORAL ARGUMENT REQUESTED

August 16, 2013

MARREKESH RESOURCES, CENTRO INSPECTION AGENCY, KALANDAR INTERNATIONAL, LANDVILLE CAPITAL MANAGEMENT S.A., 20/20 INVESTMENTS, AXA PRIVATE MANAGEMENT, DIVERSIFIED INVESTMENTS ASSOCIATES CLASS A UNITS, ABR CAPITAL FIXED OPTION/INCOME STRATEGIC FUND LP, HAREL INVESTMENT AND FINANCIAL SERVICES LTD., MIGUEL LOMELI, JITENDRA BHATIA, GOPAL BHATIA, KISHANCHAND BHATIA, JAYSHREE BHATIA, MANDAKINI GAJARIA, ABN AMRO LIFE S.A., BAHIA DEL RIO S.A., DIAMOND HILLS INC., KIVORY CORPORATION, NORTH CLUB, INC., PFA PENSION A/S, TAURUS THE FOURTH LTD., ZENN ASSETS HOLDING, LTD., CARLOS MATTOS, CHANDRASHEKAR GUPTA, ULRICH BLASS, ROBERTO CIOCI, SANDRA MARCHI CIOCI, JOHN PAUL DOUGHERTY, LILA NEEMBERRY, PETER A. & RITA M. CARFAGNA IRREVOCABLE CHARITABLE REMAINDER UNITRUST, MOSHE PODHORZER, R. WICKNESWARI V. RATNAM, ENRIQUE SANTOS, ENRIQUE SANTOS CALDERON, JACQUELINE URZOLA, FELIPE J. BENAVIDES, FUNDACION VIRGILIO BARCO, DAVID HOPKINS, CATALINA MEJIA, CESAR MEJIA, R.M. RADEMAKER, THE ALPHA AND OMEGA PARTNERSHIP, LP, RICHMON COMPANY LTD., POSITANO INVESTMENT LTD., DAVID I. FERBER, THE KNIGHT SERVICES HOLDINGS LIMITED, ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED, FRANK E. PIERCE, FRANK E. PIERCE IRA, NADAV ZOHAR, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, RONIT ZOHAR, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, FAIRFIELD SENTRY LTD., HEADWAY INVESTMENT CORP., JOSEFINA SANTOS URZOLA, BPV FINANCE (INTERNATIONAL) LTD., JOSE ANTONIO PUJALS, INDIVIDUALLY AND IN THEIR REPRESENTATIVE CAPACITIES FOR ALL THOSE SIMILARLY SITUATED, ROSA JULIETA A DE PUJALS, INDIVIDUALLY AND IN THEIR REPRESENTATIVE CAPACITIES FOR ALL THOSE SIMILARLY SITUATED, MARIDOM LIMITED, A FOREIGN CORPORATION, RICARDO LOPEZ, STANDARD CHARTERED BANK INTERNATIONAL (AMERICAS) LIMITED, STANCHART SECURITIES INTERNATIONAL, INC., MARIA AKRIBY VALLADOLID, RICARDO RODRIGUEZ CASO, WONG YUK HING DE LOU, JOAQUINA TERESA BARBACHANO HERRERO, SAND OVERSEAS LIMITEDSAND OVERSEAS LIMITED, BLOCKBEND LTD, BAYMALL INVESTMENTS LTD, EASTFORK ASSETS LTD, GERICO INVESTMENTS, INC., ALICIA GAVIRIA RIVERA, EDUARDO CHILD ESCOBAR, MAILAND INEVSTMENT INC., AXA PRIVATE MANAGEMENT, PASHA S. ANWAR, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED INVESTORS IN THE GREENWICH SENTRY, L.P. PRIVATE INVESTMENT LIMITED PARTNERSHIP, BEVINGTON MANAGEMENT, LTD., CALWELL INVESTMENT S.A., HEDGE STRATEGY FUND LLC, DEEPA

GUPTA, E. THOMAS DOUGHERTY NOVELLA, MUNIANDY NALAIAH, MOISES LOU MARTINEZ,

*Plaintiffs,*

and

ST. STEPHEN'S SCHOOL, PACIFIC WEST HEALTH MEDICAL CENTER INC. EMPLOYEES RETIREMENT TRUST, ON BEHALF OF ITSELF, PACIFIC WEST HEALTH MEDICAL CENTER INC. EMPLOYEES RETIREMENT TRUST, ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, SECURITIES & INVESTMENT COMPANY BAHRAIN, HAREL INSURANCE COMPANY, LTD., ST. STEPHEN'S SCHOOL, PACIFIC WEST HEALTH MEDICAL CENTER, INC. EMPLOYEE'S RETIREMENT TRUST,

*Plaintiffs - Appellees,*

v.

YANKO DELLAW SCHIAVA, PHILIP TOUB, LOURDES BARRENECHE, CORNELIS BOELE, MATTHEW C. BROWN, VIANNEY D'HENDECOURT, HAROLD GREISMAN, JACQUELINE HARARY, DAVID HORN, RICHARD LANDSBERGER, DAVID LIPTON, JULIA LUONGO, MARK MCKEEFRY, MARIA TERESA PULIDO MENDOZO, CHARLES MURPHY, SANTIAGO REYES, ANDREW SMITH, GREENWICH SENTRY, L.P., FAIRFIELD SENTRY LIMITED, PRICEWATERHOUSECOOPERS INTERNATIONAL LIMITED, PRICEWATERHOUSECOOPERS LLP (US), PRICEWATERHOUSECOOPERS LLP CHARTERED ACCOUNTANTS, FAIRFIELD INTERNATIONAL MANAGERS, INC., AMIT VIJAYVERGIYA, CORINA NOEL PIEDRAHITA, 1-20 JOHN DOES, STANDARD CHARTERED INTERNATIONAL (USA) LTD., STANDARD CHARTERED PLC, AMERICAN EXPRESS BANK LTD., AMERICAN EXPRESS BANK LTD., STANDARD CHARTERED BANK INTERNATIONAL (AMERICAS) LIMITED, A FOREIGN ENTITY, STANDARD CHARTERED PRIVATE BANK, FOREIGN ENTITY, AND A PRIVATE BANKING DIVISION OF STANDARD CHARTERED BANK, STANDARD CHARTERED BANK, GREGORY BOWES, STANDARD CHARTERED BANK INTERNATIONAL (AMERICAS) LIMITED, STANDARD CHARTERED BANK INTERNATIONAL (AMERICAS) LIMITED,

*Consolidated - Defendants,*

GLOBEOP FINANCIAL SERVICES LLC, FAIRFIELD GREENWICH LIMITED, A CAYMAN ISLAND COMPANY, FAIRFIELD GREENWICH GROUP, FAIRFIELD GREENWICH (BERMUDA) LTD., FAIRFIELD GREENWICH ADVISORS L.L.C., WALTER M. NOEL, JR., ANDRES PIEDRAHITA, JEFFREY TUCKER, BRIAN FRANCOUER, AMIT VIGAYVERGIA, PRICEWATERHOUSECOOPERS BERMUDA, IAN PILGRIM, FAIRFIELD HEATHCLIFF CAPITAL LLC, FAIRFIELD RISK SERVICES LTD., PRICEWATERHOUSECOOPERS ACCOUNTANTS NETHERLANDS N.V., LION FAIRFIELD CAPITAL MANAGEMENT LIMITED, CARLOS GADALA-MARIA, RAUL MAS, ROBERT FRIEDMAN, RODOLFO PAGES, JOHN G. DUTKOWSKI, LUISA SERENA, MIGUEL CALVO, SAMUEL PERRUCHOUD, EFG CAPITAL INTERNATIONAL CORP.,

*Defendants,*

and

PRICEWATERHOUSECOOPERS ACCOUNTANTS N.V., CITCO FUND SERVICES (EUROPE) B.V., CITCO BANK NEDERLAND N.V. DUBLIN BRANCH, CITCO CANADA INC., CITCO GLOBAL CUSTODY N.V., CITCO GROUP LIMITED, CITCO FUND SERVICES (BERMUDA) LIMITED, PRICEWATERHOUSECOOPERS L.L.P.,

*Defendants - Appellants.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, I hereby certify that defendant-appellant PricewaterhouseCoopers, LLP, an Ontario Limited Liability Partnership, is not a publicly held company, has no parent company, and no publicly held company owns more than ten percent of its stock.

*/s/ Christopher Landau*

Christopher Landau, P.C.
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC  20005
(202) 879-5000

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, I hereby certify that defendant-appellant PricewaterhouseCoopers Accountants N.V. has no public parent company, and that no publicly held company owns more than ten percent of its stock.

/s/ *William R. Maguire*

William R. Maguire
Sarah L. Cave
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY   10004
(212) 837-6000
*maguire@hugheshubbard.com*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................... 1

STATEMENT OF JURISDICTION ............................................. 3

STATEMENT OF THE ISSUES ................................................. 4

STATEMENT OF THE CASE AND THE FACTS ..................... 4

SUMMARY OF ARGUMENT .................................................... 8

STANDARD OF REVIEW ........................................................ 9

ARGUMENT ............................................................................ 10

I.    The District Court Erred By Certifying A Class To Pursue Common-Law Negligence Claims Against The PwC Defendants Without Analyzing Whether Those Claims Satisfy The Requirements Of Rule 23. .......................................... 10

II.   Plaintiffs' Common-Law Negligence Claims Against The PwC Defendants Do Not Satisfy The Requirements Of Rule 23. .................................................................................... 17

      A.   Plaintiffs Failed To Establish That They Could Prove Duty On A Classwide Basis With Classwide Proof. ............. 19

      B.   Plaintiffs Failed To Establish That They Could Prove Reliance On A Classwide Basis With Classwide Proof. ....... 21

CONCLUSION ....................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abrams v. Interco Inc.,*
  719 F.2d 23 (2d Cir. 1983) ................................................................. 10

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.,*
  269 F.R.D. 252 (S.D.N.Y. 2010) ............................................. 23, 24, 26

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997) ........................................................................... 11

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,*
  133 S. Ct. 1184 (2013) ................................................................. 12, 22

*Blyden v. Mancusi,*
  186 F.3d 252 (2d Cir. 1999) ............................................................... 10

*Bolin v. Sears, Roebuck & Co.,*
  231 F.3d 970 (5th Cir. 2000) ............................................................. 12

*Bresson v. Thomson McKinnon Sec. Inc.,*
  118 F.R.D. 339 (S.D.N.Y. 1988) ........................................................ 25

*Broussard v. Meineke Disc. Muffler Shops, Inc.,*
  155 F.3d 331 (4th Cir. 1998) ............................................................. 25

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ........................................................................... 11

*Comcast Corp. v. Behrend,*
  133 S. Ct. 1426 (2013) ....................................................................... 11

*Credit Alliance Corp. v. Arthur Andersen & Co.,*
  65 N.Y.2d 536 (1985) ..................................................... 18, 19, 20, 21

*CRT Invs., Ltd. v. BDO Seidman, LLP,*
  925 N.Y.S.2d 439 (App. Div. 2011) ................................................... 21

*DaPuzzo v. Reznick Fedder & Silverman,*
788 N.Y.S.2d 69 (App. Div. 2005) ......................................................... 21

*Esplin v. Hirschi,*
402 F.2d 94 (10th Cir. 1968) ................................................................. 16

*General Tel. Co. of S.W. v. Falcon,*
457 U.S. 147 (1982) ............................................................................. 11

*Green v. Wolf Corp.,*
406 F.2d 291 (2d Cir. 1968) .......................................................... 16, 17

*Hansberry v. Lee,*
311 U.S. 32 (1940) ............................................................................... 11

*In re Hydrogen Peroxide Antitrust Litig.,*
552 F.3d 305 (3d Cir. 2009) ................................................................. 15

*In re IPO Secs. Litig.,*
471 F.3d 24 (2d Cir. 2006) ........................................... 10, 11, 15, 22, 24

*International Fund Mgmt. S.A. v. Citigroup Inc.,*
822 F. Supp. 2d 368 (S.D.N.Y. 2011) .................................................... 22

*Kern v. Siemens Corp.,*
393 F.3d 120 (2d Cir. 2004) ................................................................. 11

*Levitt v. J.P. Morgan Secs., Inc.,*
710 F.3d 454 (2d Cir. 2013) ................................................................. 24

*Lewis v. Casey,*
518 U.S. 343 (1996) ............................................................................. 13

*McLaughlin v. Am. Tobacco Co.,*
522 F.3d 215 (2d Cir. 2008) ................................................................. 25

*Meridian Horizon Fund, LP v. KPMG (Cayman),*
487 F. App'x 636 (2d Cir. 2012) ........................................................... 20

*Myers v. Hertz Corp.,*
624 F.3d 537 (2d Cir. 2010) ................................................................. 10

*Parker v. Time Warner Entmt. Co.*,
  331 F.3d 13 (2d Cir. 2003) .................................................................. 9

*Parrott v. Coopers & Lybrand, L.L.P.*,
  702 N.Y.S.2d 40 (App. Div.),
  *aff'd*, 95 N.Y.2d 479 (2000) ............................................................ 17, 20

*Saltz v. First Frontier, LP*,
  782 F. Supp. 2d 61 (S.D.N.Y. 2010),
  *aff'd*, 485 F. App'x 461 (2d Cir. 2012) .................................................. 20

*Security Pac. Bus. Credit, Inc. v. Peat Marwick Main & Co.*,
  79 N.Y.2d 695 (1992) ........................................................................ 21

*SIPC v. BDO Seidman, LLP*,
  222 F.3d 63 (2d Cir. 2000) ..................................... 18, 19, 20, 21, 22, 26

*Stephenson v. PricewaterhouseCoopers LLP*,
  482 F. App'x 618 (2d Cir. 2012) ......................................................... 20

*Sykes v. RFD Third Ave. 1 Assocs., LLC*,
  15 N.Y.3d 370 (2010) ........................................................................ 20

*UFCW Local 1776 v. Eli Lilly & Co.*,
  620 F.3d 121 (2d Cir. 2010) ............................................................... 13

*Ultramares Corp. v. Touche*,
  255 N.Y. 170 (1931) .......................................................................... 19

*Vega v. T-Mobile USA, Inc.*,
  564 F.3d 1256 (11th Cir. 2009) ........................................................... 13

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ............................................................ 11, 22, 24

*William Iselin & Co. v. Landau*,
  71 N.Y.2d 420 (1988) ................................................................... 18, 22

## Statutes and Rules

28 U.S.C. § 1331........................................................................... 3

28 U.S.C. § 1332(d)(2)(B)...............................................................3

Fed. R. Civ. P. 23 ................................... 1, 2, 4, 8, 10, 11, 12, 15, 16, 17

Fed. R. Civ. P. 23(b)(3) ..................................................... 11, 12, 13, 22

Fed. R. Civ. P. 23(c)(1)(C) ........................................................ 15

Fed. R. Civ. P. 23(f)................................................................3, 8

## INTRODUCTION

This case turns on the simple and settled principle that a district court may not certify a class without undertaking a rigorous analysis of the requirements of Rule 23 of the Federal Rules of Civil Procedure. Those requirements are not mere technicalities; rather, they safeguard the due process rights of both defendants and absent class members by ensuring that the named plaintiffs are entitled to exercise the extraordinary power to adjudicate—for good or for ill—the claims of third parties not before the court.

The district court in this multi-claim, multi-party litigation certified a class seeking to impose *billions* of dollars in liability upon defendants PricewaterhouseCoopers, LLP and PricewaterhouseCoopers Accountants N.V. (collectively the PwC defendants) without analyzing whether the claims against those defendants satisfy the requirements of Rule 23. Rather, the court focused exclusively on *other* claims against *other* defendants. The court thereby erred. The rigorous analysis mandated by Rule 23 requires a court to determine that the elements of *each* claim sought to be litigated on a classwide basis can be proven on a classwide basis with classwide proof. Thus, a court cannot simply

determine that certain claims against certain defendants are amenable to classwide adjudication, and then certify a class to pursue other claims against other defendants.

Had the district court analyzed the elements of the sole claims remaining against the PwC defendants in this case—two common-law negligence claims under New York law—it would have been constrained to deny class certification with respect to those claims. The general rule under New York law is that investors (like the putative class here) cannot pursue negligence claims against auditors (like the PwC defendants) with whom they had no contractual relationship. While that rule is not absolute, the exceptions are inherently individualized, and cannot be established on a classwide basis with classwide proof. Plaintiffs' common-law negligence claims against the PwC defendants thus cannot satisfy the requirements of Rule 23.

Accordingly, this Court should vacate the class certification order and remand with directions for the district court to deny the motion for certification with respect to the claims against the PwC defendants.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction over this case under the federal-question statute, 28 U.S.C. § 1331, because the complaint asserted claims arising under federal law. *See* Joint Appendix ("A") 121. In addition, the district court had subject-matter jurisdiction over this case under the Class Action Fairness Act of 2005, codified in relevant part at 28 U.S.C. § 1332(d)(2)(B), because this is a class action brought on behalf of more than 100 individuals, at least one plaintiff is a citizen of a foreign state, at least one defendant is a citizen of New York, and the amount in controversy exceeds $5 million. *See id.*

On February 25, 2013, the district court entered an order certifying a class to pursue several different claims against several different defendants. *See* Special Appendix ("SAP," attached hereto) 1-40. On March 11, 2013, the PwC defendants timely petitioned this Court under Rule 23(f) for leave to appeal that certification order. *See* 2d Cir. No. 13-896. On June 14, 2013, this Court granted that petition and docketed this appeal. *See* 2d Cir. No. 13-2340 (Dkt. 1-1); A-14320.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred by certifying a class to pursue common-law negligence claims against the PwC defendants without analyzing whether those claims satisfy the requirements of Rule 23.

2.    Whether plaintiffs' common-law negligence claims against the PwC defendants satisfy the requirements of Rule 23.

## STATEMENT OF THE CASE AND THE FACTS

The named plaintiffs here purport to represent a class of investors in certain funds issued by the Fairfield Greenwich Group.  Those funds entrusted substantially all of their assets to Bernard L. Madoff Investment Securities, LLC.  As everyone now knows, Madoff was running the largest Ponzi scheme in history.  When Madoff confessed his fraud in December 2008 and his firm collapsed into bankruptcy, the Fairfield Greenwich funds lost the money they had entrusted to Madoff and plaintiffs lost the money they had entrusted to the Fairfield Greenwich funds.

Plaintiffs thereafter brought this putative class action not only against the Fairfield Greenwich funds and their directors and officers (collectively the Fairfield Greenwich defendants), but also against third

4

parties hired by those funds at various points in time to perform administrative services (the Citco and GlobeOp defendants) and auditing services (the PwC defendants). *See* A-119-20, 138-61. Plaintiffs allege that the class they purport to represent lost over $5 billion as a result of Madoff's scheme. *See* A-3237.

In a ruling not on appeal here, the district court (Marrero, J.) dismissed all claims against the PwC defendants other than common-law negligence and negligent-misrepresentation claims under New York law. *See* A-3045-47, 3176-207, published at 728 F. Supp. 2d 372, 399-400, 449-61 (S.D.N.Y. 2010). Those claims allege that the Madoff scheme was so patently obvious that the PwC defendants—which had no relationship whatsoever with Madoff—acted negligently by failing to uncover that scheme in the course of auditing the financial statements of the Fairfield Greenwich funds, and that the audit reports misrepresented both the funds' financial condition and the PwC defendants' compliance with applicable auditing standards. *See* A-282-85. In other words, plaintiffs contend that the PwC defendants were negligent for having failed to uncover the fraud that the world's most sophisticated investors, auditors, and fund managers—not to mention

government regulators, including the U.S. Securities and Exchange
Commission—failed to discover for almost two decades until Madoff
himself confessed to the authorities.

Plaintiffs moved for class certification, and the district court
granted the motion.  *See* SAP1-40.  The certification order contains no
analysis whatsoever of plaintiffs' claims against the PwC defendants.
Indeed, the order mentions the PwC defendants only twice: once in
identifying the defendants in the action, *see id.* at SAP2 & n.3, and once
in generally describing all of the claims against all of the non-Fairfield
Greenwich defendants, *see id.* at SAP5.  The latter description provides
in its entirety as follows:

> [Plaintiffs] also bring[] claims against Citco, PwC, and
> GlobeOp related to the services that these entities allegedly
> provided to [the Fairfield Greenwich funds].  Specifically,
> Plaintiffs claim that the Funds' administrators, Citco and
> GlobeOp, and auditor, PwC, failed to conduct any due
> diligence and wholly failed to fulfill their duties, thereby
> assisting the Funds in their fraud and breaches of fiduciary
> duties, and ultimately allowing Madoff to abscond with
> Plaintiffs' money.

*Id.*

As noted above, however, the *only* claims that remained against
the PwC defendants at the time of the class certification order were

common-law negligence claims under New York law; all other claims against those defendants (including claims for violations of the federal securities laws, common-law fraud, and aiding-and-abetting a breach of fiduciary duty) had been dismissed over two years earlier. *See* A-3176-207, published at 728 F. Supp. 2d at 449-61. But the class certification order described plaintiffs' claims against "Defendants" generically, and characterized those claims in ways clearly inapplicable to the PwC defendants. *See, e.g.*, *id.* at SAP15 ("Plaintiffs' claims arise out of Defendants' alleged *fraudulent* conduct, which was directed at all investors.") (emphasis added); *id.* at SAP15-16 ("Plaintiffs have also alleged a series of false and misleading statements and omissions by Defendants, in violation of federal securities laws …."); *id.* at SAP16 ("The critical issues for establishing liability in this case include whether Defendants engaged in a fraudulent scheme and made the false and misleading statements and omissions, whether those statements and omissions were material, whether Defendants acted with scienter, and whether Defendants' conduct injured members of the Class.").

Thus, without any analysis of whether the common-law negligence claims against the PwC defendants satisfied the requirements of Rule 23, the district court certified a class of "all shareholders/limited partners in Fairfield Sentry Limited, Fairfield Sigma Limited, Greenwich Sentry, L.P. and Greenwich Sentry Partners, L.P. (the 'Funds') as of December 10, 2008 who suffered a net loss of principal invested in the Funds" to pursue such claims against those defendants. *Id.* at SAP3, 39-40.

The PwC defendants thereafter filed a timely petition under Rule 23(f) for leave to appeal the class certification order. This Court granted that petition, and this appeal follows.

## SUMMARY OF ARGUMENT

The district court erred by certifying a multi-national class of investors to pursue common-law negligence claims against the PwC defendants. That error is unsurprising, given that the court did not analyze whether those claims satisfy the requirements of Rule 23. Instead, the court based the class certification order on an analysis of *other* claims against *other* defendants. But plaintiffs cannot evade the requirements of Rule 23 by bringing multiple claims against multiple

8

parties in a single lawsuit.  A court must determine whether those requirements are satisfied with respect to *each* claim sought to be adjudicated on a classwide basis, and cannot lump defendants into a class action without any analysis of the specific claims asserted against them.

Had the district court undertaken the requisite rigorous analysis, it could not have certified a class to pursue common-law negligence claims against the PwC defendants.  The general rule under New York law is that investors cannot bring such claims against auditors with whom they had no contractual relationship.  While that rule is not absolute, plaintiffs cannot establish *on a classwide basis* that they fall within an exception to the rule.  Accordingly, this Court should vacate the class certification order and remand with directions for the district court to deny certification with respect to the claims against the PwC defendants.

## STANDARD OF REVIEW

"Generally, a district court's decision regarding class certification is reviewed for abuse of discretion."  *Parker v. Time Warner Entmt. Co.*, 331 F.3d 13, 18 (2d Cir. 2003).  However, "the failure to follow the

9

proper legal standards in certifying a class … is an abuse of discretion."
*Blyden v. Mancusi*, 186 F.3d 252, 269 (2d Cir. 1999) (internal quotation omitted); *see also In re IPO Secs. Litig.*, 471 F.3d 24, 31-32 (2d Cir. 2006).  Thus, "[i]t is not inconsistent with the discretion standard for an appellate court to decline to honor a purported exercise of discretion which was infected by an error of law." *Abrams v. Interco Inc.*, 719 F.2d 23, 28 (2d Cir. 1983).  "[A] court of appeals can no more tolerate divergence by a district judge from the principles it has developed on this subject than it would under a standard of full review … ." *Id.*  In this regard, "review of class action determinations for 'abuse of discretion' does not differ greatly from review for error."  *Id.*; *see also Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) ("[O]ur review of the legal standards applied by the district court and the court's other legal conclusions is de novo.").

## ARGUMENT

## I.    The District Court Erred By Certifying A Class To Pursue Common-Law Negligence Claims Against The PwC Defendants Without Analyzing Whether Those Claims Satisfy The Requirements Of Rule 23.

The district court erred, first and foremost, by certifying a class to pursue common-law negligence claims against the PwC defendants

without analyzing whether those claims satisfy the requirements of Rule 23. Class litigation represents "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (same). The limits to that exception are set forth in Rule 23, which is carefully crafted to address the due process concerns that arise from giving one person the authority to bind another, for good or for ill, in litigation. *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Hansberry v. Lee*, 311 U.S. 32, 44-46 (1940). Thus, a trial court may certify a class only after conducting a "'rigorous analysis'" of the requirements of Rule 23, with the burden squarely on the "party seeking to maintain a class action." *Comcast*, 133 S. Ct. at 1432 (quoting *General Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 161 (1982)); *see also Wal-Mart*, 131 S. Ct. at 2551; *Amchem*, 521 U.S. at 615; *IPO*, 471 F.3d at 29, 40; *Kern v. Siemens Corp.*, 393 F.3d 120, 128 (2d Cir. 2004).

At least where, as here, plaintiffs seek certification of a class to pursue money damages under Rule 23(b)(3), that "rigorous analysis"

requires a district court to determine whether each claim sought to be litigated on behalf of a class can be proven on a classwide basis with classwide proof. If one or more of the elements of a particular claim requires individualized proof, then common issues cannot "predominate" over individual issues and a class action cannot be "superior" to individual adjudication. Fed. R. Civ. P. 23(b)(3); *see generally Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191-92 (2013).

It goes without saying, therefore, that a district court cannot certify a class to pursue *multiple* claims against *multiple* defendants without undertaking a "rigorous analysis" of *each* claim—the procedural device of consolidating claims in a single lawsuit is not a license to bypass the requirements of Rule 23. "[A] court should certify a class on a *claim-by-claim basis*, treating each claim individually and certifying the class with respect to *only* those claims for which certification is appropriate." *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 976 (5th Cir. 2000) (emphasis added); *see generally Amgen*, 133 S. Ct. at 1192 (analyzing elements of claim to determine whether amenable to class certification); *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131

12

(2d Cir. 2010) (same).   Class certification, like standing, "is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). Indeed, a court cannot possibly determine whether common issues "predominate" over individual issues, or whether a class action is "superior" to individual adjudication, Fed. R. Civ. P. 23(b)(3), without considering whether particular claims must be adjudicated individually, *see, e.g.*, *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1270 (11th Cir. 2009).

This case underscores the point.   As noted above, plaintiffs' only remaining claims against the PwC defendants are for common-law negligence and negligent misrepresentation under New York law. *See* A-3176-207, published at 728 F. Supp. 2d at 449-61.   Plaintiffs have a variety of other claims against other defendants, including both fraud and securities claims under state and federal law.   Whether these other claims are amenable to class certification has no bearing on whether the claims against the PwC defendants are amenable to class certification. Just because the PwC defendants have been sued in a multi-party, multi-claim lawsuit, in other words, does not mean that they can be lumped into a class action seeking to saddle them with billions of

13

dollars in liability without any analysis—much less the requisite "rigorous analysis"—of whether the claims against *them* are amenable to classwide adjudication.

Indeed, there is irony in the district court's certification order. The court sought to justify class certification by reference to the fraud and securities claims against *other* defendants, primarily the Fairfield Greenwich defendants. *See* SAP2, 4-5, 15. But the court had already given its preliminary approval to a settlement agreement between plaintiffs and those defendants, and stayed the claims against them. *See* A-12827-39. Shortly after entering the class certification order at issue here, the court entered supplemental orders specifying that, in light of the pending stay, the certification order *does not even apply* to plaintiffs' claims against the Fairfield Greenwich defendants. *See* A-13049-50; A-13051-52. And, after entering those orders, the district court granted final approval to the settlement agreement. *See* A-13055-69. So the PwC defendants now find themselves in the anomalous position of being forced to litigate against a plaintiff class justified primarily by reference to claims against parties as to whom the

certification order does not even apply and who have settled all claims asserted against them.

In no way is the class certification order justified by the district court's recitation of the truism that "[t]his Class is subject to further adjustment or decertification as warranted as facts develop." SAP4; *see generally* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants … class certification may be altered or amended before final judgment."). A court must conduct the "rigorous analysis" required by Rule 23 *before*, not *after*, certifying a class. Unless and until all of the Rule's requirements are satisfied for each claim, class certification with respect to that claim is unwarranted. *See, e.g.*, *IPO*, 471 F.3d at 40 ("It would seem to be beyond dispute that a district court may not grant class certification without making a determination that all of the Rule 23 requirements are met."). Rule 23 does not authorize a "certify first, ask questions later" approach. Indeed, the 2003 amendments to the Rule abolished "conditional" certification precisely to underscore that a court cannot certify a class that does not *presently* satisfy the Rule's requirements. *See, e.g.*, *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 319 (3d Cir. 2009) ("'A court that is not satisfied that the

requirements of Rule 23 have been met should refuse certification until they have been met.'") (quoting 2003 Advisory Committee note to Rule 23).

The district court sought to justify its sweeping certification order by declaring that "[t]he Second Circuit has directed courts to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to private parties and, in cases such as this that involve alleged manipulation of public markets, to maximize the benefits to the public provided by class actions." SAP7. In support of that assertion, the district court quoted a 1968 decision of this Court stating that "'"if there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require.'"'" *Id.* (quoting *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968) (in turn quoting *Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir. 1968)). But that statement simply cannot be squared with modern class-action law, including the requirement of a "rigorous analysis" of Rule 23 and the abolition of conditional certification. This case underscores that the time has come for this Court to disavow the language from *Green* on

16

which the district court relied.  Otherwise, that language remains an open invitation to error by directing district courts to place a heavy thumb on the pro-certification side of the scales.

## II.  Plaintiffs' Common-Law Negligence Claims Against The PwC Defendants Do Not Satisfy The Requirements Of Rule 23.

Had the district court below undertaken the "rigorous analysis" required by Rule 23, it could not properly have certified a class to pursue common-law negligence claims against the PwC defendants.  As noted above, the district court had previously held that such claims are uniformly governed by New York law, regardless of where the plaintiffs lived.  *See* A-3045-47, published at 728 F. Supp. 2d at 399-400. Accepting that choice-of-law ruling for present purposes, the general rule under New York law is that investors cannot pursue negligence claims against auditors with whom they have no contractual relationship.  Auditors, like other professionals, generally owe duties to their clients, not to "the public at large."  *Parrott v. Coopers & Lybrand, L.L.P.*, 702 N.Y.S.2d 40, 43 (App. Div.), *aff'd*, 95 N.Y.2d 479 (2000). While courts have carved out a narrow exception to this general rule, a plaintiff pursuing a negligence claim against an auditor with whom he

had no contractual relationship still carries "a heavy burden" under New York law. *SIPC v. BDO Seidman, LLP*, 222 F.3d 63, 73 (2d Cir. 2000); *see also William Iselin & Co. v. Landau*, 71 N.Y.2d 420, 425 (1988) ("In the absence of a contractual relationship between the accountant and the party claiming injury, the potential for accountant liability is carefully circumscribed.").

In particular, as the New York Court of Appeals has explained, a plaintiff must prove three elements to prevail on such a claim:

> (1) the accountants must have been aware that the[ir] financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

*Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 551 (1985). "This strict limitation on the class of potential plaintiffs represents a policy determination by the New York courts that accountants will not, merely by contracting with a particular client, expose themselves 'to a liability in an indeterminate amount for an indeterminate time to an indeterminate class.'" *BDO Seidman*, 222 F.3d at 74 (quoting *Ultramares Corp. v. Touche*, 255 N.Y. 170, 179

(1931) (Cardozo, C.J.)).    The *Credit Alliance* test is inherently individualized on multiple levels, and therefore not subject to classwide proof on a classwide basis.

### A.    Plaintiffs Failed To Establish That They Could Prove Duty On A Classwide Basis With Classwide Proof.

As noted above, the *Credit Alliance* test requires that a plaintiff show that he was "known" to the auditor, and establish some "linking conduct" between the auditor and himself showing that the auditor "intended" him to rely on its reports.  In essence, these elements require the plaintiff to establish "a relationship 'approaching that of privity'" with the auditor to give rise to a legal duty.  *BDO Seidman*, 222 F.3d at 73 (quoting *Credit Alliance*, 65 N.Y.2d at 550).  Such a relationship is virtually impossible to establish on a classwide basis, and this case is no exception.

Here, there is no allegation (or evidence) of direct communications between the PwC defendants and the named plaintiffs, much less the entire putative class, and certainly no basis on which to conclude that the PwC defendants "knew" each investor in the Fairfield Greenwich funds and intended for each such investor to rely on their audits.  As this Court has already held in affirming the dismissal, in a separate

19

action, of a member of the purported class in this case, those legal requirements are not satisfied by generalities; rather, "'[t]he words "known party" … in the *Credit Alliance* test mean what they say,' and where the complaint does not allege that the defendant knew 'the identity of the *specific* non-privity party who would be relying,' a negligence claim fails." *Stephenson v. PricewaterhouseCoopers LLP*, 482 F. App'x 618, 622 (2d Cir. 2012) (emphasis added; quoting *Sykes v. RFD Third Ave. 1 Assocs., LLC*, 15 N.Y.3d 370, 373-74 (2010)); *see also Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636, 642 (2d Cir. 2012); *BDO Seidman*, 222 F.3d at 75; *Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 83-84 (S.D.N.Y. 2010), *aff'd*, 485 F. App'x 461 (2d Cir. 2012).

In other words, plaintiffs cannot satisfy the *Credit Alliance* test by simply asserting that auditors should be deemed to "know" all investors in a particular company or fund, and to intend that all such investors rely on their audit reports. Rather, that test requires analysis of the contacts between the auditor and a specific plaintiff, focusing not only on "the number of contacts but also on the substantive nature of the contacts." *Parrott*, 702 N.Y.S.2d at 44. It is not enough for investors to

have access to audit reports; "a plaintiff generally must show some form of *direct* contact between the accountant and the plaintiff, such as a face-to-face conversation, the sharing of documents, or other 'substantive communication' between the parties." *BDO Seidman*, 222 F.3d at 75 (emphasis added); *see also CRT Invs., Ltd. v. BDO Seidman, LLP*, 925 N.Y.S.2d 439, 441 (App. Div. 2011) ("Where … direct contact between the accountant and the plaintiff is minimal or nonexistent, the plaintiff cannot recover for the accountant's alleged negligence."); *DaPuzzo v. Reznick Fedder & Silverman*, 788 N.Y.S.2d 69, 71 (App. Div. 2005) (rejecting negligence claim against non-privy auditor where "[t]here were no direct communications between … plaintiffs and defendant"). These cases would be inexplicable (and the *Credit Alliance* test would be meaningless) if *every* investor in a particular company or fund necessarily satisfied that test as a matter of law.

## B.    Plaintiffs Failed To Establish That They Could Prove Reliance On A Classwide Basis With Classwide Proof.

In addition, the *Credit Alliance* test requires a plaintiff to prove that he actually *relied* on the auditors' reports. *See, e.g., Security Pac. Bus. Credit, Inc. v. Peat Marwick Main & Co.*, 79 N.Y.2d 695, 705 (1992) (plaintiff may not "unilaterally create such an extraordinary obligation"

on an auditor "by merely interposing and announcing its reliance");
*William Iselin*, 71 N.Y.2d at 427 (rejecting conclusory assertion of
reliance on audit report). Thus, even in the extraordinary circumstance
where a plaintiff can establish that a non-privy auditor owed him a
duty, such an investor cannot sue the auditor for negligence under New
York law unless the plaintiff can also establish that he actually relied to
his detriment on the auditor's statements.

The reliance inquiry—like the duty inquiry—is inherently
individualized, and hence cannot be established on a classwide basis
with classwide proof. The key point here is that New York allows no
*presumption* of reliance in this context. *See BDO Seidman*, 222 F.3d at
73; *International Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d
368, 386-87 (S.D.N.Y. 2011). In the absence of such a presumption, as
the Supreme Court has recently reiterated, "[i]ndividualized reliance
issues would predominate," and "[t]he litigation … could not be certified
under Rule 23(b)(3)." *Amgen*, 133 S. Ct. at 1199; *see also Wal-Mart*, 131
S. Ct. at 2552 n.6 (individualized proof of reliance generally poses "an
insuperable barrier to class certification"); *IPO*, 471 F.3d at 43
("Without [a] presumption [of reliance], individual questions of reliance

would predominate over common questions."). "[W]hen individual reliance is an issue, class certification under those circumstances is the exception, rather than the rule." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 269 F.R.D. 252, 257 (S.D.N.Y. 2010).

Indeed, the evidence here only underscores the individualized nature of reliance. For instance, some class representatives testified that they did not receive any audited financial statements or other information from the PwC defendants before investing. *See* A-3780; A-3801; A-3840-44. Others testified that they did not rely on anything from the PwC defendants. *See* A-3780-81; A-3793, 3796; A-3806-13; A-3814-18. At least one class representative testified that he did not even think that the PwC defendants were the auditors of the Fairfield Greenwich funds. *Id.* at A-3780. And while some named plaintiffs claimed to have seen and relied upon the PwC defendants' audit reports, those same plaintiffs also admitted to having reviewed other documents that expressly told investors not to rely on any information therein. *See* A-3781.

Regardless of whether any particular class representatives or class members saw and relied on any information from the PwC

defendants, the evidence presented to the district court establishes that reliance will have to be litigated on an investor-by-investor basis.  Class certification is thus unwarranted here because "the question of reliance requires hearing from each investor as to what it did, what it relied on when deciding to invest …, and whether it relied substantially …, minimally …, or did not rely … at all" on information provided by the PwC defendants.  *Abu Dhabi*, 269 F.R.D. at 263.   Indeed, as the Supreme Court has repeatedly instructed, such individualized issues of reliance present an "insuperable barrier to class certification."  *Wal-Mart*, 131 S. Ct. at 2552 n.6; *see also Amgen*, 133 S. Ct. at 1199 (acknowledging that "[i]ndividual reliance issues would predominate" in the absence of a presumption of reliance); *Levitt v. J.P. Morgan Secs., Inc.*, 710 F.3d 454, 468 (2d Cir. 2013) (same); *IPO*, 471 F.3d at 43 (same).

Although the district court failed to analyze whether plaintiffs' negligence claims against the PwC defendants, including the reliance element, are amenable to classwide adjudication, the court did analyze the reliance element of plaintiffs' fraud and securities claims against other defendants.  *See* SAP12-14.  In particular, the court held that

24

plaintiffs can prove reliance on a classwide basis because "even assuming Defendants' claims that certain 'communications to class members may not have been uniform, they allegedly were uniformly misleading.  The variations are therefore immaterial and will not defeat class certification.'"  SAP13 (quoting *Bresson v. Thomson McKinnon Sec. Inc.*, 118 F.R.D. 339, 343 (S.D.N.Y. 1988)).  That holding is manifestly incorrect.

Even assuming that non-uniform communications could be deemed to be "uniformly misleading"—itself an exceedingly dubious proposition, *see*, *e.g.*, *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 341 (4th Cir. 1998)—the existence of a misleading statement *per se* does not prove *reliance* on that statement.  As this Court has explained, "proof of misrepresentation—even widespread and uniform misrepresentation—only satisfies half of the equation; the other half, reliance on the misrepresentation, cannot be the subject of general proof."  *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 223 (2d Cir. 2008).  Plaintiffs simply cannot prove individual reliance on a classwide basis; there are "material differences among investors with regard to their decision making processes, investment guidelines, due

25

diligence inquiries, and communications with those involved in selling the [notes at issue]." *Abu Dhabi*, 269 F.R.D. at 261.

At bottom, New York's "strict limitation on the class of potential plaintiffs" who can bring negligence claims against an auditor with whom they have no contractual relationship, *BDO Seidman*, 222 F.3d at 74, means that it is virtually impossible to pursue such claims on a classwide basis. Because plaintiffs have not remotely carried their burden of showing that they can prove such extraordinary claims on a classwide basis with classwide proof, the district court erred as a matter of law by certifying a class to pursue such claims against the PwC defendants.

## CONCLUSION

For the foregoing reasons, and those set forth in the brief filed concurrently by the Citco defendants (which the PwC defendants join and adopt by reference to the extent relevant), this Court should vacate the class certification order and remand with directions for the district court to deny certification with respect to the claims against the PwC defendants.

August 16, 2013

Respectfully submitted,

/s/ *Christopher Landau*

Timothy A. Duffy, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
(312) 862-2000
*tim.duffy@kirkland.com*

Christopher Landau, P.C.
Emily P. Hughes
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC  20005
(202) 879-5000
*clandau@kirkland.com*
emily.hughes@kirkland.com

*Counsel for Defendant-Appellant PricewaterhouseCoopers LLP*

/s/ *William R. Maguire*

William R. Maguire
Sarah L. Cave
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY  10004
(212) 837-6000
*maguire@hugheshubbard.com*

*Counsel for Defendant-Appellant PricewaterhouseCoopers
Accountants N.V.*

## CERTIFICATE OF TYPE-VOLUME COMPLIANCE

The undersigned certifies that the foregoing brief is proportionately spaced, has a typeface of 14 points or more, and contains 5,044 words, as authorized by Rule 32.

*/s/ Christopher Landau*

Christopher Landau, P.C.
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC   20005

*Counsel for Defendant-Appellant*
*PricewaterhouseCoopers LLP*

**CERTIFICATE OF DIGITAL-SUBMISSION COMPLIANCE**

The undersigned hereby certifies that:

(1) all required privacy redactions have been made and, with the exception of those redactions, every document submitted in Digital Form or scanned PDF format is an exact copy of the written document filed with the Clerk; and

(2) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program (McAfee Enterprise 8.5 Virus Scan, updated as of August 16, 2013) and, according to the program, are free of viruses.

*/s/ Christopher Landau*

Christopher Landau, P.C.
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC   20005

# CERTIFICATE OF SERVICE

Pursuant to this Court's Rule 25.1(h), I hereby certify that the foregoing brief was served electronically through the CM/ECF system upon the following counsel:

David A. Barrett, Esq.
Howard L. Vickery, II, Esq.
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY   10022
(212) 446-2300

Stuart H. Singer, Esq.
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Ft. Lauderdale, FL  33301
(954) 356-0011

James Abram Harrod, Esq.
Carl Lester Stine, Esq.
WOLF POPPER LLP
845 3rd Avenue
New York, NY 10022
(212) 451-9642

Brian Dale Graifman, Esq.
GUSRAE KAPLAN NUSBAUM, PLLC
120 Wall Street
11th Floor
New York, NY  10005
(212) 269-1400

*Counsel for Plaintiffs-Appellees*

Michael S. Kim, Esq.
Jonathan D. Cogan, Esq.
David Harrison McGill, Esq.
KOBRE & KIM LLP
800 3rd Avenue
New York, NY 10022
(212) 488-1200

*Counsel for Defendant GlobeOp Financial Services LLC*

Walter Rieman, Esq.
Leslie Gordon Fagan, Esq.
Andrew Gordon, Esq.
Brad S. Karp, Esq.
Gregory Laufer, Esq.
Patrick James Somers, Esq.
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

*Counsel for Defendants-Appellants Citco Fund Services (Europe) B.V., Citco Bank Nederland N.V. Dublin Branch, Citco Canada Inc., Citco Global Custody N.V., Citco Group Limited, Citco Fund Services (Bermuda) Limited*

*/s/ Christopher Landau*

Christopher Landau, P.C.
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005

# SPECIAL APPENDIX

CONTENTS

| S.D.N.Y. Dkt. No. | Document Description | SAP No. |
|---|---|---|
| 1052 | February 25, 2013 Decision and Order | 1 |
| | Federal Rule of Civil Procedure 23 (Annotated) | 41 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------X

PASHA S. ANWAR, et al.,                 :
                                        :     09 Civ. 0118 (VM)
           Plaintiffs,                  :
                                        :
                                        :
                                        :
     -against-                          :
                                        :
FAIRFIELD GREENWICH LIMITED,            :
et al.,                                 :
                                        :
                                        :     **DECISION AND ORDER**
           Defendants.                  :
------------------------------ X

**VICTOR MARRERO, United States District Judge.**

        Lead plaintiffs AXA Private Management, Pacific West

Health Medical Center Employees Retirement Trust, Harel

Insurance Company Ltd., Martin and Shirley Bach Family

Trust, Natalia Hatgis, Securities & Investment Company

Bahrain, Dawson Bypass Trust, and St. Stephen's School

(collectively, "Plaintiffs"), brought this class action on

behalf of individuals and entities who invested large sums

of money in four investment funds (the "Funds") created and

operated by the Fairfield Greenwich Group ("FGG"). The

overwhelming majority of Plaintiffs' money was in turn

invested by FGG in the Ponzi scheme operated by Bernard

Madoff ("Madoff") under the auspices of Bernard L. Madoff

Investment Securities, Inc. ("BLMIS"), and for which Madoff

was sentenced to 150 years in prison following his guilty

-1-

**SAP1**

plea.   See United States v. Madoff, No. 09 Cr. 0213 (S.D.N.Y. June 29, 2009).

Plaintiffs are suing a number of FGG entities, executives, and other professional service providers who audited, administered, or served as custodians of the Funds.   In the Second Consolidated Amended Complaint (the "SCAC"), filed September 29, 2009, Plaintiffs allege violations of federal securities law and common law tort, breach of contract and quasi-contract causes of action against FGG and associated entities and individuals (the "Fairfield Defendants"),[1] several Citco entities (collectively, "Citco"),[2] two PricewaterhouseCoopers entities (collectively, "PwC"),[3] and GlobeOp Financial Services, LLC ("GlobeOp") (collectively, "Defendants"). Plaintiffs allegations are detailed more fully in this Court's prior opinions in this action, Anwar v. Fairfield

---

[1]  In addition to FGG, these entities and individuals include Fairfield Greenwich Advisors LCC ("FGA"), Fairfield Greenwich Ltd. ("FGL"), and three wholly-owned FGL subsidiaries: Fairfield Greenwich (Bermuda) Ltd. ("FGBL"), Fairfield Risk Services Ltd. ("FRS"), Fairfield Heathcliff Capital LCC ("FHC"), Walter M. Noel Jr. ("Noel"), Jeffrey H. Tucker ("Tucker"), Andres Piedrahita ("Piedrahita"), Amit Vijayvergiya ("Vijayvergiya"), Daniel E. Lipton ("Lipton"), and Mark McKeefry ("McKeefry").

[2]  Citco is defined to include defendants Citco Group Ltd. ("Citco Group"), Citco Fund Services (Europe) B.V. ("CFSE"), Citco (Canada) Inc. ("CCI"), Citco Global Custody N.V. ("Citco Global"), Citco Bank Nederland N.V. Dublin Branch ("Citco Bank,"), and Citco Fund Services (Bermuda) Ltd. ("CFSB").

[3]  Plaintiffs' surviving claims are against PricewaterhouseCoopers LLC ("PwC Canada"), and PricewaterhouseCoopers Accountants Netherlands N.V. ("PwC Netherlands").

SAP2

Greenwich Ltd., 728 F. Supp. 2d 354 (S.D.N.Y. 2010) ("Anwar I") and Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372 (S.D.N.Y. 2010) ("Anwar II").

Plaintiffs now move, pursuant to Rule 23 of the Federal Rule of Civil Procedure 23 ("Rule 23"), to certify a class (the "Class" or "Proposed Class") comprised of:

> all shareholders/limited partners in Fairfield Sentry Limited, Fairfield Sigma Limited, Greenwich Sentry, L.P. and Greenwich Sentry Partners, L.P. (the "Funds") as of December 10, 2008 who suffered a net loss of principal invested in the Funds.

(Pls.' Mem. of Law in Supp. of Mot. for Class Cert. ("Pls.' Mem.") at 1.)[4] For the reasons discussed below, Plaintiffs' proposed class definition is modified to exclude members of the Proposed Class whose investments in the Funds were made in the following countries: Switzerland, France, Luxembourg, Israel, Kuwait, Korea, North Korea, Picairn, Tokelau, Mongolia, China, Liechtenstein, Japan, Oman, Taiwan, United Arab Emirates, Qatar, Saudi Arabia, Bosnia, Andorra, San Marino, Namibia, Monaco, Germany, and South Africa (collectively, the "Excluded Countries"). The Court finds that the Proposed Class, modified as indicated, satisfies all of the requirements of Rule 23(a) and the

---

[4] Excluded from the Class definition are the Defendants, and any entity in which the Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, immediate family members, heirs, successors, subsidiaries, and/or assigns of any such individual or entity.

**SAP3**

pertinent requirements of Rule 23(b). This Class is subject to further adjustment or decertification as warranted as facts develop.

## I. BACKGROUND[5]

The SCAC alleges a common course of wrongful conduct by the Fairfield Defendants characterized by a continuous series of false representations and material omissions that began from the founding of the Funds in 1990 to Madoff's confession of wrongdoing in December 2008. Specifically, Plaintiffs claim that uniform marketing materials and the periodic updates about the Funds' performance falsely represented (1) that the Plaintiffs' investments were actually invested by Madoff in the so-called "split-strike conversion" strategy; (2) that Madoff's strategy resulted in substantial, consistent returns; and (3) that FGG had performed extensive due diligence, continually monitored Madoff's operations and, as a result, had full access to all of Madoff's operations. (SCAC ¶ 182.) The SCAC contains myriad examples of these misrepresentations or omissions, including the alleged investment via a "split-strike conversion," an investment which never actually occurred, (id. ¶ 184), information showing "substantial,

---

[5]   A more detailed description of the facts of this case is provided in Anwar I and Anwar II. Unless otherwise indicated, all facts in the Background section are taken from these opinions, and the documents on which they relied.

-4-

consistent annualized rates of return for the Funds," (id. ¶ 187), and that FGG was simply recycling information that Madoff had provided and did nothing to independently verify whether investments occurred or whether the returns Madoff reported were accurate, (id. ¶ 189; see also id. ¶¶ 184-216, 229, 231, 233.) Plaintiffs further allege that FGG made these misstatements or omissions despite numerous "red flags" that should have put FGG on notice that Madoff was not being honest.

The SCAC also brings claims against Citco, PwC, and GlobeOp related to the services that these entities allegedly provided to FGG. Specifically, Plaintiffs claim that the Funds' administrators, Citco and GlopeOp, and auditor, PwC, failed to conduct any due diligence and wholly failed to fulfill their duties, thereby assisting the Funds in their fraud and breaches of fiduciary duties, and ultimately allowing Madoff to abscond with Plaintiffs' money.

Defendants moved to dismiss the SCAC and in two orders, as detailed in Anwar I and Anwar II, the Court denied in part and granted in part Defendants' motions to dismiss, familiarity with which is assumed.

## II. DISCUSSION

SAP5

A. <u>STANDARD OF REVIEW</u>

To certify the Proposed Class, Plaintiffs must satisfy all four of the requirements of Rule 23(a) and the relevant portions of Rule 23(b)(3).   See <u>In re Livent Noteholders Sec. Litig.</u>, 210 F.R.D. 512, 514 (S.D.N.Y. 2002) ("<u>Livent</u>").

To meet Rule 23(a)'s prerequisites, Plaintiffs must demonstrate that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Rule 23(b)(3) further requires that Plaintiffs demonstrate that common questions of law or fact "predominate over any questions affecting individual members" and that maintaining a class action "is superior to other available methods" of adjudication.  Fed. R. Civ. P. 23(b)(3).

Trial courts are given substantial discretion in determining whether to grant class certification because "'the district court is often in the best position to assess the propriety of the class and has the ability . . . to alter or modify the class, create subclasses, and decertify the class whenever warranted.'"  <u>In re Nigeria</u>

-6-

**SAP6**

Charter Flights Contract Litig., 233 F.R.D. 297, 301
(E.D.N.Y. 2006) (quoting In re Sumitomo Copper Litig., 262
F.3d 134, 139 (2d Cir. 2001) ("Sumitomo III") (alteration
in original)).   The Second Circuit has directed courts to
adopt a liberal interpretation of Rule 23 in order to
maximize the benefits to private parties and, in cases such
as this that involve alleged manipulation of public
markets, to maximize the benefits to the public provided by
class actions.   See In re Sumitomo Copper Litig., 182
F.R.D. 85, 88-89 (S.D.N.Y. 1998) ("Sumitomo I"); see also
In re Sumitomo Copper Litig., 194 F.R.D. 480, 481 (S.D.N.Y.
2000) ("Sumitomo II").   As the Second Circuit stated in
Green v. Wolf Corp., "'if there is to be an error made, let
it be in favor and not against the maintenance of the class
action, for it is always subject to modification should
later developments during the course of the trial so
require.'"   406 F.2d 291, 298 (2d Cir. 1968) (quoting
Esplin v. Hirshi, 402 F.2d 94, 99 (10th Cir. 1968)).

B.   RULE 23(a) REQUIREMENTS

    1. Numerosity

    To meet the requirements of Rule 23(a)(1), "the class
must be so large that joinder of all members would be
impracticable" (the "Numerosity Requirement").   Sumitomo
II, 194 F.R.D at 482 (citing In re Drexel Burnham Lambert

-7-

**SAP7**

Grp., Inc., 960 F.2d 285, 290 (2d Cir. 1992)). Although
precise calculation of the number of potential class
members is not required, the Second Circuit has observed
that "numerosity is presumed at a level of 40 members." In
re Vivendi Universal, S.A. Sec. Litig., 242 F.R.D. 76, 83
(S.D.N.Y. 2007) (citing Consol. Rail Corp. v. Town of Hyde
Park, 47 F.3d 473, 483 (2d Cir.1995), cert. denied, 515
U.S. 1122 (1995)) (quotation marks omitted) ("Vivendi").

    During the Proposed Class Period, approximately 1,000
members of the Proposed Class maintained accounts with the
Defendants and therefore Plaintiffs clearly meet the
Numerosity Requirement. (See Pls.' Mem. 3.)

    2.    Commonality of Law or Fact Questions

    Rule 23(a)(2) requires plaintiffs to demonstrate that
common issues of law or fact affect all class members (the
"Commonality Requirement"), which has been characterized as
a "low hurdle." See Sumitomo II, 194 F.R.D at 482 (citing
In re Prudential Sec. Litig., 163 F.R.D. 200, 206 n.8
(S.D.N.Y. 1995)).

    It is evident that common questions of law and fact
exist in this proceeding. Where plaintiffs allege that
class members have been injured by similar material
misrepresentations and omissions, the Commonality
Requirement is satisfied. See, e.g., Vivendi, 242 F.R.D.

-8-

**SAP8**

at 84.  The claims of the Proposed Class clearly arise from a common course of conduct by Defendants and Plaintiffs specifically allege that certain actions and statements by the Defendants led to the concealment of Madoff's Ponzi scheme and were misleading with respect to material facts. Furthermore, there are numerous issues of law and fact that are common to the Proposed Class, including whether: (1) Defendants were complicit in Madoff's Ponzi scheme; (2) Defendants omitted or misrepresented material facts; (3) Defendants knew or recklessly disregarded that these statements were false or misleading; (4) Defendants breached duties owed to the Plaintiffs; and (5) Plaintiffs suffered damages and the extent and appropriate measure of damages.

Accordingly, because Plaintiffs allege a common course of fraudulent conduct, the Commonality Requirement is satisfied.

### 3.  <u>Typicality</u>

Rule 23(a)(3) requires that Plaintiffs' claims be typical of the class (the "Typicality Requirement").  "Rule 23(a)(3) is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's

**SAP9**

liability." <u>Sumitomo I</u>, 182 F.R.D. at 94 (internal quotation marks and citation omitted).

Here, Plaintiffs allege that they will use common evidence to prove that Defendants "misrepresented the nature and extent of their due diligence and compliance with industry standards, which, if performed as represented, would have prevented the loss of billions of dollars" to the Class. (Pls.' Mem. 6.) Furthermore, Plaintiffs argue that individual members of the Class will not be subject to unique defenses because investments in the Funds were made only through private placement transactions, and nearly all the information related to the investments came from the Defendants.

Accordingly, Plaintiffs have sufficiently demonstrated that the potential class members' claims satisfy the Typicality Requirement of Rule 23(a)(3).

    4.   <u>Adequacy</u>

Rule 23(a)(4) requires that the representative of the parties will "fairly and adequately protect the interests of the class" (the "Adequacy Requirement"). Fed. R. Civ. P. 23(a)(4). To meet this requirement, the lead plaintiffs' counsel must be "qualified, experienced, and generally able to conduct the proposed litigation," and the class representatives must not have interests conflicting

-10-

with the class.    <u>Livent</u>, 210 F.R.D. at 517 (internal citations and quotation marks omitted).    The Court finds that both requirements are satisfied in the instant matter.

Plaintiffs' attorneys have vigorously pursued these claims to date and have adequately represented classes in other securities litigation and other complex class actions.    Therefore, counsel for the Plaintiffs are qualified for the purposes of Rule 23(a)(4).

Additionally, no conflicts of interest between the Plaintiffs and members of the Class have been raised by any of the parties here.

Accordingly, the Court finds that Plaintiffs have satisfied the Adequacy Requirement of Rule 23(a)(4).

D.    <u>RULE 23(b)(3) REQUIREMENTS</u>

In addition to satisfying Rule 23(a), Plaintiffs must also establish that this action is maintainable as a class action under Rule 23(b).    Plaintiffs seek to certify the Proposed Class pursuant to Rule 23(b)(3), which provides that an action is maintainable as a class action if "questions of law or fact common to class members predominate over any questions affecting only individual members" (the "Predominance Requirement"), and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (the

-11-

**SAP11**

"Superiority Requirement"). Fed. R. Civ. P. 23(b)(3). "A class certified under Rule 23(b)(3) is sometimes referred to as an 'opt-out' class because Rule 23(c)(2) mandates that members of a class certified pursuant to Rule 23(b)(3) be afforded the opportunity to 'request exclusion' from that class." Vivendi, 242 F.R.D. at 90. Should the Court certify the Proposed Class, any investor — foreign or domestic — who does not opt out of the class "is bound by the final disposition of the case." Id.

    1.  Predominance Requirement

The Predominance Requirement is a more demanding standard than the Commonality Requirement and is satisfied if the "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." Id. (citing Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002)). The Predominance Requirement is "readily met in certain cases alleging . . . securities fraud." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997).

Defendants argue that the Proposed Class should not be certified because individual issues of reliance foreclose a finding of predominance. Specifically, Defendants claim,

-12-

**SAP12**

among other things, that Plaintiffs allegedly relied on certain non-uniform materials — or, on the flip-side, did not uniformly rely on certain materials, uniform or otherwise.   Defendants further allege that Plaintiffs varied in their sophistication and access to information, and that, in any event, the Defendants never actually "made" these representations.   Plaintiffs counter that (1) reliance can be demonstrated based on common, circumstantial evidence and that, at the least, Plaintiffs relied on core misrepresentations and omissions by Defendants; (2) reliance can be shown because the fraud created a market that would never otherwise have existed; and (3) the presumption of reliance under Affiliated Ute applies to Defendants' material omissions.   The Court concludes that, even absent a "fraud created the market" theory or the Affiliated Ute presumption of reliance, common questions of law and fact clearly predominate over any individual issues.

As this Court noted under similar circumstances in another case, even assuming Defendants' claims that certain "communications to class members may not have been uniform, they allegedly were uniformly misleading.   The variations are therefore immaterial and will not defeat class certification."   Bresson v. Thomson McKinnon Sec. Inc., 118

-13-

**SAP13**

F.R.D. 339, 343 (S.D.N.Y. 1988). The use of third-party investment agents by the Plaintiffs also does not create individual issues of reliance that foreclose a finding of predominance because "misrepresentations made to an agent are deemed to [be] made to the principal." In re Beacon Assocs. Litig., 745 F. Supp. 2d 386, 408 (S.D.N.Y. 2010). This conclusion is only buttressed by the fact that there was little to no publically available information relating to Madoff investments, and therefore any information relating to the Funds, whether provided to Plaintiffs or Plaintiffs' agents, was likely obtained through the Defendants.

Furthermore, to the extent the Defendants' other arguments in opposition to class certification relate to the merits of the dispute and do not directly pertain to the predominance inquiry or other Rule 23 requirements – such as whether Defendants can be deemed to have "made" any of the statements in the relevant materials – "despite [the] parties' extensive briefing of the merits of the case, [the Court] circumscribe[s] [its] present inquiry to the essentials for class certification." Dornberger v. Metro. Life Ins. Co., 182 F.R.D. 72, 76 (S.D.N.Y. 1998) ("In considering the certification of a potential class, the district court is not, at this stage, to assess the

-14-

**SAP14**

merits or the substance of the claims at issue but, rather, is to limit its inquiry to the satisfaction of the requirements under [Rule 23].”); Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974) (“In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.” (internal quotation marks and citations omitted)).[6]  To the extent any of the merits-based arguments presented by Defendants necessitate the establishment of sub-classes or the severance of some Plaintiffs, Defendants are free to propose these remedies at the appropriate time.

The Court concludes that questions of law and fact common to the Proposed Class predominate over any questions affecting only individual members.  Plaintiffs' claims arise out of Defendants' alleged fraudulent conduct, which was directed at all investors.  Plaintiffs have also alleged a series of false and misleading statements and omissions by Defendants, in violation of federal securities

---

[6]  As the Supreme Court has recently emphasized, the "rigorous analysis" required under Rule 23 necessarily "entail[s] some overlap with the merits of the plaintiff's underlying claim." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011).  The Court has rigorously considered all of the Rule 23 requirements and the merits of the case, where appropriate, in reaching the conclusion that Plaintiffs Proposed Class satisfies Rule 23's stringent requirements.  Under similar circumstances, other courts in this district have reached the same conclusion. See, e.g., In re Beacon, 282 F.R.D. 315.

-15-

**SAP15**

laws, which Plaintiffs assert affected all investors. The critical issues for establishing liability in this case include whether Defendants engaged in a fraudulent scheme and made the false and misleading statements and omissions, whether those statements and omissions were material, whether Defendants acted with scienter, and whether Defendants' conduct injured members of the Class. Plaintiffs will likely rely on similar evidence when establishing each of the foregoing issues at trial, and thus, common issues predominate over individual issues. See, e.g., In re Beacon, 282 F.R.D. at 328-331 (applying Affiliated Ute presumption of reliance to certify class of investors in funds that invested assets with Madoff).

Accordingly, Plaintiffs have satisfied the Predominance Requirement.

2. Superiority Requirement

When certifying a proposed class in accordance with Rule 23(b)(3), courts must consider whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Superiority Requirement asks courts to balance, in terms of fairness and efficiency, the advantages of a class action against those of alternative available methods of adjudication. See Fed. R. Civ. P. 23

-16-

**SAP16**

Advisory Committee Notes, 1966 Amendment, 28 U.S.C.A. Rule 23, at 385 ("Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."). Rule 23(b)(3) identifies several factors to consider in determining whether a class action is in fact "superior to other available methods for for fairly and efficiently adjudicating the controversy":

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Courts may properly consider res judicata concerns when evaluating the Superiority Requirement with respect to a proposed class that includes foreign class members. See Vivendi, 242 F.R.D. at 95 (stating that "res judicata concerns have been appropriately grafted onto the superiority inquiry," but that the res judicata determination should not be "dispositive without either an evaluation of the likelihood of nonrecognition or a

-17-

**SAP17**

consideration of other factors which impact a determination of the superiority requirement"). Defendants assert that foreign investors[7] should be excluded from the Proposed Class and that a United States class action is not a superior method for adjudicating Plaintiffs' claims because a resulting judgment would not be given preclusive effect by the courts in the approximately seventy countries in which Plaintiffs reside (collectively, the "Foreign Courts").

    a.  <u>Standard</u>

As this Court has stated previously, the appropriate standard for evaluating the likelihood of the Foreign Courts' recognition of a judgment rendered by this Court is whether "the Foreign Courts would probably recognize as preclusive any judgment rendered by this Court (the "Probability Standard")." <u>In re Alstom SA Sec. Litig.</u>, 253 F.R.D. 266, 282 (S.D.N.Y. 2008). Under the Probability Standard,

> Plaintiffs carry the burden of demonstrating that "foreign court recognition is more likely than not," but if Plaintiffs are "unable to show that foreign court recognition is more likely than not, this factor weighs against a finding of superiority and, taken in consideration with other factors, may lead to the exclusion of foreign claimants from the class."

---

[7]  The Proposed Class included members from a large number of foreign countries which Plaintiffs have placed into eight groups. (<u>See</u> Decl. of Sashi Bach Boruchow, dated Mar. 2, 2011 ("Boruchow Decl.") Ex. 2.) The Court will therefore analyze them within these groups.

-18-

Id. (quoting Vivendi, 242 F.R.D. at 95). However, even under the Probability Standard, Courts should "'evaluate the risk of nonrecognition along a continuum,'" in determining whether, along with other factors, plaintiffs satisfy the Superiority Requirement. Vivendi, 242 F.R.D. at 95 (quoting In re Initial Pub. Offering Sec. Litig., 471 F.3d 24, 33 (2d Cir.2006)). "When determining foreign law, courts 'may consider any relevant material or source,' including determinations by other courts, and the fact that United States courts have generally certified proposed classes which included [certain foreign] lead plaintiffs and class members, is particularly persuasive." Alstom, 253 F.R.D. at 291 (quoting Fed. R. Civ. P. 44.1).

The Court is currently presented with extensive dueling expert reports from preeminent practitioners and scholars debating the likelihood of foreign recognition of a United States opt-out class action judgment. The most contentious issue debated by these esteemed scholars is whether recognition of the judgment would violate a foreign country's public policy. Undoubtedly, in certain jurisdictions that have affirmatively considered the efficiency and fairness concerns implicated by class action procedures, this discussion has substantive merit and will

-19-

**SAP19**

likely determine whether a foreign court will grant recognition to a judgment by this Court. However, in the vast majority of countries that have not yet squarely confronted the issue of class actions, much less explicitly addressed recognition of a United States class action judgment, the reams of esoteric legal analysis submitted by the parties, citing as legal authority Baron Blackburn[8] and his young-blooded contemporaries, ultimately amount to no more than high-priced arm-chair oracles, conjecture that provides little assistance to the Court, one way or another, in analyzing the likelihood of foreign recognition of this Court's judgment.

Therefore, the Court concludes that, where a plaintiff sufficiently demonstrates that the stated policy of a foreign country is to recognize and enforce foreign judgments, or that its law is generally inclined to favor that course of action, such a showing would create a rebuttable presumption that, absent an affirmative showing

---

[8]  Baron Blackburn was an eminent eighteenth century British judge and Lord of Appeal in Ordinary responsible for a number of influential contract law decisions. However, like most of the authorities cited by the parties, Baron Blackburn's opinion makes absolutely no mention of class action litigation, which is unsurprising considering the absence of class action litigation in the United Kingdom during the relevant time period.    While the concept of "group litigation" may have originated in medieval England, it had apparently "disappeared in England by the middle of the nineteenth century."    Robert G. Bone, Personal and Impersonal Litigative Forms, 70 B.U. L. Rev. 213, 223 (1990) (citing Stephen C. Yeazell, From Medieval Group Litigation to the Modern Class Action (1987)).    In most of the foreign legal authorities cited by the parties, reference to class action litigation has yet to appear.

to the contrary, recognition of a particular United States judgment, even in class action litigation, does not violate a foreign country's public policy. Such a presumption is especially warranted in situations where the relevant Foreign Courts do not routinely address the underlying substantive or procedural issues considered and embodied in the United States court judgment, and therefore have not had the occasion to explicitly embrace, or reject, a particular question of procedure or substance. Following certification of the Proposed Class, should the Defendants find clear and convincing evidence that enforcement of a class-action judgment rendered in this litigation would in fact violate the public policy of any of the countries of residence of the members of a certified class, thereby calling into question the likelihood of enforcement of this Court's judgment by the courts of that foreign country, the Defendants may introduce such evidence and move to sever those members from the class at that time.

    a.    Group 1: Netherlands and Curacao

    Under Dutch law, a foreign judgment will not be recognized unless the foreign court based its jurisdiction on an "internationally acknowledged ground," that satisfied domestic due process requirements, and comports with Dutch public policy. (Decl. of Prof. Hans Smit, dated Mar. 1,

-21-

2011 ¶ 28 ("Smit Decl.").)   The Curacao legal system is copied from the Netherlands and therefore any analysis of the likelihood of a Dutch court to recognize judgment applies equally to Curacao.  (Smit Decl. ¶¶ 71-72.)

In the instant matter, Plaintiffs have sufficiently demonstrated that a Dutch court would more likely than not recognize a judgment rendered by this Court.  The January 25, 2007 Amsterdam Court of Appeals decision In re Dexia Bank Nederland N.V., rekestnummer 1783/05 (Amsterdam Court of Appeals, Jan. 25, 2007) ("Dexia") regarding the Mass Damages Act (the "Damages Act") "demonstrates the Dutch authorities' willingness to adopt opt-out class mechanisms" and "the Dutch courts' likelihood for recognizing opt-out mechanisms as generally consistent with Dutch treaties and constitutional principles." Alstom, 253 F.R.D. at 289-90. After examining the expert declarations and considering the parties' arguments concerning Dutch law, the Court concludes that Plaintiffs have sufficiently demonstrated that Dutch courts – and therefore those of Curacao as well – would more likely than not recognize, enforce, and give preclusive effect to any judgment in this case rendered by this Court involving absent Dutch class members. Accordingly, the Court will certify a class which includes

-22-

**SAP22**

class members from both the Netherlands and Curacao with
claims against Defendants.

b.   Group 2: United Kingdom, Canada and Common Law
Jurisdictions

"There is no clear authority addressing the res
judicata effect of a [United States] class action judgment
in England," which is an issue of English common law.
Vivendi, 242 F.R.D. at 102; see also (Decl. of Prof.
Jonathan Harris, dated Feb. 26, 2011 ¶ 15) ("Harris
Decl.").)   Under English common law, British courts will
generally enforce a foreign judgment if the foreign court
that issued the judgment was "jurisdictionally competent."
(Harris Decl. ¶ 27.)   More specifically, British "courts
will regard the overseas court as jurisdictionally
competent either if the defendant had the requisite
territorial connection with the foreign state," which is
satisfied if a corporate defendant maintains a "fixed place
of business . . . at the [corporate defendant's] own
expense from which it has carried out its own business in
the overseas jurisdiction," or "if the defendant submitted
to proceedings in that state," which includes, but is not
limited to, "voluntarily pleading to the merits." (Id. ¶¶
27, 29-33.)

The English common law framework for adjudging the jurisdictional competence of foreign courts focuses on the circumstances of the defendant and not those of the plaintiff. (See id. ¶¶ 34-38.) If the foreign judgment meets the basic requirements for recognition and enforcement, the British court will likely consider two defenses — "that the foreign judgment is in breach of natural justice" or that "it is contrary to English public policy." (Id. ¶ 39.) Courts of other common law countries frequently look to the law of the United Kingdom for guidance on the recognition of foreign judgments, and the law of those countries is either substantially similar to, or even more favorable than, the law of the United Kingdom regarding the enforcement of foreign class action judgments. (See id. ¶¶ 177-199.)

To consider a particular action a breach of natural justice, the British courts again focus on the defendant, determining whether the defendant had the opportunity to adequately defend itself by having "been served with proper notice of the proceedings, been allowed properly to arrange his defence, and that the procedures of the foreign court must have been acceptable." (Id. ¶ 40.) British courts rarely refuse to recognize in personam foreign judgments as contrary to English public policy, and although there is no

-24-

**SAP24**

formal analytical framework for determining a violation of
English public policy, "'[t]he usual colourful examples are
an order to pay damages for breach of a contract to kidnap
or to sell narcotics, or those based on openly racist
laws.'" (Id. ¶¶ 43, 88 (quoting Adrian Briggs et al., Civil
Jurisdiction and Judgments 557 (5th ed. 2009)).)
Defendants have submitted no credible evidence that British
courts would consider a class-action judgment to be either
a breach of natural justice or contrary to British public
policy.

After examining the expert declarations and
considering the parties' arguments concerning English law
and other common law jurisdictions, the Court re-adopts the
rationale set forth in Alstom and concludes that Plaintiffs
have sufficiently demonstrated that the courts of the
United Kingdom, Canada, and other common law countries
would more likely than not recognize, enforce, and give
preclusive effect to any judgment rendered in this case by
this Court involving absent class members from these
jurisdictions. Furthermore, this Court has already
concluded that both the United Kingdom and Canada would
more likely than not recognize a United States class action
judgment and bar absent class members from bringing later
actions against the defendants. Alstom, 253 F.R.D. at 289;

-25-

_Vivendi_, 242 F.R.D. at 103.  Accordingly, the Court will certify a class which includes British, Canadian, and other common law country class members.

    c.   Group 3: Switzerland

    Under Swiss law, a foreign judgment will be recognized in Switzerland if (1) the foreign court has jurisdiction according to Swiss legal principles; (2) the decision is final; and (3) there is no ground to refuse recognition, such as a violation of public policy, under Art. 27 of the Swiss Private International Law Act ("SPILA").  (Decl. of Phillipp Kanzig, dated Mar. 1, 2011 ¶ 29 ("Kanzig Decl"); Decl. of Prof. Isabelle Romy, dated Sept. 13, 2011 ¶ 14 ("Romy Decl.").)  Plaintiffs' expert acknowledges that under the traditional Swiss legal doctrine's conception of a "party," "Absent Class Members would not . . . be bound by the U.S. class action judgment and could initiate duplicative litigation in Switzerland."  (Kanzig Decl. ¶ 22.)

    Therefore, the Court concludes that Plaintiffs have not sufficiently demonstrated that Swiss courts would more likely than not recognize, enforce, and give preclusive effect to any judgment in this case rendered by this Court involving absent Swiss class members.  Finding otherwise would expose Defendants to the possibility that they may

have to relitigate the same or similar issues before a
Swiss court. Accordingly, the Court will not certify a
class which includes absent Swiss class members.

     d.   Group 4: France and Luxembourg

     Before a French court will recognize and give
preclusive effect to a judgment rendered in a foreign
court, the French court will analyze the foreign judgment
under the framework primarily set forth in Munzer v.
Munzer, which was issued by France's highest court. See
Vivendi, 242 F.R.D. at 96; (Decl. of Alexis Mourre, dated
Feb. 8, 2011 ¶ 12 ("Mourre Decl.").)  The portion of the
Munzer framework which is currently valid law may be
summarized as follows: (1) the foreign court must have
jurisdiction pursuant to French rules on conflict of
jurisdictions (the "Jurisdictional Prong"); (2) the
judgment of the foreign court is not contrary to
international public policy (the "Public Policy Prong");
and (3) the action before the foreign court was not the
result of forum shopping (the "Forum Shopping Prong"). See
Vivendi, 242 F.R.D. at 96. According to Plaintiffs, courts
in Luxembourg "substantially follow the French approach"
for recognition and enforcement of foreign judgments.
(Mourre Decl. ¶¶ 18, 87.)

This Court previously held that French courts would likely not enforce a foreign judgment in opt-out class action because to do so would violate French constitutional principles and public policy. See Alstom, 253 F.R.D. at 286-87. Recent developments have only served to confirm this conclusion. For example in an amicus curiae brief in Morrison v. Nat'l Australia Bank Ltd., --- U.S. ---, 130 S.Ct. 2869 (2010), the Republic of France stated that "French courts would almost certainly refuse to enforce a court judgment in a U.S. 'opt-out' class action because it . . . violates French constitutional principles and public policy" and approvingly cited this Court's decision in Alstom. (See Mourre Decl. ¶¶ 16-17.)

Therefore, the Court concludes that Plaintiffs have not sufficiently demonstrated that French or Luxembourgish courts would more likely than not recognize, enforce, and give preclusive effect to any judgment in this case rendered by this Court involving absent class members residing in France or Luxembourg. Finding otherwise would expose Defendants to the possibility that they may have to relitigate the same or similar issues before courts in France or Luxembourg. Accordingly, the Court will not certify a class which includes absent class members from France or Luxembourg.

    e.   <u>Group 5: Spain</u>

The United States and Spain do not have a bilateral treaty regarding the recognition and enforcement of foreign judgments. (Decl. of Prof. Miguel Angel Fernandez-Ballesteros, dated Jan. 11, 2012 ¶ 31 ("Fernandez-Ballesteros Decl.").) Under the Spanish legal principle of reciprocity, Spanish courts will recognize a foreign judgment if that country recognizes similar Spanish judgments. (Fernandez-Ballesteros Decl. ¶ 32; Decl. of Prof. Fernando Gascón, dated Feb. 28, 2011 ¶ 19("Gascón Decl.").) Spanish law also recognizes foreign judgments where the following "system of conditions" criteria are met: (1) the judgment is final; (2) the foreign court had jurisdiction; (3) the foreign judgment was rendered pursuant to an action <u>in personam</u>; (4) the judgment was not rendered <u>in absentia</u> of the defendant and did not violate defendant's due process rights; (5) the decision is not contrary to the public policy of Spain; and (6) the decision is "authentic," meaning that it complies with all requirements of the foreign state, and is not in conflict with any prior Spanish judgment. (Fernandez-Ballesteros Decl. ¶ 35; Gascón Decl. ¶¶ 36-38.) The parties do not dispute that any judgment here would likely satisfy most of these criteria; however, they do offer different opinions

-29-

**SAP29**

as to whether recognizing an opt-out class action judgment
would violate Spanish public policy.

In certain situations, Spanish law provides for "group
actions" in which multiple plaintiffs can assert their
individual claims together in a single action. (Fernandez-
Ballesteros Decl. ¶¶ 47-49.)    Specifically, plaintiffs may
bring a group action if (1) plaintiffs maintain their
status as individual claimants similar to "permissive
joinder"; (2) plaintiffs are similarly-situated consumers
or users; or (3) plaintiffs bring their claims as part of a
legally constituted association.    (Id.)    The ability to
bring group actions was first enacted in 2000 and was
subsequently broadened in 2002 to include injunctive relief
to enjoin harmful conduct, and in 2007 to include gender
discrimination claims.    (Reply Decl. of Prof. Fernando
Gascón, dated Apr. 24, 2012 ¶¶ 14-16 ("Gascón Reply
Decl.").)

Defendants argue that members of the Proposed Class
would not fall within one of these explicitly enumerated
types of group actions under Spanish law and that the
absence of a United States-style opt-out class action
mechanism in Spain is evidence that the recognition of a
judgment in this case would violate material Spanish public
policy.    However, Defendants fail to identify an explicit

-30-

**SAP30**

conflict with Spanish public policy that would bar
recognition of the judgment. The mere fact that Spanish
law does not explicitly embrace a foreign legal mechanism
does not mean that it would find the judgment so repugnant
that it would reject it as violating Spanish public policy.
In fact, under Spanish law, certain situations exist in
which collective action to enjoin clauses in contracts of
adhesion may be brought without the opportunity to opt out
in the first place. (Gascón Reply Decl. ¶¶ 7-8, 33.) It
is inevitable that the precise contours of the procedural
vehicle used to vindicate certain rights will differ
between countries, however, these differences do not by
definition constitute a conflict of material public policy.
Holding otherwise would allow the exception to swallow the
rule of comity and general recognition propounded in many
foreign jurisdictions, including Spain. Based on this
backdrop of fundamental acceptance of group actions under
Spanish law and the explicit adoption of binding injunctive
collective actions in limited situations, the Court is not
persuaded that the recognition of an opt-out class action
judgment would violate material Spanish public policy.

Defendants also argue that recognition of the
judgment in this case would violate Spanish procedural
public policy due to (1) the inability of absent class

-31-

**SAP31**

members to intervene, and (2) the binding effect of the
judgment on absent class members not afforded a full
opportunity to participate. However, the intricacies of
the Spanish collective action legal system appear to
demonstrate an attempt to balance the interests of finality
with the rights of individual litigants in a manner
markedly similar to that of the United States judicial
system. For example, in collective actions involving known
parties, potentially interested parties must be notified
and have the right to intervene. However, these notified,
potentially interested parties will be barred from active
participation if they fail to intervene prior to the filing
of the complaint. (Gascón Reply Decl. ¶¶ 38-39.) The
United States judicial system provides a similar mechanism
by which individual plaintiffs may participate: by filing
independent materials either prior to or following the
appointment of lead plaintiff. Moreover, a plaintiff in
the United States always has the opportunity to opt out of
the litigation, and absent class members may voice
objection to settlements at a fairness hearing — additional
safeguards and rights not necessarily present in the
Spanish system. (Id. ¶¶ 51-52; Gascón Decl. ¶ 95.) In
some cases where the interests at stake are diffuse,
Spanish courts do not require any notice whatsoever and

-32-

interested parties that fail to intervene during a certain specified waiting period will nevertheless be bound by the eventual judgment. (Id. ¶ 41.)

These situations persuasively suggest that Spanish procedural public policy does not always mandate that an interested party be required to intervene or opt out at all points during certain types of collective active litigation. Instead, these individual participation rights are balanced against other competing interests in much the same way as the United States class action system provides. Therefore, the Court concludes that the recognition of a United States opt-out class action judgment would not violate Spanish procedural public policy.

In the instant matter, Plaintiffs have sufficiently demonstrated that a Spanish court would more likely than not recognize, enforce, and give preclusive effect to a judgment in this action rendered by this Court. Accordingly, the Court will certify a class which includes class members from Spain with claims against Defendants.

      f.   Group 6: Latin America

The Proposed Class includes members from certain Latin American countries, specifically, Panama, Colombia, Uruguay, Brazil, Chile, Venezuela, Argentina, Ecuador, El Salvador, Peru, Dominican Republic, Mexico and Bolivia,

-33-

that the Court will consider collectively for the purposes
of this analysis (the "relevant Latin American countries").
(Boruchow Decl. Ex. 2.)    Generally, the relevant Latin
American countries, regardless of whether they are
signatories, look to the principles embodied in the
Bustamante Code and Inter-American Convention on
Extraterritorial Validity of Foreign Judgments and Arbitral
Awards (the "Inter-American Convention") to determine
whether to recognize a foreign judgment.    (See Decl. of
Prof. Michael Wallace Gordon, dated Mar. 1, 2011 ¶¶ 20-21
("Gordon Decl.").)    While the United States is not a party
to the Inter-American Convention and therefore its
provisions are not binding here, the Inter-American
Convention's principles reflect the general framework
characteristic of the approach Latin American courts take
to recognition of foreign judgments. (Gordon Decl. ¶ 25.)
Under the current circumstances, the essential issues for
determining the likelihood of recognition of foreign
judgments are: (1) whether adequate notice of the
litigation was provided to potentially interested parties,
including whether the parties had an opportunity to present
their claims and defenses, and whether the summons or
subpoena were issued in a substantially similar fashion to
that provided for in the procedures of the jurisdiction

-34-

**SAP34**

where the judgment will take effect, and (2) whether the judgment is manifestly contrary to the state's public policy.    (See Gordon Decl. ¶¶ 23-24; Inter-American Convention arts. 2(e), (f), (h).)

After examining the expert declarations and considering the parties' arguments concerning the law of the relevant Latin American countries, the Court concludes that, under the present circumstances, Plaintiffs have made a sufficient presumptive showing that courts in the relevant Latin American countries would more likely than not recognize a class-action judgment rendered in this case by this Court. While the majority of Latin American courts have not specifically addressed the enforcement of United States class-action judgments, the Court finds that the general policy of the relevant Latin American countries inclines to favor granting recognition to judgments of United States courts. The Court also takes into account the unlikely ability of plaintiffs from the relevant Latin American countries to bring a duplicative action in their home countries, and the absence in the record before the Court of any authority from the relevant Latin American countries expressly stating that the enforcement of a United States opt-out class action judgment would manifestly violate the public policy of any of the relevant

-35-

Latin American countries. These considerations make it more likely than not that the courts of the various jurisdictions would recognize, enforce, and give preclusive effect to a judgment in this action. (See Gordon Decl. ¶¶ 29, 100.) Accordingly, the Court will certify a class which includes class members from the relevant Latin American countries.

g. Group 7: Belgium

Generally, Belgian law provides for the automatic recognition of United States judgments. (Decl. of Jean-Pierre Fierens & Bart Volders, dated Feb. 25, 2011 ¶ 11 ("Fierens-Volders Decl.").) However, in a number of enumerated circumstances, Belgian courts must refuse to recognize judgments rendered by courts in the United States. (Id. ¶ 12.) In the instant case, Defendants argue that Belgian courts would refuse to recognize a judgment because (1) recognition would be manifestly incompatible with Belgian public policy, and (2) recognition would infringe upon the requirements of fair trial and due process. (Id.; Decl. of Prof. Dr. Hakim Boularbah and Dr. Frédéric Georges, dated Nov. 28, 2011 ¶¶ 7, 8, 48, 49 ("Boularbah-Georges Decl.").)

Although Belgian law does not currently provide an opt-out class action procedure, it does recognize a number

-36-

**SAP36**

of different collective litigation mechanisms. (Fierens-
Volders Decl. ¶ 19.) The Belgian legislature has also
explored expanding the availability of class actions under
Belgian law, including opt-in and opt-out class actions.
(Fierens-Volders Decl. ¶ 21; Fierens-Volders Reply Decl. ¶¶
13-14.) Such developments are consistent with a general
policy that inclines to favor class action procedures by
other European Union member states, as reflected in the
finding of the Amsterdam Court of the First Instance that
United States opt-out class action procedures are not
incompatible with the requirements of the European Code of
Human Rights. (Fierens-Volders Decl. ¶¶ 22-23, 27.)

Against this backdrop, which is complemented by the
absence of a showing of any controlling Belgian authority
holding that the recognition of an opt-out class action
judgment would manifestly violate Belgian public policy or
infringe on the Belgian requirements of a fair trial and
due process, Plaintiffs have made a sufficient presumptive
showing that a Belgian court would more likely than not
recognize a class-action judgment rendered in this case by
this Court. After examining the expert declarations and
considering the parties' arguments concerning Belgian law,
the Court concludes that Belgian courts would more likely
than not recognize, enforce, and give preclusive effect to

-37-

any judgment rendered in this action by this Court
involving absent Belgian class members. Accordingly, the
Court will certify a class which includes class members
from Belgium with claims against Defendants.

       i. Group 8: Other Jurisdictions

      "Although plaintiffs often submit expert declarations
regarding issues of foreign law, such declarations are not
necessary for plaintiffs to carry their burden of
establishing aspects of foreign law." Alstom, 253 F.R.D.
at 291 (citing Fed. R. Civ. P. 44.1). The Court finds that
Plaintiffs have met their burden of establishing that the
courts of countries that are members of the European
Community or signatories to the Lugano Treaty – with the
exception of France, Luxembourg, and Switzerland – will
more likely than not recognize, enforce, and give
preclusive effect to any judgment rendered in this action
by this Court involving absent class members. (See Smit
Decl. ¶ 73(4).) Accordingly, the Court will certify a
class which includes class members from Italy, Portugal,
Greece, Malta, Denmark, Norway, Sweden, and Finland with
claims against Defendants.

      However, the Court finds that the Plaintiffs have not
sufficiently demonstrated that the stated policy or general
inclination of the law of the following countries would

-38-

**SAP38**

more likely than not favor recognizing, enforcing, and giving preclusive effect to any judgment rendered in this action by this Court involving absent class members: Israel, Kuwait, Korea, North Korea, Picairn, Tokelau, Mongolia, China, Liechtenstein, Japan, Oman, Taiwan, United Arab Emirates, Qatar, Saudi Arabia, Bosnia, Andorra, San Marino, Namibia, Monaco, Germany,[9] and South Africa (collectively, the "Additional Excluded Countries"). Therefore, the Court will not certify a class which includes absent class members from the Additional Excluded Countries.

### III. ORDER

For the reasons discussed above, it is hereby:

**ORDERED** that the motion (Docket No. 776) of lead plaintiffs AXA Private Management, Pacific West Health Medical Center Employees Retirement Trust, Harel Insurance Company Ltd., Martin and Shirley Bach Family Trust, Natalia Hatgis, Securities & Investment Company Bahrain, Dawson Bypass Trust, and St. Stephen's School for class

---

[9]    Although Germany is a member of the European Union and signatory to the Lugano Convention, other courts in this District have determined that it is not more likely than not that German courts would enforce a class action judgment. See Vivendi, 242 F.R.D. at 103-05; Borochoff v. GlaxoSmithKline PLC, 246 F.R.D. 201 (S.D.N.Y. 2007). The Court is persuaded by the findings and reasoning in those cases and will apply them here.

-39-

**SAP39**

certification pursuant to Federal Rule of Civil Procedure 23 is GRANTED as modified herein.

**SO ORDERED.**

Dated: New York, New York
       22 February 2013

VICTOR MARRERO
U.S.D.J.

United States Code Annotated
  Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
    Title IV. Parties

Federal Rules of Civil Procedure Rule 23

Rule 23. Class Actions

Currentness

<Notes of Decisions for 28 USCA Federal Rules of Civil Procedure Rule 23 are displayed in two separate documents. Notes of Decisions for subdivisions I and II are contained in this document. For Notes of Decisions for subdivisions III to end, see second document for 28 USCA Federal Rules of Civil Procedure Rule 23.>

**(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

**(1)** the class is so numerous that joinder of all members is impracticable;

**(2)** there are questions of law or fact common to the class;

**(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

**(4)** the representative parties will fairly and adequately protect the interests of the class.

**(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:

**(1)** prosecuting separate actions by or against individual class members would create a risk of:

**(A)** inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

**(B)** adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

**(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

SAP41

**(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

**(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;

**(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;

**(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

**(D)** the likely difficulties in managing a class action.

**(c) Certification Order; Notice to Class Members; Judgment; Issues Classes; Subclasses.**

**(1)** *Certification Order.*

**(A)** *Time to Issue.* At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.

**(B)** *Defining the Class; Appointing Class Counsel.* An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g).

**(C)** *Altering or Amending the Order.* An order that grants or denies class certification may be altered or amended before final judgment.

**(2)** *Notice.*

**(A)** *For (b)(1) or (b)(2) Classes.* For any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class.

**(B)** *For (b)(3) Classes.* For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must clearly and concisely state in plain, easily understood language:

**(i)** the nature of the action;

**(ii)** the definition of the class certified;

**SAP42**

**(iii)** the class claims, issues, or defenses;

**(iv)** that a class member may enter an appearance through an attorney if the member so desires;

**(v)** that the court will exclude from the class any member who requests exclusion;

**(vi)** the time and manner for requesting exclusion; and

**(vii)** the binding effect of a class judgment on members under Rule 23(c)(3).

**(3)** *Judgment.* Whether or not favorable to the class, the judgment in a class action must:

**(A)** for any class certified under Rule 23(b)(1) or (b)(2), include and describe those whom the court finds to be class members; and

**(B)** for any class certified under Rule 23(b)(3), include and specify or describe those to whom the Rule 23(c)(2) notice was directed, who have not requested exclusion, and whom the court finds to be class members.

**(4)** *Particular Issues.* When appropriate, an action may be brought or maintained as a class action with respect to particular issues.

**(5)** *Subclasses.* When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.

**(d) Conducting the Action.**

**(1)** *In General.* In conducting an action under this rule, the court may issue orders that:

**(A)** determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument;

**(B)** require--to protect class members and fairly conduct the action--giving appropriate notice to some or all class members of:

**(i)** any step in the action;

**(ii)** the proposed extent of the judgment; or

SAP43

**(iii)** the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action;

**(C)** impose conditions on the representative parties or on intervenors;

**(D)** require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly; or

**(E)** deal with similar procedural matters.

**(2)** *Combining and Amending Orders.* An order under Rule 23(d)(1) may be altered or amended from time to time and may be combined with an order under Rule 16.

**(e) Settlement, Voluntary Dismissal, or Compromise.** The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

**(1)** The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

**(2)** If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

**(3)** The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

**(4)** If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

**(5)** Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

**(f) Appeals.** A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule if a petition for permission to appeal is filed with the circuit clerk within 14 days after the order is entered. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

**(g) Class Counsel.**

**(1)** *Appointing Class Counsel.* Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

SAP44

**(A)** must consider:

    **(i)** the work counsel has done in identifying or investigating potential claims in the action;

    **(ii)** counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

    **(iii)** counsel's knowledge of the applicable law; and

    **(iv)** the resources that counsel will commit to representing the class;

**(B)** may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

**(C)** may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;

**(D)** may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); and

**(E)** may make further orders in connection with the appointment.

**(2)** *Standard for Appointing Class Counsel.* When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4). If more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class.

**(3)** *Interim Counsel.* The court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action.

**(4)** *Duty of Class Counsel.* Class counsel must fairly and adequately represent the interests of the class.

**(h)** **Attorney's Fees and Nontaxable Costs.** In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

**(1)** A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

**(2)** A class member, or a party from whom payment is sought, may object to the motion.

**(3)** The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

**(4)** The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

**CREDIT(S)**

(Amended February 28, 1966, effective July 1, 1966; March 2, 1987, effective August 1, 1987; April 24, 1998, effective December 1, 1998; March 27, 2003, effective December 1, 2003; April 30, 2007, effective December 1, 2007; March 26, 2009, effective December 1, 2009.)

**ADVISORY COMMITTEE NOTES**

1937 Adoption

**Note to Subdivision (a).** This is a substantial restatement of [former] Equity Rule 38 (Representatives of Class) as that rule has been construed. It applies to all actions, whether formerly denominated legal or equitable. For a general analysis of class actions, effect of judgment, and requisites of jurisdiction see Moore, *Federal Rules of Civil Procedure: Some Problems Raised by the Preliminary Draft,* 25 Georgetown L.J. 551, 570 et seq. (1937); Moore and Cohn, *Federal Class Actions,* 32 Ill.L.Rev. 307 (1937); Moore and Cohn, *Federal Class Actions--Jurisdiction and Effect of Judgment,* 32 Ill.L.Rev. 555-567 (1938); Lesar, *Class Suits and the Federal Rules,* 22 Minn.L.Rev. 34 (1937); cf. Arnold and James, *Cases on Trials, Judgments and Appeals* (1936) 175; and see Blume, *Jurisdictional Amount in Representative Suits,* 15 Minn.L.Rev. 501 (1931).

The general test of [former] Equity Rule 38 (Representatives of Class) that the question should be "one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court," is a common test. For states which require the two elements of a common or general interest and numerous persons, as provided for in [former] Equity Rule 38, see Del.Ch. Rule 113; Fla.Comp.Gen.Laws Ann. (Supp., 1936) § 4918(7); Georgia Code (1933) § 37-1002, and see *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 16, r. 9. For statutory provisions providing for class actions when the question is one of common or general interest or when the parties are numerous, see Ala.Code Ann. (Michie, 1928) § 5701; 2 Ind.Stat.Ann. (Burns, 1933) § 2-220; N.Y.C.P.A. (1937) 195; Wis.Stat. (1935) § 260.12. These statutes have, however, been uniformly construed as though phrased in the conjunctive. See *Garfein v. Stiglitz,* 260 Ky. 430, 86 S.W.2d 155 (1935). The rule adopts the test of [former] Equity Rule 38, but defines what constitutes a "common or general interest". Compare with code provisions which make the action dependent upon the propriety of joinder of the parties. See Blume, *The "Common Questions" Principle in the Code Provision for Representative Suits,* 30 Mich.L.Rev. 878 (1932). For discussion of what constitutes "numerous persons" see Wheaton, *Representative Suits Involving Numerous Litigants,* 19 Corn.L.Q. 399 (1934); Note, 36 Harv.L.Rev. 89 (1922).

**Clause (1), Joint, Common, or Secondary Right.** This clause is illustrated in actions brought by or against representatives of an unincorporated association. See *Oster v. Brotherhood of Locomotive Firemen and Enginemen,* 271 Pa. 419, 114 Atl. 377 (1921); *Pickett v. Walsh,* 192 Mass. 572, 78 N.E. 753, 6 L.R.A., N.S., 1067 (1906); *Colt v. Hicks,* 97 Ind.App. 177, 179 N.E. 335 (1932). Compare Rule 17(b) as to when an unincorporated association has capacity to sue or be sued in its common name; *United Mine Workers of America v. Coronado Coal Co.,* 42 S.Ct. 570, 259 U.S. 344, 66 L.Ed. 975, 27 A.L.R. 762 (1922) (an unincorporated association was sued as an entity for the purpose of enforcing against it a federal substantive right); Moore, *Federal Rules of Civil Procedure: Some Problems Raised by the Preliminary Draft,* 25 Georgetown L.J. 551, 566 (for discussion of jurisdictional requisites when an unincorporated association sues or is sued in its common name and jurisdiction is founded upon diversity of citizenship). For an action brought by representatives of one group against representatives of another group for distribution of a fund held by an unincorporated association, see *Smith v. Swormstedt,* 16 How. 288, 14 L.Ed. 942 (U.S. 1853). Compare *Christopher, et al. v. Brusselback,* 1938, 58 S.Ct. 350, 302 U.S. 500, 82 L.Ed. 388.

**SAP46**

For an action to enforce rights held in common by policyholders against the corporate issuer of the policies, see *Supreme Tribe of Ben Hur v. Cauble*, 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921). See also *Terry v. Little*, 101 U.S. 216, 25 L.Ed. 864 (1880); *John A. Roebling's Sons Co. v. Kinnicutt*, 248 Fed. 596 (D.C.N.Y., 1917) dealing with the right held in common by creditors to enforce the statutory liability of stockholders.

Typical of a secondary action is a suit by stockholders to enforce a corporate right. For discussion of the general nature of these actions see *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936); Glenn, *The Stockholder's Suit--Corporate and Individual Grievances*, 33 Yale L.J. 580 (1924); McLaughlin, *Capacity of Plaintiff-Stockholder to Terminate a Stockholder's Suit*, 46 Yale L.J. 421 (1937). See also Subdivision (b) of this rule which deals with Shareholder's Action; Note, 15 Minn.L.Rev. 453 (1931).

**Clause (2).** A creditor's action for liquidation or reorganization of a corporation is illustrative of this clause. An action by a stockholder against certain named defendants as representatives of numerous claimants presents a situation converse to the creditor's action.

**Clause (3).** See *Everglades Drainage League v. Napoleon Broward Drainage Dist.*, 253 Fed. 246 (D.C.Fla., 1918); *Gramling v. Maxwell*, 52 F.2d 256 (D.C.N.C., 1931), approved in 30 Mich.L.Rev. 624 (1932); *Skinner v. Mitchell*, 108 Kan. 861, 197 Pac. 569 (1921); *Duke of Bedford v. Ellis* (1901) A.C. 1, for class actions when there were numerous persons and there was only a question of law or fact common to them; and see Blume, *The "Common Questions" Principle in the Code Provision for Representative Suits*, 30 Mich.L.Rev. 878 (1932).

**Note to Subdivision (b).** This is [former] Equity Rule 27 (Stockholder's Bill) with verbal changes. See also *Hawes v. Oakland*, 104 U.S. 450, 26 L.Ed. 827 (1882) and former Equity Rule 94, promulgated January 23, 1882, 104 U.S. IX.

**Note to Subdivision (c).** See McLaughlin, Capacity of Plaintiff-Stockholder to Terminate a Stockholder's Suit, 46 Yale L.J. 421 (1937).

Supplementary Note

**Note.** Subdivision (b), relating to secondary actions by shareholders, provides among other things, that in such an action the complainant "shall aver (1) that the plaintiff was a shareholder at the time of the transaction of which he complains or that his share thereafter devolved on him by operation of law * * *".

As a result of the decision in *Erie R. Co. v. Tompkins,* 1938, 304 U.S. 64, 58 S.Ct. 817 (decided April 25, 1938, after this rule was promulgated by the Supreme Court, though before it took effect) a question has arisen as to whether the provision above quoted deals with a matter of substantive right or is a matter of procedure. If it is a matter of substantive law or right, then under *Erie R. Co. v. Tompkins* clause (1) may not be validly applied in cases pending in states whose local law permits a shareholder to maintain such actions, although not a shareholder at the time of the transactions complained of. The Advisory Committee, believing the question should be settled in the courts, proposes no change in Rule 23 but thinks rather that the situation should be explained in an appropriate note.

The rule has a long history. In *Hawes v. Oakland,* 1882, 104 U.S. 450, the Court held that a shareholder could not maintain such an action unless he owned shares at the time of the transactions complained of, or unless they devolved on him by operation of law. At that time the decision in *Swift v. Tyson,* 1842, 16 Peters 1, was the law, and the federal courts considered themselves free to establish their own principles of equity jurisprudence, so the Court was not in 1882 and has not been, until *Erie R. Co. v. Tompkins* in 1938, concerned with the question whether *Hawes v. Oakland* dealt with substantive right or procedure.

SAP47

Following the decision in *Hawes v. Oakland,* and at the same term, the Court, to implement its decision, adopted [former] Equity Rule 94, which contained the same provision above quoted from Rule 23 F.R.C.P. The provision in [former] Equity Rule 94 was later embodied in [former] Equity Rule 27, of which the present Rule 23 is substantially a copy.

In *City of Quincy v. Steel,* 1887, 120 U.S. 241, 245, 7 S.Ct. 520, the Court referring to *Hawes v. Oakland* said: "In order to give effect to the principles there laid down, this Court at that term adopted Rule 94 of the rules of practice for courts of equity of the United States."

Some other cases dealing with [former] Equity Rules 94 or 27 prior to the decision in *Erie R. Co. v. Tompkins* are *Dimpfel v. Ohio & Miss. R.R.,* 1884, 3 S.Ct. 573, 110 U.S. 209, 28 L.Ed. 121; *Illinois Central R. Co. v. Adams,* 1901, 21 S.Ct. 251, 180 U.S. 28, 34, 45L.Ed. 410; *Venner v. Great Northern Ry.,* 1908, 28 S.Ct. 328, 209 U.S. 24, 30, 52 L.Ed. 666; *Jacobson v. General Motors Corp.,* S.D.N.Y.1938, 22 F.Supp. 255, 257. These cases generally treat *Hawes v. Oakland* as establishing a "principle" of equity, or as dealing not with jurisdiction but with the "right" to maintain an action, or have said that the defense under the equity rule is analogous to the defense that the plaintiff has no "title" and results in a dismissal "for want of equity."

Those state decisions which held that a shareholder acquiring stock after the event may maintain a derivative action are founded on the view that it is a right belonging to the shareholder at the time of the transaction and which passes as a right to the subsequent purchaser. See *Pollitz v. Gould,* 1911, 202 N.Y. 11, 94 N.E. 1088.

The first case arising after the decision in *Erie R. Co. v. Tompkins,* in which this problem was involved, was *Summers v. Hearst,* S.D.N.Y.1938, 23 F.Supp. 986. It concerned [former] Equity Rule 27, as Federal Rule 23 was not then in effect. In a well considered opinion Judge Leibell reviewed the decisions and said: "The federal cases that discuss this section of [former] Rule 27 support the view that it states a principle of substantive law." He quoted *Pollitz v. Gould, 1911, 202 N.Y. 11, 94 N.E. 1088,* as saying that the United States Supreme Court "seems to have been more concerned with establishing this rule as one of practice than of substantive law" but that "whether it be regarded as establishing a principle of law or a rule of practice, this authority has been subsequently followed in the United States courts."

He then concluded that, although the federal decisions treat the equity rule as "stating a principle of substantive law", if "[former] Equity Rule 27 is to be modified or revoked in view of *Erie R. Co. v. Tompkins,* it is not the province of this Court to suggest it, much less impliedly to follow that course by disregarding the mandatory provisions of the Rule."

In *Piccard v. Sperry Corporation,* S.D.N.Y.1941, 36 F.Supp. 1006, 1009-10, affirmed without opinion, C.C.A.2d 1941, 120 F.2d 328, a shareholder, not such at the time of the transactions complained of, sought to intervene. The court held an intervenor was as much subject to Rule 23 as an original plaintiff; and that the requirement of Rule 23(b) was "a matter of practice", not substance, and applied in New York where the state law was otherwise, despite *Erie R. Co. v. Tompkins.* In *New York v. Guaranty Trust Co. of New York,* C.C.A.2, 1944, 143 F.2d 503, rev'd on other grounds, 1945, 65 S.Ct. 1464, the court said: "Restrictions on the bringing of stockholders' actions, such as those imposed by F.R.C.P. 23(b) or other state statutes are procedural," citing the *Piccard* and other cases.

Some other federal decisions since 1938 touch the question.

In *Gallup v. Caldwell,* C.C.A.3, 1941, 120 F.2d 90, 95 arising in New Jersey, the point was raised but not decided, the court saying that it was not satisfied that the then New Jersey rule differed from Rule 23(b), and that "under the circumstances the proper course was to follow Rule 23(b)."

In *Mullins v. DeSoto Securities Co.,* W.D.La.1942, 45 F.Supp. 871, 878, the point was not decided, because the court found the Louisiana rule to be the same as that stated in Rule 23(b).

SAP48

In *Toebelman v. Missouri-Kansas Pipe Line Co.,* D.Del.1941, 41 F.Supp. 334, 340, the court dealt only with another part of Rule 23(b), relating to prior demands on the stockholders and did not discuss *Erie R. Co. v. Tompkins,* or its effect on the rule.

In *Perrott v. United States Banking Corp.,* D.Del.1944, 53 F.Supp. 953, it appeared that the Delaware law does not require the plaintiff to have owned shares at the time of the transaction complained of. The court sustained Rule 23(b), after discussion of the authorities, saying:

"It seems to me the rule does not go beyond procedure. * * * Simply because a particular plaintiff cannot qualify as a proper party to maintain such an action does not destroy or even whittle at the cause of action. The cause of action exists until a qualified plaintiff can get it started in a federal court."

In *Bankers Nat. Corp. v. Barr,* S.D.N.Y.1945, 9 Fed.Rules Serv. 23b.11, Case 1, the court held Rule 23(b) to be one of procedure, but that whether the plaintiff was a stockholder was a substantive question to be settled by state law.

The New York rule, as stated in *Pollitz v. Gould,* supra, has been altered by an act of the New York Legislature, Chapter 667, Laws of 1944, effective April 9, 1944, General Corporation Law, § 61, which provides that "in any action brought by a shareholder in the right of a * * * corporation, it must appear that the plaintiff was a stockholder at the time of the transaction of which he complains, or that his stock thereafter devolved upon him by operation of law." At the same time a further and separate provision was enacted, requiring under certain circumstances the giving of security for reasonable expenses and attorney's fees, to which security the corporation in whose right the action is brought and the defendants therein may have recourse. (Chapter 668, Laws of 1944, effective April 9, 1944, General Corporation Law, § 61-b.) These provisions are aimed at so-called "strike" stockholders' suits and their attendant abuses. *Shielcrawt v. Moffett,* Ct.App.1945, 294 N.Y. 180, 61 N.E.2d 435, rev'g 51 N.Y.S.2d 188, aff'g 49 N.Y.S.2d 64; *Noel Associates, Inc. v. Merrill,* Sup.Ct.1944, 184 Misc. 646, 63 N.Y.S.2d 143.

Insofar as § 61 is concerned, it has been held that the section is procedural in nature. *Klum v. Clinton Trust Co.,* Sup.Ct.1944, 183 Misc. 340, 48 N.Y.S.2d 267; *Noel Associates, Inc. v. Merrill,* supra. In the latter case the court pointed out that "The 1944 amendment to Section 61 rejected the rule laid down in the Pollitz case and substituted, in place thereof, in its precise language, the rule which has long prevailed in the Federal Courts and which is now Rule 23(b) * * *". There is, nevertheless, a difference of opinion regarding the application of the statute to pending actions. See *Klum v. Clinton Trust Co.*, supra (applicable); *Noel Associates, Inc. v. Merrill,* supra (inapplicable).

With respect to § 61-b, which may be regarded as a separate problem, *Noel Associates, Inc. v. Merrill,* supra, it has been held that even though the statute is procedural in nature--a matter not definitely decided--the Legislature evinced no intent that the provisions should apply to actions pending when it became effective. *Shielcrawt v. Moffett,* supra. As to actions instituted after the effective date of the legislation, the constitutionality of § 61-b is in dispute. See *Wolf v. Atkinson,* Sup.Ct.1944, 182 Misc. 675, 49 N.Y.S.2d 703 (constitutional); *Citron v. Mangel Stores Corp.,* Sup.Ct.1944, 50 N.Y.S.2d 416 (unconstitutional); Zlinkoff, *The American Investor and the Constitutionality of § 61-b of the New York General Corporation Law,* 1945, 54 Yale L.J. 352.

New Jersey also enacted a statute, similar to Chapters 667 and 668 of the New York law. See P.L.1945, Ch. 131, R.S.Cum.Supp. 14:3-15. The New Jersey provision similar to Chapter 668, § 61-b, differs, however, in that it specifically applies retroactively. It has been held that this provision is procedural and hence will not govern a pending action brought against a New Jersey corporation in the New York courts. *Shielcrawt v. Moffett,* Sup.Ct.N.Y.1945, 184 Misc. 1074, 56 N.Y.S.2d 134.

See, also generally, 2 Moore's *Federal Practice,* 1938, 2250-2253, and Cum.Supplement § 23.05.

The decisions here discussed show that the question is a debatable one, and that there is respectable authority for either view, with a recent trend towards the view that Rule 23(b)(1) is procedural. There is reason to say that the question is one which should not be decided by the Supreme Court ex parte, but left to await a judicial decision in a litigated case, and that in the

SAP49

light of the material in this note, the only inference to be drawn from a failure to amend Rule 23(b) would be that the question is postponed to await a litigated case.

The Advisory Committee is unanimously of the opinion that this course should be followed.

If, however, the final conclusion is that the rule deals with a matter of substantive right, then the rule should be amended by adding a provision that Rule 23(b)(1) does not apply in jurisdictions where state law permits a shareholder to maintain a secondary action, although he was not a shareholder at the time of the transactions of which he complains.

1966 Amendment

**Difficulties with the original rule.** The categories of class actions in the original rule were defined in terms of the abstract nature of the rights involved: the so-called "true" category was defined as involving "joint, common, or secondary rights"; the "hybrid" category, as involving "several" rights related to "specific property"; the "spurious" category, as involving "several" rights affected by a common question and related to common relief. It was thought that the definitions accurately described the situations amenable to the class-suit device, and also would indicate the proper extent of the judgment in each category, which would in turn help to determine the res judicata effect of the judgment if questioned in a later action. Thus the judgment in "true" and "hybrid" class actions would extend to the class (although in somewhat different ways); the judgment in a "spurious" class action would extend only to the parties including intervenors. See Moore, *Federal Rules of Civil Procedure: Some Problems Raised by the Preliminary Draft,* 25 Geo.L.J. 551, 570-76 (1937).

In practice the terms "joint," "common," etc., which were used as the basis of the Rule 23 classification proved obscure and uncertain. See Chafee, *Some Problems of Equity* 245-46, 256-57 (1950); Kalven & Rosenfield, *The Contemporary Function of the Class Suit,* 8 U. of Chi.L.Rev. 684, 707 & n. 73 (1941); Keeffe, Levy & Donovan, *Lee Defeats Ben Hur,* 33 Corn.L.Q. 327, 329-36 (1948); *Developments in the Law: Multiparty Litigation in the Federal Courts,* 71 Harv. L.Rev. 874, 931 (1958); Advisory Committee's Note to Rule 19, as amended. The courts had considerable difficulty with these terms. See, e.g., *Gullo v. Veterans' Coop. H. Assn.,* 13 F.R.D. 11 (D.D.C.1952); *Shipley v. Pittsburgh & L.E.R. Co.,* 70 F.Supp. 870 (W.D.Pa.1947); *Deckert v. Independence Shares Corp.,* 27 F.Supp. 763 (E.D.Pa.1939), rev'd 108 F.2d 51 (3d Cir. 1939), rev'd, 311 U.S. 282 (1940), on remand, 39 F.Supp. 592 (E.D.Pa.1941), rev'd sub nom. *Pennsylvania Co. for Ins. on Lives v. Deckert,* 123 F.2d 979 (3d Cir.1941) (see Chafee, supra, at 264-65).

Nor did the rule provide an adequate guide to the proper extent of the judgments in class actions. First, we find instances of the courts classifying actions as "true" or intimating that judgments would be decisive for the class where these results seemed appropriate but were reached by dint of depriving the word "several" of coherent meaning. See, e.g., *System Federation No. 91 v. Reed,* 180 F.2d 991 (6th Cir.1950); *Wilson v. City of Paducah,* 100 F.Supp. 116 (W.D.Ky.1951); *Citizens Banking Co. v. Monticello State Bank,* 143 F.2d 261 (8th Cir.1944); *Redmond v. Commerce Trust Co.,* 144 F.2d 140 (8th Cir.1944), cert. denied, 323 U.S. 776 (1944); *United States v. American Optical Co.,* 97 F.Supp. 66 (N.D.Ill.1951); *National Hairdressers' & C. Assn. v. Philad Co.,* 34 F.Supp. 264 (D.Del.1940); 41 F.Supp. 701 (D.Del.1940), aff'd mem., 129 F.2d 1020 (3d Cir.1942). Second, we find cases classified by the courts as "spurious" in which, on a realistic view, it would seem fitting for the judgments to extend to the class. See, e.g., *Knapp v. Bankers Sec. Corp.,* 17 F.R.D. 245 (E.D.Pa.1954), aff'd 230 F.2d 717 (3d Cir.1956); *Giesecke v. Denver Tramway Corp.,* 81 F.Supp. 957 (D.Del.1949); *York v. Guaranty Trust Co.,* 143 F.2d 503 (2d Cir.1944), rev'd on grounds not here relevant, 326 U.S. 99 (1945) (see Chafee, supra, at 208); cf. *Webster Eisenlohr, Inc. v. Kalodner,* 145 F.2d 316, 320 (3d Cir.1944), cert. denied, 325 U.S. 867 (1945). But cf. the early decisions, *Duke of Bedford v. Ellis,* [1901] A.C. 1; *Sheffield Waterworks v. Yeomans,* L.R. 2 Ch.App. 8 (1866); *Brown v. Vermuden,* 1 Ch.Cas. 272, 22 Eng.Rep. 796 (1676).

The "spurious" action envisaged by original Rule 23 was in any event an anomaly because, although denominated a "class" action and pleaded as such, it was supposed not to adjudicate the rights or liabilities of any person not a party. It was believed to be an advantage of the "spurious" category that it would invite decisions that a member of the "class" could, like a member of the class in a "true" or "hybrid" action, intervene on an ancillary basis without being required to show an independent basis of

SAP50

Federal jurisdiction, and have the benefit of the date of the commencement of the action for purposes of the statute of limitations. See 3 Moore's *Federal Practice,* pars. 23.10[1], 23.12 (2d ed.1963). These results were attained in some instances but not in others. On the statute of limitations, see *Union Carbide & Carbon Corp. v. Nisley,* 300 F.2d 561 (10th Cir.1961), pet. cert. dism., 371 U.S. 801 (1963); but cf. *P. W. Husserl, Inc. v. Newman,* 25 F.R.D. 264 (S.D.N.Y.1960); *Athas v. Day,* 161 F.Supp. 916 (D.Colo.1958). On ancillary intervention, see *Amen v. Black,* 234 F.2d 12 (10th Cir.1956), cert. granted, 352 U.S. 888 (1956), dism. on stip., 355 U.S. 600 (1958); but cf. *Wagner v. Kemper,* 13 F.R.D. 128 (W.D.Mo.1952). The results, however, can hardly depend upon the mere appearance of a "spurious" category in the rule; they should turn on more basic considerations. See discussion of subdivision (c)(1) below.

Finally, the original rule did not squarely address itself to the question of the measures that might be taken during the course of the action to assure procedural fairness, particularly giving notice to members of the class, which may in turn be related in some instances to the extension of the judgment to the class. See Chafee, supra, at 230-31; Keeffe, Levy & Donovan, supra; *Developments in the law,* supra, 71 Harv.L.Rev. at 937-38; Note, *Binding Effect of Class Actions,* 67 Harv.L.Rev. 1059, 1062-65 (1954); Note, *Federal Class Actions: A Suggested Revision of Rule 23,* 46 Colum.L.Rev. 818, 833-36 (1946); Mich.Gen.Court R. 208.4 (effective Jan. 1, 1963); Idaho R.Civ.P. 23(d); Minn.R.Civ.P. 23.04; N.Dak.R.Civ.P. 23(d).

*The amended rule* describes in more practical terms the occasions for maintaining class actions; provides that all class actions maintained to the end as such will result in judgments including those whom the court finds to be members of the class, whether or not the judgment is favorable to the class; and refers to the measures which can be taken to assure the fair conduct of these actions.

**Subdivision (a)** states the prerequisites for maintaining any class action in terms of the numerousness of the class making joinder of the members impracticable, the existence of questions common to the class, and the desired qualifications of the representative parties. See Weinstein, *Revision of Procedure: Some Problems in Class Actions,* 9 Buffalo L.Rev. 433, 458-59 (1960); 2 Barron & Holtzoff, *Federal Practice & Procedure* § 562, at 265, § 572, at 351-52 (Wright ed. 1961). These are necessary but not sufficient conditions for a class action. See, e.g., *Giordano v. Radio Corp. of Am.,* 183 F.2d 558, 560 (3d Cir.1950); *Zachman v. Erwin,* 186 F.Supp. 681 (S.D.Tex.1959); *Baim & Blank, Inc. v. Warren-Connelly Co., Inc.,* 19 F.R.D. 108 (S.D.N.Y.1956). Subdivision (b) describes the additional elements which in varying situations justify the use of a class action.

**Subdivision (b)(1).** The difficulties which would be likely to arise if resort were had to separate actions by or against the individual members of the class here furnish the reasons for, and the principal key to, the propriety and value of utilizing the class-action device. The considerations stated under clauses (A) and (B) are comparable to certain of the elements which define the persons whose joinder in an action is desirable as stated in Rule 19(a), as amended. See amended Rule 19(a)(2)(i) and (ii), and the Advisory Committee's Note thereto; Hazard, *Indispensable Party: The Historical Origin of a Procedural Phantom,* 61 Colum.L.Rev. 1254, 1259-60 (1961); cf. 3 Moore, supra, par. 23.08, at 3435.

**Clause (A):** One person may have rights against, or be under duties toward, numerous persons constituting a class, and be so positioned that conflicting or varying adjudications in lawsuits with individual members of the class might establish incompatible standards to govern his conduct. The class action device can be used effectively to obviate the actual or virtual dilemma which would thus confront the party opposing the class. The matter has been stated thus: "The felt necessity for a class action is greatest when the courts are called upon to order or sanction the alteration of the status quo in circumstances such that a large number of persons are in a position to call on a single person to alter the status quo, or to complain if it is altered, and the possibility exists that [the] actor might be called upon to act in inconsistent ways." Louisell & Hazard, *Pleading and Procedure: State and Federal* 719 (1962); see *Supreme Tribe of Ben-Hur v. Cauble,* 255 U.S. 356, 366-67 (1921). To illustrate: Separate actions by individuals against a municipality to declare a bond issue invalid or condition or limit it, to prevent or limit the making of a particular appropriation or to compel or invalidate an assessment, might create a risk of inconsistent or varying determinations. In the same way, individual litigations of the rights and duties of riparian owners, or of landowners' rights and duties respecting a claimed nuisance, could create a possibility of incompatible adjudications. Actions by or against a class provide a ready and fair means of achieving unitary adjudication. See *Maricopa County Mun. Water Con. Dist. v. Looney,* 219

SAP51

F.2d 529 (9th Cir.1955); *Rank v. Krug,* 142 F.Supp. 1, 154-59 (S.D.Calif.1956), on app., *State of California v. Rank,* 293 F.2d 340, 348 (9th Cir.1961); *Gart v. Cole,* 263 F.2d 244 (2d Cir.1959), cert. denied 359 U.S. 978 (1959); cf. *Martinez v. Maverick Cty. Water Con. & Imp. Dist.,* 219 F.2d 666 (5th Cir.1955); 3 Moore, supra, par. 23.11[2], at 3458-59.

**Clause (B):** This clause takes in situations where the judgment in a nonclass action by or against an individual member of the class, while not technically concluding the other members, might do so as a practical matter. The vice of an individual action would lie in the fact that the other members of the class, thus practically concluded, would have had no representation in the lawsuit. In an action by policy holders against a fraternal benefit association attacking a financial reorganization of the society, it would hardly have been practical, if indeed it would have been possible, to confine the effects of a validation of the reorganization to the individual plaintiffs. Consequently a class action was called for with adequate representation of all members of the class. See *Supreme Tribe of Ben-Hur v. Cauble,* 255 U.S. 356 (1921); *Waybright v. Columbian Mut. Life Ins. Co.,* 30 F.Supp. 885 (W.D.Tenn.1939); cf. *Smith v. Swormstedt,* 16 How. (57 U.S.) 288 (1853). For much the same reason actions by shareholders to compel the declaration of a dividend[,] the proper recognition and handling of redemption or pre-emption rights, or the like (or actions by the corporation for corresponding declarations of rights), should ordinarily be conducted as class actions, although the matter has been much obscured by the insistence that each shareholder has an individual claim. See *Knapp v. Bankers Securities Corp.,* 17 F.R.D. 245 (E.D.Pa.1954), aff'd, 230 F.2d 717 (3d Cir.1956); *Giesecke v. Denver Tramway Corp.,* 81 F.Supp. 957 (D.Del.1949); *Zahn v. Transamerica Corp.,* 162 F.2d 36 (3d Cir.1947); *Speed v. Transamerica Corp.,* 100 F.Supp. 461 (D.Del.1951); *Sobel v. Whittier Corp.,* 95 F.Supp. 643 (E.D.Mich.1951), app. dism., 195 F.2d 361 (6th Cir.1952); *Goldberg v. Whittier Corp.,* 111 F.Supp. 382 (E.D.Mich.1953); *Dann v. Studebaker-Packard Corp.,* 288 F.2d 201 (6th Cir.1961); *Edgerton v. Armour & Co.,* 94 F.Supp. 549 (S.D.Calif.1950); *Ames v. Mengel Co.,* 190 F.2d 344 (2d Cir.1951). (These shareholders' actions are to be distinguished from derivative actions by shareholders dealt with in new Rule 23.1). The same reasoning applies to an action which charges a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class of security holders or other beneficiaries, and which requires an accounting or like measures to restore the subject of the trust. See *Boesenberg v. Chicago T. & T. Co.,* 128 F.2d 245 (7th Cir.1942); *Citizens Banking Co. v. Monticello State Bank,* 143 F.2d 261 (8th Cir.1944); *Redmond v. Commerce Trust Co.,* 144 F.2d 140 (8th Cir.1944), cert. denied, 323 U.S. 776 (1944); cf. *York v. Guaranty Trust Co.,* 143 F.2d 503 (2d Cir.1944), rev'd on grounds not here relevant, 326 U.S. 99 (1945).

In various situations an adjudication as to one or more members of the class will necessarily or probably have an adverse practical effect on the interests of other members who should therefore be represented in the lawsuit. This is plainly the case when claims are made by numerous persons against a fund insufficient to satisfy all claims. A class action by or against representative members to settle the validity of the claims as a whole, or in groups, followed by separate proof of the amount of each valid claim and proportionate distribution of the fund, meets the problem. Cf. *Dickinson v. Burnham,* 197 F.2d 973 (2d Cir.1952), cert. denied, 344 U.S. 875 (1952); 3 Moore, supra, at par. 23.09. The same reasoning applies to an action by a creditor to set aside a fraudulent conveyance by the debtor and to appropriate the property to his claim, when the debtor's assets are insufficient to pay all creditors' claims. See *Heffernan v. Bennett & Armour,* 110 Cal.App.2d 564, 243 P.2d 846 (1952); cf. *City & County of San Francisco v. Market Street Ry.,* 95 Cal.App.2d 648, 213 P.2d 780 (1950). Similar problems, however, can arise in the absence of a fund either present or potential. A negative or mandatory injunction secured by one of a numerous class may disable the opposing party from performing claimed duties toward the other members of the class or materially affect his ability to do so. An adjudication as to movie "clearances and runs" nominally affecting only one exhibitor would often have practical effects on all the exhibitors in the same territorial area. Cf. *United States v. Paramount Pictures, Inc.,* 66 F.Supp. 323, 341-46 (S.D.N.Y.1946); 334 U.S. 131, 144-48 (1948). Assuming a sufficiently numerous class of exhibitors, a class action would be advisable. (Here representation of subclasses of exhibitors could become necessary; see subdivision (c)(3)(B).)

**Subdivision (b)(2).** This subdivision is intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate. Declaratory relief "corresponds" to injunctive relief when as a practical matter it affords injunctive relief or serves as a basis for later injunctive relief. The subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages. Action or inaction is directed

SAP52

to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class.

Illustrative are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration. See *Potts v. Flax,* 313 F.2d 284 (5th Cir. 1963); *Bailey v. Patterson,* 323 F.2d 201 (5th Cir. 1963), cert. denied, 376 U.S. 910, (1964); *Brunson v. Board of Trustees of School District No. 1, Clarendon Cty., S.C.,* 311 F.2d 107 (4th Cir. 1962), cert. denied, 373 U.S. 933 (1963); *Green v. School Bd. of Roanoke, Va.,* 304 F.2d 118 (4th Cir. 1962); *Orleans Parish School Bd. v. Bush,* 242 F.2d 156 (5th Cir. 1957), cert. denied, 354 U.S. 921 (1957); *Mannings v. Board of Public Inst. of Hillsborough County, Fla.,* 277 F.2d 370 (5th Cir. 1960); *Northcross v. Board of Ed. of City of Memphis,* 302 F.2d 818 (6th Cir. 1962), cert. denied, 370 U.S. 944 (1962); *Frasier v. Board of Trustees of Univ. of N.C.,* 134 F.Supp. 589 (M.D.N.C.1955, 3-judge court), aff'd 350 U.S. 979 (1956). Subdivision (b)(2) is not limited to civil-rights cases. Thus an action looking to specific or declaratory relief could be brought by a numerous class of purchasers, say retailers of a given description, against a seller alleged to have undertaken to sell to that class at prices higher than those set for other purchasers, say retailers of another description, when the applicable law forbids such a pricing differential. So also a patentee of a machine, charged with selling or licensing the machine on condition that purchasers or licensees also purchase or obtain licenses to use an ancillary unpatented machine, could be sued on a class basis by a numerous group of purchasers or licensees, or by a numerous group of competing sellers or licensors of the unpatented machine, to test the legality of the "tying" condition.

**Subdivision (b)(3).** In the situations to which this subdivision relates, class-action treatment is not as clearly called for as in those described above, but it may nevertheless be convenient and desirable depending upon the particular facts. Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results. Cf. Chafee, supra, at 201.

The court is required to find, as a condition of holding that a class action may be maintained under this subdivision, that the questions common to the class predominate over the questions affecting individual members. It is only where this predominance exists that economies can be achieved by means of the class-action device. In this view, a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class. On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed. See *Oppenheimer v. F. J. Young & Co., Inc.,* 144 F.2d 387 (2d Cir. 1944); *Miller v. National City Bank of N.Y.,* 166 F.2d 723 (2d Cir. 1948); and for like problems in other contexts, see *Hughes v. Encyclopaedia Britannica,* 199 F.2d 295 (7th Cir. 1952); *Sturgeon v. Great Lakes Steel Corp.,* 143 F.2d 819 (6th Cir. 1944). A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried. See *Pennsylvania R.R. v. United States,* 111 F.Supp. 80 (D.N.J.1953); cf. Weinstein, supra, 9 Buffalo L.Rev. at 469. Private damage claims by numerous individuals arising out of concerted antitrust violations may or may not involve predominating common questions. See *Union Carbide & Carbon Corp. v. Nisley,* 300 F.2d 561 (10th Cir. 1961), pet. cert. dism., 371 U.S. 801 (1963); cf. *Weeks v. Bareco Oil Co.,* 125 F.2d 84 (7th Cir. 1941); *Kainz v. Anheuser-Busch, Inc.,* 194 F.2d 737 (7th Cir. 1952); *Hess v. Anderson, Clayton & Co.,* 20 F.R.D. 466 (S.D.Calif.1957).

That common questions predominate is not itself sufficient to justify a class action under subdivision (b)(3), for another method of handling the litigious situation may be available which has greater practical advantages. Thus one or more actions agreed to by the parties as test or model actions may be preferable to a class action; or it may prove feasible and preferable to consolidate actions. Cf. Weinstein, supra, 9 Buffalo L.Rev. at 438-54. Even when a number of separate actions are proceeding simultaneously, experience shows that the burdens on the parties and the courts can sometimes be reduced by arrangements for avoiding repetitious discovery or the like. Currently the Coordinating Committee on Multiple Litigation in the United States

**SAP53**

District Courts (a subcommittee of the Committee on Trial Practice and Technique of the Judicial Conference of the United States) is charged with developing methods for expediting such massive litigation. To reinforce the point that the court with the aid of the parties ought to assess the relative advantages of alternative procedures for handling the total controversy, subdivision (b)(3) requires, as a further condition of maintaining the class action, that the court shall find that that procedure is "superior" to the others in the particular circumstances.

Factors (A)-(D) are listed, non-exhaustively, as pertinent to the findings. The court is to consider the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit. See *Weeks v. Bareco Oil Co.,* 125 F.2d 84, 88-90, 93-94 (7th Cir. 1941) (anti-trust action); see also *Pentland v. Dravo Corp.,* 152 F.2d 851 (3d Cir. 1945), and Chafee, supra, at 273-75, regarding policy of Fair Labor Standards Act of 1938, § 16(b), 29 U.S.C. § 216(b), prior to amendment by Portal-to-Portal Act of 1947, § 5(a). [The present provisions of 29 U.S.C. § 216(b) are not intended to be affected by Rule 23, as amended.]

In this connection the court should inform itself of any litigation actually pending by or against the individuals. The interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action. On the other hand, these interests may be theoretic rather than practical; the class may have a high degree of cohesion and prosecution of the action through representatives would be quite unobjectionable, or the amounts at stake for individuals may be so small that separate suits would be impracticable. The burden that separate suits would impose on the party opposing the class, or upon the court calendars, may also fairly be considered. (See the discussion, under subdivision (c)(2) below, of the right of members to be excluded from the class upon their request.)

Also pertinent is the question of the desirability of concentrating the trial of the claims in the particular forum by means of a class action, in contrast to allowing the claims to be litigated separately in forums to which they would ordinarily be brought. Finally, the court should consider the problems of management which are likely to arise in the conduct of a class action.

**Subdivision (c)(1).** In order to give clear definition to the action, this provision requires the court to determine, as early in the proceedings as may be practicable, whether an action brought as a class action is to be so maintained. The determination depends in each case on satisfaction of the terms of subdivision (a) and the relevant provisions of subdivision (b).

An order embodying a determination can be conditional; the court may rule, for example, that a class action may be maintained only if the representation is improved through intervention of additional parties of a stated type. A determination once made can be altered or amended before the decision on the merits if, upon fuller development of the facts, the original determination appears unsound. A negative determination means that the action should be stripped of its character as a class action. See subdivision (d)(4). Although an action thus becomes a nonclass action, the court may still be receptive to interventions before the decision on the merits so that the litigation may cover as many interests as can be conveniently handled; the questions whether the intervenors in the nonclass action shall be permitted to claim "ancillary" jurisdiction or the benefit of the date of the commencement of the action for purposes of the statute of limitations are to be decided by reference to the laws governing jurisdiction and limitations as they apply in particular contexts.

Whether the court should require notice to be given to members of the class of its intention to make a determination, or of the order embodying it, is left to the court's discretion under subdivision (d)(2).

**Subdivision (c)(2)** makes special provision for class actions maintained under subdivision (b)(3). As noted in the discussion of the latter subdivision, the interests of the individuals in pursing their own litigations may be so strong here as to warrant denial of a class action altogether. Even when a class action is maintained under subdivision (b)(3), this individual interest is respected. Thus the court is required to direct notice to the members of the class of the right of each member to be excluded from the class upon his request. A member who does not request exclusion may, if he wishes, enter an appearance in the action through his counsel; whether or not he does so, the judgment in the action will embrace him.

**SAP54**

The notice[,] setting forth the alternatives open to the members of the class, is to be the best practicable under the circumstances, and shall include individual notice to the members who can be identified through reasonable effort. (For further discussion of this notice, see the statement under subdivision (d)(2) below.)

**Subdivision (c)(3).** The judgment in a class action maintained as such to the end will embrace the class, that is, in a class action under subdivision (b)(1) or (b)(2), those found by the court to be class members; in a class action under subdivision (b)(3), those to whom the notice prescribed by subdivision (c)(2) was directed, excepting those who requested exclusion or who are ultimately found by the court not to be members of the class. The judgment has this scope whether it is favorable or unfavorable to the class. In a (b)(1) or (b)(2) action the judgment "describes" the members of the class, but need not specify the individual members; in a (b)(3) action the judgment "specifies" the individual members who have been identified and described the others.

Compare subdivision (c)(4) as to actions conducted as class actions only with respect to particular issues. Where the class-action character of the lawsuit is based solely on the existence of a "limited fund," the judgment, while extending to all claims of class members against the fund, has ordinarily left unaffected the personal claims of nonappearing members against the debtor. See 3 Moore, supra, par. 23.11[4].

Hitherto, in a few actions conducted as "spurious" class actions and thus nominally designed to extend only to parties and others intervening before the determination of liability, courts have held or intimated that class members might be permitted to intervene after a decision on the merits favorable to their interests, in order to secure the benefits of the decision for themselves, although they would presumably be unaffected by an unfavorable decision. See, as to the propriety of this so-called "one-way" intervention in "spurious" actions, the conflicting views expressed in *Union Carbide & Carbon Corp. v. Nisley,* 300 F.2d 561 (10th Cir. 1961), pet. cert. dism., 371 U.S. 801 (1963); *York v. Guaranty Trust Co.,* 143 F.2d 503, 529 (2d Cir. 1944), rev'd on grounds not here relevant, 326 U.S. 99 (1945); *Pentland v. Dravo Corp.,* 152 F.2d 851, 856 (3d Cir. 1945); *Speed v. Transamerica Corp.,* 100 F.Supp. 461, 463 (D.Del.1951); *State Wholesale Grocers v. Great Atl. & Pac. Tea Co.,* 24 F.R.D. 510 (N.D.Ill.1959); *Alabama Ind. Serv. Stat. Assn. v. Shell Pet. Corp.,* 28 F.Supp. 386, 390 (N.D.Ala.1939); *Tolliver v. Cudahy Packing Co.,* 39 F.Supp. 337, 339 (E.D.Tenn.1941); Kalven & Rosenfield, supra, 8 U. of Chi.L.Rev. 684 (1941); Comment, 53 Nw.U.L.Rev. 627, 632-33 (1958); *Developments in the Law, supra,* 71 Harv.L.Rev. at 935; 2 Barron & Holtzoff, supra, § 568; but cf. *Lockwood v. Hercules Powder Co.,* 7 F.R.D. 24, 28-29 (W.D.Mo.1947); *Abram v. San Joaquin Cotton Oil Co.,* 46 F.Supp. 969, 976-77 (S.D.Calif.1942); Chafee, supra, at 280, 285; 3 Moore, supra, par. 23.12, at 3476. Under proposed subdivision (c)(3), one-way intervention is excluded; the action will have been early determined to be a class or nonclass action, and in the former case the judgment, whether or not favorable, will include the class, as above stated.

Although thus declaring that the judgment in a class action includes the class, as defined, subdivision (c)(3) does not disturb the recognized principle that the court conducting the action cannot predetermine the *res judicata* effect of the judgment; this can be tested only in a subsequent action. See Restatement, Judgments § 86, comment (h), § 116 (1942). The court, however, in framing the judgment in any suit brought as a class action, must decide what its extent or coverage shall be, and if the matter is carefully considered, questions of *res judicata* are less likely to be raised at a later time and if raised will be more satisfactorily answered. See Chafee, supra, at 294; Weinstein, supra, 9 Buffalo L.Rev. at 460.

**Subdivision (c)(4).** This provision recognizes that an action may be maintained as a class action as to particular issues only. For example, in a fraud or similar case the action may retain its "class" character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims.

Two or more classes may be represented in a single action. Where a class is found to include subclasses divergent in interest, the class may be divided correspondingly, and each subclass treated as a class.

**Subdivision (d)** is concerned with the fair and efficient conduct of the action and lists some types of orders which may be appropriate.

**SAP55**

The court should consider how the proceedings are to be arranged in sequence, and what measures should be taken to simplify the proof and argument. See subdivision (d)(1). The orders resulting from this consideration, like the others referred to in subdivision (d), may be combined with a pretrial order under Rule 16, and are subject to modification as the case proceeds.

**Subdivision (d)(2)** sets out a non-exhaustive list of possible occasions for orders requiring notice to the class. Such notice is not a novel conception. For example, in "limited fund" cases, members of the class have been notified to present individual claims after the basic class decision. Notice has gone to members of a class so that they might express any opposition to the representation, see *United States v. American Optical Co.,* 97 F.Supp. 66 (N.D.Ill.1951), and 1950-51 CCH Trade Cases 64573-74 (par. 62869); cf. *Weeks v. Bareco Oil Co.,* 125 F.2d 84, 94 (7th Cir. 1941), and notice may encourage interventions to improve the representation of the class. Cf. *Oppenheimer v. F. J. Young & Co.,* 144 F.2d 387 (2d Cir. 1944). Notice has been used to poll members on a proposed modification of a consent decree. See record in *Sam Fox Publishing Co. v. United States,* 366 U.S. 683 (1961).

Subdivision (d)(2) does not require notice at any stage, but rather calls attention to its availability and invokes the court's discretion. In the degree that there is cohesiveness or unity in the class and the representation is effective, the need for notice to the class will tend toward a minimum. These indicators suggest that notice under subdivision (d)(2) may be particularly useful and advisable in certain class actions maintained under subdivision (b)(3), for example, to permit members of the class to object to the representation. Indeed, under subdivision (c)(2), notice must be ordered, and is not merely discretionary, to give the members in a subdivision (b)(3) class action an opportunity to secure exclusion from the class. This mandatory notice pursuant to subdivision (c)(2), together with any discretionary notice which the court may find it advisable to give under subdivision (d)(2), is designed to fulfill requirements of due process to which the class action procedure is of course subject. See *Hansberry v. Lee,* 311 U.S. 32 (1940); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306 (1950); cf. *Dickinson v. Burnham,* 197 F.2d 973, 979 (2d Cir. 1952), and studies cited at 979 in 4; see also *All American Airways, Inc. v. Elderd,* 209 F.2d 247, 249 (2d Cir. 1954); *Gart v. Cole,* 263 F.2d 244, 248-49 (2d Cir. 1959), cert. denied, 359 U.S. 978 (1959).

Notice to members of the class, whenever employed under amended Rule 23, should be accommodated to the particular purpose but need not comply with the formalities for service of process. See Chafee, supra, at 230-31; *Brendle v. Smith,* 7 F.R.D. 119 (S.D.N.Y.1946). The fact that notice is given at one stage of the action does not mean that it must be given at subsequent stages. Notice is available fundamentally "for the protection of the members of the class or otherwise for the fair conduct of the action" and should not be used merely as a device for the undesirable solicitation of claims. See the discussion in *Cherner v. Transitron Electronic Corp.,* 201 F.Supp. 934 (D.Mass.1962); *Hormel v. United States,* 17 F.R.D. 303 (S.D.N.Y.1955).

In appropriate cases the court should notify interested government agencies of the pendency of the action or of particular steps therein.

**Subdivision (d)(3)** reflects the possibility of conditioning the maintenance of a class action, e.g., on the strengthening of the representation, see subdivision (c)(1) above; and recognizes that the imposition of conditions on intervenors may be required for the proper and efficient conduct of the action.

As to orders under subdivision (d)(4), see subdivision (c)(1) above.

**Subdivision (e)** requires approval of the court, after notice, for the dismissal or compromise of any class action.

1987 Amendment

The amendments are technical. No substantive change is intended.

1998 Amendments

**SAP56**

**Subdivision (f).** This permissive interlocutory appeal provision is adopted under the power conferred by 28 U.S.C. § 1292(e). Appeal from an order granting or denying class certification is permitted in the sole discretion of the court of appeals. No other type of Rule 23 order is covered by this provision. The court of appeals is given unfettered discretion whether to permit the appeal, akin to the discretion exercised by the Supreme Court in acting on a petition for certiorari. This discretion suggests an analogy to the provision in 28 U.S.C. § 1292(b) for permissive appeal on certification by a district court. Subdivision (f), however, departs from the § 1291(b) model in two significant ways. It does not require that the district court certify the certification ruling for appeal, although the district court often can assist the parties and court of appeals by offering advice on the desirability of appeal. And it does not include the potentially limiting requirements of § 1292(b) that the district court order "involve a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."

The courts of appeals will develop standards for granting review that reflect the changing areas of uncertainty in class litigation. The Federal Judicial Center study supports the view that many suits with class-action allegations present familiar and almost routine issues that are no more worthy of immediate appeal than many other interlocutory rulings. Yet several concerns justify expansion of present opportunities to appeal. An order denying certification may confront the plaintiff with a situation in which the only sure path to appellate review is by proceeding to final judgment on the merits of an individual claim that, standing alone, is far smaller than the costs of litigation. An order granting certification, on the other hand, may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability. These concerns can be met at low cost by establishing in the court of appeals a discretionary power to grant interlocutory review in cases that show appeal-worthy certification issues.

Permission to appeal may be granted or denied on the basis of any consideration that the court of appeals finds persuasive. Permission is most likely to be granted when the certification decision turns on a novel or unsettled question of law, or when, as a practical matter, the decision on certification is likely dispositive of the litigation.

The district court, having worked through the certification decision, often will be able to provide cogent advice on the factors that bear on the decision whether to permit appeal. This advice can be particularly valuable if the certification decision is tentative. Even as to a firm certification decision, a statement of reasons bearing on the probably benefits and costs of immediate appeal can help focus the court of appeals decision, and may persuade the disappointed party that an attempt to appeal would be fruitless.

The 10-day period for seeking permission to appeal is designed to reduce the risk that attempted appeals will disrupt continuing proceedings. It is expected that the courts of appeals will act quickly in making the preliminary determination whether to permit appeal. Permission to appeal does not stay trial court proceedings. A stay should be sought first from the trial court. If the trial court refuses a stay, its action and any explanation of its views should weigh heavily with the court of appeals.

Appellate Rule 5 has been modified to establish the procedure for petitioning for leave to appeal under subdivision (f).

2003 Amendments

**Subdivision (c).** Subdivision (c) is amended in several respects. The requirement that the court determine whether to certify a class "as soon as practicable after commencement of an action" is replaced by requiring determination "at an early practicable time." The notice provisions are substantially revised.

**Paragraph (1).** Subdivision (c)(1)(A) is changed to require that the determination whether to certify a class be made "at an early practicable time." The "as soon as practicable" exaction neither reflects prevailing practice nor captures the many valid reasons that may justify deferring the initial certification decision. See Willging, Hooper & Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 26-36* (Federal Judicial Center 1996).

**SAP57**

Time may be needed to gather information necessary to make the certification decision. Although an evaluation of the probable outcome on the merits is not properly part of the certification decision, discovery in aid of the certification decision often includes information required to identify the nature of the issues that actually will be presented at trial. In this sense it is appropriate to conduct controlled discovery into the "merits," limited to those aspects relevant to making the certification decision on an informed basis. Active judicial supervision may be required to achieve the most effective balance that expedites an informed certification determination without forcing an artificial and ultimately wasteful division between "certification discovery" and "merits discovery." A critical need is to determine how the case will be tried. An increasing number of courts require a party requesting class certification to present a "trial plan" that describes the issues likely to be presented at trial and tests whether they are susceptible of class-wide proof. See Manual For Complex Litigation Third, § 21.213, p. 44; § 30.11, p. 214; § 30.12, p. 215.

Other considerations may affect the timing of the certification decision. The party opposing the class may prefer to win dismissal or summary judgment as to the individual plaintiffs without certification and without binding the class that might have been certified. Time may be needed to explore designation of class counsel under Rule 23(g), recognizing that in many cases the need to progress toward the certification determination may require designation of interim counsel under Rule 23(g)(2)(A).

Although many circumstances may justify deferring the certification decision, active management may be necessary to ensure that the certification decision is not unjustifiably delayed.

Subdivision (c)(1)(C) reflects two amendments. The provision that a class certification "may be conditional" is deleted. A court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met. The provision that permits alteration or amendment of an order granting or denying class certification is amended to set the cut-off point at final judgment rather than "the decision on the merits." This change avoids the possible ambiguity in referring to "the decision on the merits." Following a determination of liability, for example, proceedings to define the remedy may demonstrate the need to amend the class definition or subdivide the class. In this setting the final judgment concept is pragmatic. It is not the same as the concept used for appeal purposes, but it should be flexible, particularly in protracted litigation.

The authority to amend an order under Rule 23(c)(1) before final judgment does not restore the practice of "one-way intervention" that was rejected by the 1966 revision of Rule 23. A determination of liability after certification, however, may show a need to amend the class definition. Decertification may be warranted after further proceedings.

If the definition of a class certified under Rule 23(b)(3) is altered to include members who have not been afforded notice and an opportunity to request exclusion, notice--including an opportunity to request exclusion--must be directed to the new class members under Rule 23(c)(2)(B).

**Paragraph (2).** The first change made in Rule 23(c)(2) is to call attention to the court's authority--already established in part by Rule 23(d)(2)--to direct notice of certification to a Rule 23(b)(1) or (b)(2) class. The present rule expressly requires notice only in actions certified under Rule 23(b)(3). Members of classes certified under Rules 23(b)(1) or (b)(2) have interests that may deserve protection by notice.

The authority to direct notice to class members in a (b)(1) or (b)(2) class action should be exercised with care. For several reasons, there may be less need for notice than in a (b)(3) class action. There is no right to request exclusion from a (b)(1) or (b)(2) class. The characteristics of the class may reduce the need for formal notice. The cost of providing notice, moreover, could easily cripple actions that do not seek damages. The court may decide not to direct notice after balancing the risk that notice costs may deter the pursuit of class relief against the benefits of notice.

When the court does direct certification notice in a (b)(1) or (b)(2) class action, the discretion and flexibility established by subdivision (c)(2)(A) extend to the method of giving notice. Notice facilitates the opportunity to participate. Notice calculated to reach a significant number of class members often will protect the interests of all. Informal methods may prove effective.

**SAP58**

A simple posting in a place visited by many class members, directing attention to a source of more detailed information, may suffice. The court should consider the costs of notice in relation to the probable reach of inexpensive methods.

If a Rule 23(b)(3) class is certified in conjunction with a (b)(2) class, the (c)(2)(B) notice requirements must be satisfied as to the (b)(3) class.

The direction that class-certification notice be couched in plain, easily understood language is a reminder of the need to work unremittingly at the difficult task of communicating with class members. It is difficult to provide information about most class actions that is both accurate and easily understood by class members who are not themselves lawyers. Factual uncertainty, legal complexity, and the complication of class-action procedure raise the barriers high. The Federal Judicial Center has created illustrative clear-notice forms that provide a helpful starting point for actions similar to those described in the forms.

**Subdivision (e).** Subdivision (e) is amended to strengthen the process of reviewing proposed class-action settlements. Settlement may be a desirable means of resolving a class action. But court review and approval are essential to assure adequate representation of class members who have not participated in shaping the settlement.

**Paragraph (1).** Subdivision (e)(1)(A) expressly recognizes the power of a class representative to settle class claims, issues, or defenses.

Rule 23(e)(1)(A) resolves the ambiguity in former Rule 23(e)'s reference to dismissal or compromise of "a class action." That language could be--and at times was--read to require court approval of settlements with putative class representatives that resolved only individual claims. See Manual for Complex Litigation Third, § 30.41. The new rule requires approval only if the claims, issues, or defenses of a certified class are resolved by a settlement, voluntary dismissal, or compromise.

Subdivision (e)(1)(B) carries forward the notice requirement of present Rule 23(e) when the settlement binds the class through claim or issue preclusion; notice is not required when the settlement binds only the individual class representatives. Notice of a settlement binding on the class is required either when the settlement follows class certification or when the decisions on certification and settlement proceed simultaneously.

Reasonable settlement notice may require individual notice in the manner required by Rule 23(c)(2)(B) for certification notice to a Rule 23(b)(3) class. Individual notice is appropriate, for example, if class members are required to take action--such as filing claims--to participate in the judgment, or if the court orders a settlement opt-out opportunity under Rule 23(e)(3).

Subdivision (e)(1)(C) confirms and mandates the already common practice of holding hearings as part of the process of approving settlement, voluntary dismissal, or compromise that would bind members of a class.

Subdivision (e)(1)(C) states the standard for approving a proposed settlement that would bind class members. The settlement must be fair, reasonable, and adequate. A helpful review of many factors that may deserve consideration is provided by *In re: Prudential Ins. Co. America Sales Practice Litigation Agent Actions,* 148 F.3d 283, 316-324 (3d Cir. 1998). Further guidance can be found in the Manual for Complex Litigation.

The court must make findings that support the conclusion that the settlement is fair, reasonable, and adequate. The findings must be set out in sufficient detail to explain to class members and the appellate court the factors that bear on applying the standard.

Settlement review also may provide an occasion to review the cogency of the initial class definition. The terms of the settlement themselves, or objections, may reveal divergent interests of class members and demonstrate the need to redefine the class or to designate subclasses. Redefinition of a class certified under Rule 23(b)(3) may require notice to new class members under Rule 23(c)(2)(B). See Rule 23(c)(1)(C).

**SAP59**

**Paragraph (2).** Subdivision (e)(2) requires parties seeking approval of a settlement, voluntary dismissal, or compromise under Rule 23(e)(1) to file a statement identifying any agreement made in connection with the settlement. This provision does not change the basic requirement that the parties disclose all terms of the settlement or compromise that the court must approve under Rule 23(e)(1). It aims instead at related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others. Doubts should be resolved in favor of identification.

Further inquiry into the agreements identified by the parties should not become the occasion for discovery by the parties or objectors. The court may direct the parties to provide to the court or other parties a summary or copy of the full terms of any agreement identified by the parties. The court also may direct the parties to provide a summary or copy of any agreement not identified by the parties that the court considers relevant to its review of a proposed settlement. In exercising discretion under this rule, the court may act in steps, calling first for a summary of any agreement that may have affected the settlement and then for a complete version if the summary does not provide an adequate basis for review. A direction to disclose a summary or copy of an agreement may raise concerns of confidentiality. Some agreements may include information that merits protection against general disclosure. And the court must provide an opportunity to claim work-product or other protections.

**Paragraph (3).** Subdivision (e)(3) authorizes the court to refuse to approve a settlement unless the settlement affords class members a new opportunity to request exclusion from a class certified under Rule 23(b)(3) after settlement terms are known. An agreement by the parties themselves to permit class members to elect exclusion at this point by the settlement agreement may be one factor supporting approval of the settlement. Often there is an opportunity to opt out at this point because the class is certified and settlement is reached in circumstances that lead to simultaneous notice of certification and notice of settlement. In these cases, the basic opportunity to elect exclusion applies without further complication. In some cases, particularly if settlement appears imminent at the time of certification, it may be possible to achieve equivalent protection by deferring notice and the opportunity to elect exclusion until actual settlement terms are known. This approach avoids the cost and potential confusion of providing two notices and makes the single notice more meaningful. But notice should not be delayed unduly after certification in the hope of settlement.

Rule 23(e)(3) authorizes the court to refuse to approve a settlement unless the settlement affords a new opportunity to elect exclusion in a case that settles after a certification decision if the earlier opportunity to elect exclusion provided with the certification notice has expired by the time of the settlement notice. A decision to remain in the class is likely to be more carefully considered and is better informed when settlement terms are known.

The opportunity to request exclusion from a proposed settlement is limited to members of a (b)(3) class. Exclusion may be requested only by individual class members; no class member may purport to opt out other class members by way of another class action.

The decision whether to approve a settlement that does not allow a new opportunity to elect exclusion is confided to the court's discretion. The court may make this decision before directing notice to the class under Rule 23(e)(1)(B) or after the Rule 23(e)(1)(C) hearing. Many factors may influence the court's decision. Among these are changes in the information available to class members since expiration of the first opportunity to request exclusion, and the nature of the individual class members' claims.

The terms set for permitting a new opportunity to elect exclusion from the proposed settlement of a Rule 23(b)(3) class action may address concerns of potential misuse. The court might direct, for example, that class members who elect exclusion are bound by rulings on the merits made before the settlement was proposed for approval. Still other terms or conditions may be appropriate.

**Paragraph (4).** Subdivision (e)(4) confirms the right of class members to object to a proposed settlement, voluntary dismissal, or compromise. The right is defined in relation to a disposition that, because it would bind the class, requires court approval under subdivision (e)(1)(C).

**SAP60**

Subdivision (e)(4)(B) requires court approval for withdrawal of objections made under subdivision (e)(4)(A). Review follows automatically if the objections are withdrawn on terms that lead to modification of the settlement with the class. Review also is required if the objector formally withdraws the objections. If the objector simply abandons pursuit of the objection, the court may inquire into the circumstances.

Approval under paragraph (4)(B) may be given or denied with little need for further inquiry if the objection and the disposition go only to a protest that the individual treatment afforded the objector under the proposed settlement is unfair because of factors that distinguish the objector from other class members. Different considerations may apply if the objector has protested that the proposed settlement is not fair, reasonable, or adequate on grounds that apply generally to a class or subclass. Such objections, which purport to represent class-wide interests, may augment the opportunity for obstruction or delay. If such objections are surrendered on terms that do not affect the class settlement or the objector's participation in the class settlement, the court often can approve withdrawal of the objections without elaborate inquiry.

Once an objector appeals, control of the proceeding lies in the court of appeals. The court of appeals may undertake review and approval of a settlement with the objector, perhaps as part of appeal settlement procedures, or may remand to the district court to take advantage of the district court's familiarity with the action and settlement.

**Subdivision (g).** Subdivision (g) is new. It responds to the reality that the selection and activity of class counsel are often critically important to the successful handling of a class action. Until now, courts have scrutinized proposed class counsel as well as the class representative under Rule 23(a)(4). This experience has recognized the importance of judicial evaluation of the proposed lawyer for the class, and this new subdivision builds on that experience rather than introducing an entirely new element into the class certification process. Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while this subdivision will guide the court in assessing proposed class counsel as part of the certification decision. This subdivision recognizes the importance of class counsel, states the obligation to represent the interests of the class, and provides a framework for selection of class counsel. The procedure and standards for appointment vary depending on whether there are multiple applicants to be class counsel. The new subdivision also provides a method by which the court may make directions from the outset about the potential fee award to class counsel in the event the action is successful.

**Paragraph (1)** sets out the basic requirement that class counsel be appointed if a class is certified and articulates the obligation of class counsel to represent the interests of the class, as opposed to the potentially conflicting interests of individual class members. It also sets out the factors the court should consider in assessing proposed class counsel.

**Paragraph (1)(A)** requires that the court appoint class counsel to represent the class. Class counsel must be appointed for all classes, including each subclass that the court certifies to represent divergent interests.

Paragraph (1)(A) does not apply if "a statute provides otherwise." This recognizes that provisions of the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified in various sections of 15 U.S.C.), contain directives that bear on selection of a lead plaintiff and the retention of counsel. This subdivision does not purport to supersede or to affect the interpretation of those provisions, or any similar provisions of other legislation.

**Paragraph 1(B)** recognizes that the primary responsibility of class counsel, resulting from appointment as class counsel, is to represent the best interests of the class. The rule thus establishes the obligation of class counsel, an obligation that may be different from the customary obligations of counsel to individual clients. Appointment as class counsel means that the primary obligation of counsel is to the class rather than to any individual members of it. The class representatives do not have an unfettered right to "fire" class counsel. In the same vein, the class representatives cannot command class counsel to accept or reject a settlement proposal. To the contrary, class counsel must determine whether seeking the court's approval of a settlement would be in the best interests of the class as a whole.

SAP61

**Paragraph (1)(C)** articulates the basic responsibility of the court to appoint class counsel who will provide the adequate representation called for by paragraph (1)(B). It identifies criteria that must be considered and invites the court to consider any other pertinent matters. Although couched in terms of the court's duty, the listing also informs counsel seeking appointment about the topics that should be addressed in an application for appointment or in the motion for class certification.

The court may direct potential class counsel to provide additional information about the topics mentioned in paragraph (1)(C) or about any other relevant topic. For example, the court may direct applicants to inform the court concerning any agreements about a prospective award of attorney fees or nontaxable costs, as such agreements may sometimes be significant in the selection of class counsel. The court might also direct that potential class counsel indicate how parallel litigation might be coordinated or consolidated with the action before the court.

The court may also direct counsel to propose terms for a potential award of attorney fees and nontaxable costs. Attorney fee awards are an important feature of class action practice, and attention to this subject from the outset may often be a productive technique. Paragraph (2)(C) therefore authorizes the court to provide directions about attorney fees and costs when appointing class counsel. Because there will be numerous class actions in which this information is not likely to be useful, the court need not consider it in all class actions.

Some information relevant to class counsel appointment may involve matters that include adversary preparation in a way that should be shielded from disclosure to other parties. An appropriate protective order may be necessary to preserve confidentiality.

In evaluating prospective class counsel, the court should weigh all pertinent factors. No single factor should necessarily be determinative in a given case. For example, the resources counsel will commit to the case must be appropriate to its needs, but the court should be careful not to limit consideration to lawyers with the greatest resources.

If, after review of all applicants, the court concludes that none would be satisfactory class counsel, it may deny class certification, reject all applications, recommend that an application be modified, invite new applications, or make any other appropriate order regarding selection and appointment of class counsel.

**Paragraph (2).** This paragraph sets out the procedure that should be followed in appointing class counsel. Although it affords substantial flexibility, it provides the framework for appointment of class counsel in all class actions. For counsel who filed the action, the materials submitted in support of the motion for class certification may suffice to justify appointment so long as the information described in paragraph (g)(1)(C) is included. If there are other applicants, they ordinarily would file a formal application detailing their suitability for the position.

In a plaintiff class action the court usually would appoint as class counsel only an attorney or attorneys who have sought appointment. Different considerations may apply in defendant class actions.

The rule states that the court should appoint "class counsel." In many instances, the applicant will be an individual attorney. In other cases, however, an entire firm, or perhaps numerous attorneys who are not otherwise affiliated but are collaborating on the action will apply. No rule of thumb exists to determine when such arrangements are appropriate; the court should be alert to the need for adequate staffing of the case, but also to the risk of overstaffing or an ungainly counsel structure.

**Paragraph (2)(A)** authorizes the court to designate interim counsel during the pre-certification period if necessary to protect the interests of the putative class. Rule 23(c)(1)(B) directs that the order certifying the class include appointment of class counsel. Before class certification, however, it will usually be important for an attorney to take action to prepare for the certification decision. The amendment to Rule 23(c)(1) recognizes that some discovery is often necessary for that determination. It also may be important to make or respond to motions before certification. Settlement may be discussed before certification. Ordinarily, such work is handled by the lawyer who filed the action. In some cases, however, there may be rivalry or uncertainty that makes formal designation of interim counsel appropriate. Rule 23(g)(2)(A) authorizes the court to designate interim counsel to act on

**SAP62**

behalf of the putative class before the certification decision is made. Failure to make the formal designation does not prevent the attorney who filed the action from proceeding in it. Whether or not formally designated interim counsel, an attorney who acts on behalf of the class before certification must act in the best interests of the class as a whole. For example, an attorney who negotiates a pre-certification settlement must seek a settlement that is fair, reasonable, and adequate for the class.

Rule 23(c)(1) provides that the court should decide whether to certify the class "at an early practicable time," and directs that class counsel should be appointed in the order certifying the class. In some cases, it may be appropriate for the court to allow a reasonable period after commencement of the action for filing applications to serve as class counsel. The primary ground for deferring appointment would be that there is reason to anticipate competing applications to serve as class counsel. Examples might include instances in which more than one class action has been filed, or in which other attorneys have filed individual actions on behalf of putative class members. The purpose of facilitating competing applications in such a case is to afford the best possible representation for the class. Another possible reason for deferring appointment would be that the initial applicant was found inadequate, but it seems appropriate to permit additional applications rather than deny class certification.

**Paragraph (2)(B)** states the basic standard the court should use in deciding whether to certify the class and appoint class counsel in the single applicant situation--that the applicant be able to provide the representation called for by paragraph (1)(B) in light of the factors identified in paragraph (1)(C).

If there are multiple adequate applicants, paragraph (2)(B) directs the court to select the class counsel best able to represent the interests of the class. This decision should also be made using the factors outlined in paragraph (1)(C), but in the multiple applicant situation the court is to go beyond scrutinizing the adequacy of counsel and make a comparison of the strengths of the various applicants. As with the decision whether to appoint the sole applicant for the position, no single factor should be dispositive in selecting class counsel in cases in which there are multiple applicants. The fact that a given attorney filed the instant action, for example, might not weigh heavily in the decision if that lawyer had not done significant work identifying or investigating claims. Depending on the nature of the case, one important consideration might be the applicant's existing attorney-client relationship with the proposed class representative.

**Paragraph (2)(C)** builds on the appointment process by authorizing the court to include provisions regarding attorney fees in the order appointing class counsel. Courts may find it desirable to adopt guidelines for fees or nontaxable costs, or to direct class counsel to report to the court at regular intervals on the efforts undertaken in the action, to facilitate the court's later determination of a reasonable attorney fee.

**Subdivision (h).** Subdivision (h) is new. Fee awards are a powerful influence on the way attorneys initiate, develop, and conclude class actions. Class action attorney fee awards have heretofore been handled, along with all other attorney fee awards, under Rule 54(d)(2), but that rule is not addressed to the particular concerns of class actions. This subdivision is designed to work in tandem with new subdivision (g) on appointment of class counsel, which may afford an opportunity for the court to provide an early framework for an eventual fee award, or for monitoring the work of class counsel during the pendency of the action.

Subdivision (h) applies to "an action certified as a class action." This includes cases in which there is a simultaneous proposal for class certification and settlement even though technically the class may not be certified unless the court approves the settlement pursuant to review under Rule 23(e). When a settlement is proposed for Rule 23(e) approval, either after certification or with a request for certification, notice to class members about class counsel's fee motion would ordinarily accompany the notice to the class about the settlement proposal itself.

This subdivision does not undertake to create new grounds for an award of attorney fees or nontaxable costs. Instead, it applies when such awards are authorized by law or by agreement of the parties. Against that background, it provides a format for all awards of attorney fees and nontaxable costs in connection with a class action, not only the award to class counsel. In some situations, there may be a basis for making an award to other counsel whose work produced a beneficial result for the class, such as attorneys who acted for the class before certification but were not appointed class counsel, or attorneys who represented

**SAP63**

objectors to a proposed settlement under Rule 23(e) or to the fee motion of class counsel. Other situations in which fee awards are authorized by law or by agreement of the parties may exist.

This subdivision authorizes an award of "reasonable" attorney fees and nontaxable costs. This is the customary term for measurement of fee awards in cases in which counsel may obtain an award of fees under the "common fund" theory that applies in many class actions, and is used in many fee-shifting statutes. Depending on the circumstances, courts have approached the determination of what is reasonable in different ways. In particular, there is some variation among courts about whether in "common fund" cases the court should use the lodestar or a percentage method of determining what fee is reasonable. The rule does not attempt to resolve the question whether the lodestar or percentage approach should be viewed as preferable.

Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class-action process. Continued reliance on caselaw development of fee-award measures does not diminish the court's responsibility. In a class action, the district court must ensure that the amount and mode of payment of attorney fees are fair and proper whether the fees come from a common fund or are otherwise paid. Even in the absence of objections, the court bears this responsibility.

Courts discharging this responsibility have looked to a variety of factors. One fundamental focus is the result actually achieved for class members, a basic consideration in any case in which fees are sought on the basis of a benefit achieved for class members. The Private Securities Litigation Reform Act of 1995 explicitly makes this factor a cap for a fee award in actions to which it applies. See 15 U.S.C. §§ 77z-1(a)(6); 78u-4(a)(6) (fee award should not exceed a "reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class"). For a percentage approach to fee measurement, results achieved is the basic starting point.

In many instances, the court may need to proceed with care in assessing the value conferred on class members. Settlement regimes that provide for future payments, for example, may not result in significant actual payments to class members. In this connection, the court may need to scrutinize the manner and operation of any applicable claims procedure. In some cases, it may be appropriate to defer some portion of the fee award until actual payouts to class members are known. Settlements involving nonmonetary provisions for class members also deserve careful scrutiny to ensure that these provisions have actual value to the class. On occasion the court's Rule 23(e) review will provide a solid basis for this sort of evaluation, but in any event it is also important to assessing the fee award for the class.

At the same time, it is important to recognize that in some class actions the monetary relief obtained is not the sole determinant of an appropriate attorney fees award. Cf. *Blanchard v. Bergeron*, 489 U.S. 87, 95 (1989) (cautioning in an individual case against an "undesirable emphasis" on "the importance of the recovery of damages in civil rights litigation" that might "shortchange efforts to seek effective injunctive or declaratory relief").

Any directions or orders made by the court in connection with appointing class counsel under Rule 23(g) should weigh heavily in making a fee award under this subdivision.

Courts have also given weight to agreements among the parties regarding the fee motion, and to agreements between class counsel and others about the fees claimed by the motion. Rule 54(d)(2)(B) provides: "If directed by the court, the motion shall also disclose the terms of any agreement with respect to fees to be paid for the services for which claim is made." The agreement by a settling party not to oppose a fee application up to a certain amount, for example, is worthy of consideration, but the court remains responsible to determine a reasonable fee. "Side agreements" regarding fees provide at least perspective pertinent to an appropriate fee award.

In addition, courts may take account of the fees charged by class counsel or other attorneys for representing individual claimants or objectors in the case. In determining a fee for class counsel, the court's objective is to ensure an overall fee that is fair for counsel and equitable within the class. In some circumstances individual fee agreements between class counsel and class

**SAP64**

members might have provisions inconsistent with those goals, and the court might determine that adjustments in the class fee award were necessary as a result.

Finally, it is important to scrutinize separately the application for an award covering nontaxable costs. If costs were addressed in the order appointing class counsel, those directives should be a presumptive starting point in determining what is an appropriate award.

**Paragraph (1).** Any claim for an award of attorney fees must be sought by motion under Rule 54(d)(2), which invokes the provisions for timing of appeal in Rule 58 and Appellate Rule 4. Owing to the distinctive features of class action fee motions, however, the provisions of this subdivision control disposition of fee motions in class actions, while Rule 54(d)(2) applies to matters not addressed in this subdivision.

The court should direct when the fee motion must be filed. For motions by class counsel in cases subject to court review of a proposed settlement under Rule 23(e), it would be important to require the filing of at least the initial motion in time for inclusion of information about the motion in the notice to the class about the proposed settlement that is required by Rule 23(e). In cases litigated to judgment, the court might also order class counsel's motion to be filed promptly so that notice to the class under this subdivision (h) can be given.

Besides service of the motion on all parties, notice of class counsel's motion for attorney fees must be "directed to the class in a reasonable manner." Because members of the class have an interest in the arrangements for payment of class counsel whether that payment comes from the class fund or is made directly by another party, notice is required in all instances. In cases in which settlement approval is contemplated under Rule 23(e), notice of class counsel's fee motion should be combined with notice of the proposed settlement, and the provision regarding notice to the class is parallel to the requirements for notice under Rule 23(e). In adjudicated class actions, the court may calibrate the notice to avoid undue expense.

**Paragraph (2).** A class member and any party from whom payment is sought may object to the fee motion. Other parties--for example, nonsettling defendants--may not object because they lack a sufficient interest in the amount the court awards. The rule does not specify a time limit for making an objection. In setting the date objections are due, the court should provide sufficient time after the full fee motion is on file to enable potential objectors to examine the motion.

The court may allow an objector discovery relevant to the objections. In determining whether to allow discovery, the court should weigh the need for the information against the cost and delay that would attend discovery. See Rule 26(b)(2). One factor in determining whether to authorize discovery is the completeness of the material submitted in support of the fee motion, which depends in part on the fee measurement standard applicable to the case. If the motion provides thorough information, the burden should be on the objector to justify discovery to obtain further information.

**Paragraph (3).** Whether or not there are formal objections, the court must determine whether a fee award is justified and, if so, set a reasonable fee. The rule does not require a formal hearing in all cases. The form and extent of a hearing depend on the circumstances of the case. The rule does require findings and conclusions under Rule 52(a).

**Paragraph (4).** By incorporating Rule 54(d)(2), this provision gives the court broad authority to obtain assistance in determining the appropriate amount to award. In deciding whether to direct submission of such questions to a special master or magistrate judge, the court should give appropriate consideration to the cost and delay that such a process might entail.

2007 Amendment

The language of Rule 23 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

**SAP65**

Amended Rule 23(d)(2) carries forward the provisions of former Rule 23(d) that recognize two separate propositions. First, a Rule 23(d) order may be combined with a pretrial order under Rule 16. Second, the standard for amending the Rule 23(d) order continues to be the more open-ended standard for amending Rule 23(d) orders, not the more exacting standard for amending Rule 16 orders.

As part of the general restyling, intensifiers that provide emphasis but add no meaning are consistently deleted. Amended Rule 23(f) omits as redundant the explicit reference to court of appeals discretion in deciding whether to permit an interlocutory appeal. The omission does not in any way limit the unfettered discretion established by the original rule.

2009 Amendments

The time set in the former rule at 10 days has been revised to 14 days. See the Note to Rule 6.

Notes of Decisions (373)

Fed. Rules Civ. Proc. Rule 23, 28 U.S.C.A., FRCP Rule 23
Amendments received to 6-15-13

---

**End of Document** © 2013 Thomson Reuters. No claim to original U.S. Government Works.

SAP66