# 13-2340(L)

## 13-2345(Con)

### In the United States Court of Appeals for the Second Circuit

SHIMON LAOR, BANCO GENERAL, S.A., EL PRADO TRADING, JULIA ANWAR, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED INVESTORS IN THE GREENWICH SENTRY, L.P. PRIVATE INVESTMENT LIMITED PARTNERSHIP, INTERAMRERICAN TRUST, ELVIRA 1950 TRUST, BONAIRE LIMITED, CARLOS GAUCH, LOANA LTD., WALL STREET SECURITIES, S.A., HARVEST DAWN INTERNATIONAL INC., OMAWA INVESTMENT CORPORATION, CARMEL VENTURES LTD., TRACONCORP, BLYTHEL ASSOCIATED CORP., MARREKESH RESOURCES, CENTRO INSPECTION AGENCY, KALANDAR INTERNATIONAL, LANDVILLE CAPITAL MANAGEMENT S.A., 20/20 INVESTMENTS, AXA PRIVATE MANAGEMENT, DIVERSIFIED INVESTMENTS ASSOCIATES CLASS A UNITS,

*(For Continuation of Caption See Inside Cover)*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF OF DEFENDANTS-APPELLANTS
THE CITCO GROUP LTD., CITCO FUND SERVICES (EUROPE),
B.V., CITCO (CANADA) INC., CITCO GLOBAL CUSTODY, N.V.,
CITCO BANK NEDERLAND N.V. DUBLIN BRANCH,
AND CITCO FUND SERVICES (BERMUDA) LTD.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Attorneys for Defendants-Appellants The Citco Group Ltd.,
Citco Fund Services (Europe) B.V., Citco (Canada) Inc.,
Citco Global Custody N.V., Citco Bank Nederland N.V. Dublin Branch,
and Citco Fund Services (Bermuda) Ltd.*

ABR CAPITAL FIXED OPTION/INCOME STRATEGIC FUND LP, HAREL INVESTMENT AND FINANCIAL SERVICES LTD., MIGUEL LOMELI, JITENDRA BHATIA, GOPAL BHATIA, KISHANCHAND BHATIA, JAYSHREE BHATIA, MANDAKINI GAJARIA, ABN AMRO LIFE S.A., BAHIA DEL RIO S.A., DIAMOND HILLS INC., KIVORY CORPORATION, NORTH CLUB, INC., PFA PENSION A/S, TAURUS THE FOURTH LTD., ZENN ASSETS HOLDING, LTD., CARLOS MATTOS, CHANDRASHEKAR GUPTA, ULRICH BLASS, ROBERTO CIOCI, SANDRA MARCHI CIOCI, JOHN PAUL DOUGHERTY, LILA NEEMBERRY, PETER A. & RITA M. CARFAGNA IRREVOCABLE CHARITABLE REMAINDER UNITRUST, MOSHE PODHORZER, R. WICKNESWARI V. RATNAM, ENRIQUE SANTOS, ENRIQUE SANTOS CALDERON, JACQUELINE URZOLA, FELIPE J. BENAVIDES, FUNDACION VIRGILIO BARCO, DAVID HOPKINS, CATALINA MEJIA, CESAR MEJIA, R.M. RADEMAKER, THE ALPHA AND OMEGA PARTNERSHIP, LP, RICHMON COMPANY LTD., POSITANO INVESTMENT LTD., DAVID I. FERBER, THE KNIGHT SERVICES HOLDINGS LIMITED, ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED, FRANK E. PIERCE, FRANK E. PIERCE IRA, NADAV ZOHAR, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, RONIT ZOHAR, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, FAIRFIELD SENTRY LTD., HEADWAY INVESTMENT CORP., JOSEFINA SANTOS URZOLA, BPV FINANCE (INTERNATIONAL) LTD., JOSE ANTONIO PUJALS, INDIVIDUALLY AND IN THEIR REPRESENTATIVE CAPACITIES FOR ALL THOSE SIMILARLY SITUATED, ROSA JULIETA A DE PUJALS, INDIVIDUALLY AND IN THEIR REPRESENTATIVE CAPACITIES FOR ALL THOSE SIMILARLY SITUATED, MARIDOM LIMITED, A FOREIGN CORPORATION, RICARDO LOPEZ, STANDARD CHARTERED BANK INTERNATIONAL (AMERICAS) LIMITED, STANCHART SECURITIES INTERNATIONAL, INC., MARIA AKRIBY VALLADOLID, RICARDO RODRIGUEZ CASO, WONG YUK HING DE LOU, JOAQUINA TERESA BARBACHANO HERRERO, SAND OVERSEAS LIMITEDSAND OVERSEAS LIMITED, BLOCKBEND LTD, BAYMALL INVESTMENTS LTD, EASTFORK ASSETS LTD, GERICO INVESTMENTS, INC., ALICIA GAVIRIA RIVERA, EDUARDO CHILD ESCOBAR, MAILAND INVESTMENT INC., AXA PRIVATE MANAGEMENT, PASHA S. ANWAR, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED INVESTORS IN THE GREENWICH SENTRY, L.P. PRIVATE INVESTMENT LIMITED PARTNERSHIP, BEVINGTON MANAGEMENT, LTD., CALWELL INVESTMENT S.A., HEDGE STRATEGY FUND LLC, DEEPA GUPTA, E. THOMAS DOUGHERTY NOVELLA, MUNIANDY NALAIAH, MOISES LOU MARTINEZ,

*Plaintiffs,*

and

ST. STEPHEN'S SCHOOL, PACIFIC WEST HEALTH MEDICAL CENTER INC. EMPLOYEES RETIREMENT TRUST, ON BEHALF OF ITSELF, PACIFIC WEST HEALTH MEDICAL CENTER INC. EMPLOYEES RETIREMENT TRUST, ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, SECURITIES & INVESTMENT COMPANY BAHRAIN, HAREL INSURANCE COMPANY, LTD., ST. STEPHEN'S SCHOOL, PACIFIC WEST HEALTH MEDICAL CENTER, INC. EMPLOYEE'S RETIREMENT TRUST,

*Plaintiffs-Appellees,*

v.

YANKO DELLAW SCHIAVA, PHILIP TOUB, LOURDES BARRENECHE, CORNELIS BOELE, MATTHEW C. BROWN, VIANNEY D'HENDECOURT, HAROLD GREISMAN, JACQUELINE HARARY, DAVID HORN, RICHARD LANDSBERGER, DAVID LIPTON, JULIA LUONGO, MARK MCKEEFRY, MARIA TERESA PULIDO MENDOZO, CHARLES MURPHY, SANTIAGO REYES, ANDREW SMITH, GREENWICH SENTRY, L.P., FAIRFIELD SENTRY LIMITED, PRICEWATERHOUSECOOPERS INTERNATIONAL LIMITED, PRICEWATERHOUSECOOPERS LLP (US), PRICEWATERHOUSECOOPERS LLP CHARTERED ACCOUNTANTS, FAIRFIELD INTERNATIONAL MANAGERS, INC., AMIT VIJAYVERGIYA, CORINA NOEL PIEDRAHITA, 1-20 JOHN DOES, STANDARD CHARTERED INTERNATIONAL (USA) LTD., STANDARD CHARTERED PLC, AMERICAN EXPRESS BANK LTD., AMERICAN EXPRESS BANK LTD., STANDARD CHARTERED BANK INTERNATIONAL (AMERICAS) LIMITED, A FOREIGN ENTITY, STANDARD CHARTERED PRIVATE BANK, FOREIGN ENTITY, AND A PRIVATE BANKING DIVISION OF STANDARD CHARTERED BANK, STANDARD CHARTERERD BANK, GREGORY BOWES, STANDARD CHARTERED BANK INTERNATIONAL (AMERICAS) LIMITED, STANDARD CHARTERED BANK INTERNATIONAL (AMERICAS) LIMITED,

*Consolidated-Defendants,*

and

GLOBEOP FINANCIAL SERVICES LLC, FAIRFIELD GREENWICH LIMITED, A CAYMAN ISLAND COMPANY, FAIRFIELD GREENWICH GROUP, FAIRFIELD GREENWICH (BERMUDA) LTD., FAIRFIELD GREENWICH ADVISORS L.L.C., WALTER M. NOEL, JR., ANDRES PIEDRAHITA, JEFFREY TUCKER, BRIAN FRANCOUER, AMIT VIGAYVERGIA, PRICEWATERHOUSECOOPERS BERMUDA, IAN PILGRIM, FAIRFIELD HEATHCLIFF CAPITAL LLC, FAIRFIELD RISK SERVICES LTD., PRICEWATERHOUSECOOPERS ACCOUNTANTS NETHERLANDS N.V., LION FAIRFIELD CAPITAL MANAGEMENT LIMITED, CARLOS GADALA-MARIA, RAUL MAS, ROBERT FRIEDMAN, RODOLFO PAGES, JOHN G. DUTKOWSKI, LUISA SERENA, MIGUEL CALVO, SAMUEL PERRUCHOUD, EFG CAPITAL INTERNATIONAL CORP.,

*Defendants,*

and

PRICEWATERHOUSECOOPERS ACCOUNTANTS N.V., CITCO FUND SERVICES (EUROPE) B.V., CITCO BANK NEDERLAND N.V. DUBLIN BRANCH, CITCO CANADA INC., CITCO GLOBAL CUSTODY N.V., CITCO GROUP LIMITED, CITCO FUND SERVICES (BERMUDA) LIMITED, PRICEWATERHOUSECOOPERS L.L.P.,

*Defendants-Appellants.*

## Corporate Disclosure Statement

The Citco Group Limited is a wholly owned subsidiary of Citco III Limited.  No publicly held corporation owns ten percent or more of The Citco Group Limited's stock.

Citco Fund Services (Europe) B.V. is a subsidiary of Citco Fund Services (London) Limited.  No publicly held corporation owns ten percent or more of Citco Fund Services (Europe) B.V.'s stock.

Citco (Canada) Inc. is a subsidiary of Citco Fund Services (Nederland) B.V.  No publicly held corporation owns ten percent or more of Citco (Canada) Inc.'s stock.

Citco Global Custody N.V. is a subsidiary of Citco Bank Nederland N.V.  No publicly held corporation owns ten percent or more of Citco Global Custody N.V.'s stock.

Citco Bank Nederland N.V. Dublin Branch is a branch of Citco Bank Nederland N.V., which is a subsidiary of Citco Bank Holding N.V.  No publicly held corporation owns ten percent or more of the stock of Citco Bank Nederland N.V. Dublin Branch.

Citco Fund Services (Bermuda) Limited is a subsidiary of Citco Fund Services (Holdings) Limited.  No publicly held corporation

i

owns ten percent or more of Citco Fund Services (Bermuda) Limited's

stock.

# Table of Contents

**Page**

Corporate Disclosure Statement ................................................................ i

Table of Authorities ............................................................................... vi

Introduction ......................................................................................... 1

Jurisdictional Statement .......................................................................... 5

Statement of Issues ................................................................................ 7

Statement of the Case ............................................................................. 8

Statement of Facts ................................................................................ 10

    A.    The Fairfield Greenwich Group and
           Its Relationship with the Madoff Firm ................................ 10

    B.    The Funds' Service Providers ................................................. 12

          1.    Citco ................................................................... 12

          2.    GlobeOp ............................................................... 13

          3.    PricewaterhouseCoopers ........................................... 13

    C.    Plaintiffs and the Class ......................................................... 14

    D.    Madoff's Massive Fraud ........................................................ 14

    E.    The Complaint .................................................................... 15

Summary of Argument ........................................................................... 19

Standard of Review ............................................................................... 23

Argument ............................................................................................ 24

iii

## Table of Contents
## (cont.)

**Page**

I.   Individual Issues Concerning Reasonable Reliance
Preclude Any Finding that Common Issues Predominate,
and Accordingly Preclude Certification..........................................24

    A.   Plaintiffs' Claims Would Require the Trier of Fact
to Adjudicate Whether Each Class Member
Reasonably Relied on a Specific
Misrepresentation at Issue.....................................................24

    B.   No Presumption of Reliance Applies to This Case,
and Individual Issues Concerning Reasonable
Reliance Therefore Preclude Certification............................30

    C.   Actual Reliance Raises Numerous
Individual Issues of Fact........................................................35

        1.   Many Class Members Did Not Rely on
Any Representation Made by Citco..............................35

        2.   Many Class Members Made Their Investment
Decisions Based on Information and
Representations from Sources
Independent of Citco.....................................................38

        3.   Plaintiffs' Aiding and Abetting Claims Raise
Individual Issues Concerning Reliance on
FGG's and Citco's Alleged Misrepresentations...........40

    D.   Whether Any Alleged Reliance Was Reasonable
Raises Numerous Individual Issues of Fact.........................41

        1.   The Class Members' Sophistication
Varies Greatly................................................................43

        2.   Many Class Members Performed Extensive
Due Diligence Prior to Investing in
Any of the Funds...........................................................44

iv

# Table of Contents
## (cont.)

**Page**

3. Many Class Members Were Aware of the "Red Flags" Associated with the Madoff Firm and Still Invested .................................................. 45

E. Plaintiffs' Holder Claims Raise Additional Individual Issues of Reliance .................................................. 49

F. The District Court's Stated Basis for Rejecting Defendants' Reliance-Related Arguments Rested on Errors of Law .......................................... 53

G. The Certification Order Violates the Rules Enabling Act and the Due Process Clause ........................... 55

II. Plaintiffs' Common-Law Holder Claims Are Derivative in Nature, and a Class Action Is Therefore Not a Superior Method of Adjudicating Those Claims ........................... 56

A. Choice of Law ........................................................ 57

B. Plaintiffs' Holder Claims Are Derivative in Nature ............................................. 65

Conclusion ................................................................. 73

# Table of Authorities

**Page(s)**

Cases

*Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co. Inc.*,
269 F.R.D. 252 (S.D.N.Y. 2010)......................................................... 33, 54

*Affiliated Ute Citizens* v. *United States*,
406 U.S. 128 (1972)............................................................................. 30

*A.I. Trade Fin., Inc.* v. *Centro Internationale Handelsbank AG*,
926 F. Supp. 378 (S.D.N.Y. 1996)........................................................ 64

*In re AIG, Inc. Sec. Litig.*,
689 F.3d 229 (2d Cir. 2012) ................................................................ 32

*Am. Fin. Int'l Grp.—Asia, L.L.C.* v. *Bennett*,
2007 WL 1732427 (S.D.N.Y. June 14, 2007)...................................... 33

*Amchem Prods., Inc.* v. *Windsor*,
521 U.S. 591 (1997)............................................................................. 55

*Amgen Inc.* v. *Conn. Ret. Plans & Trust Funds*,
133 S. Ct. 1184 (2013).......................................................... 2, 4, 32, 33

*Amusement Indus., Inc.* v. *Stern*,
2010 WL 2976199 (S.D.N.Y. July 26, 2010),
*adopted*, No. 07-CV-11586-(LAK)(GWG), ECF No. 503
(S.D.N.Y. Sept. 9, 2010) ...................................................................... 60

*Anwar* v. *Fairfield Greenwich Ltd.*,
289 F.R.D. 105 (S.D.N.Y. 2013) (reproduced at Special
Appendix 1-40) ........................................................................... passim

*Anwar* v. *Fairfield Greenwich Ltd.*,
728 F. Supp. 2d 372 (S.D.N.Y. 2010) ("*Anwar I*"),
*reconsideration granted in part,* 884 F. Supp. 2d 92
(S.D.N.Y. 2012) ("*Anwar II*") ..................................................... passim

vi

## Table of Authorities
## (cont.)

**Page**

*Arbegast* v. *Bd. of Educ. of S. New Berlin Cent. Sch.*,
  480 N.E.2d 365 (N.Y. 1985) .................................................. 28

*Ashland* v. *Morgan Stanley & Co. Inc.*,
  652 F.3d 333 (2d Cir. 2011) .................................. 24, 26, 42

*Bank Brussels Lambert* v. *Chase Manhattan Bank, N.A.*,
  1999 WL 710778 (S.D.N.Y. Sept. 10, 1999) ........................ 29

*Basic Inc.* v. *Levinson*,
  485 U.S. 224 (1988) ............................................................ 31

*BBS Norwalk One, Inc.* v. *Raccolta, Inc.*,
  60 F. Supp. 2d 123 (S.D.N.Y. 1999), *aff'd*, 2000 WL 232805
  (2d Cir. Feb. 24, 2000) (summary order).............................. 62

*Black* v. *Finantra Capital, Inc.*,
  418 F.3d 203 (2d Cir. 2005) ................................................ 31

*Braddock* v. *Braddock*,
  871 N.Y.S. 2d 68 (App. Div. 1st Dep't 2009)
  (Lippman, J., dissenting).................................................... 27

*Brown* v. *E.F. Hutton Grp., Inc.*,
  991 F.2d 1021 (2d Cir. 1993) .............................................. 42

*Buckley* v. *Control Data Corp.*,
  923 F.2d 96 (8th Cir. 1991)................................................. 65

*Calcano* v. *Rodriguez*,
  936 N.Y.S.2d 185 (App. Div. 1st Dep't 2012) ..................... 30

*Caruolo* v. *John Crane, Inc.*,
  226 F.3d 46 (2d Cir. 2000) ................................................. 57

*Cash* v. *Titan Fin. Servs.*,
  873 N.Y.S. 2d 642 (App. Div. 2d Dep't 2009) ..................... 24

# Table of Authorities
## (cont.)

**Page**

*City of New York* v. *Beretta U.S.A. Corp.*,
    524 F.3d 384 (2d Cir. 2008) ................................................................ 50

*City P'ship Co.* v. *Jones Intercable, Inc.*,
    213 F.R.D. 576 (D. Colo. 2002) ......................................................... 57

*Cohn* v. *Mass. Mut. Life Ins. Co.*,
    189 F.R.D. 209 (D. Conn. 1999) ........................................................ 30

*Cont'l Cas. Co.* v. *PricewaterhouseCoopers, LLP*,
    933 N.E.2d 738 (N.Y. 2010) ............................................................... 62

*Conway* v. *Icahn & Co., Inc.*,
    16 F.3d 504 (2d Cir. 1994) ................................................................. 29

*Cordts-Auth* v. *Crunk, LLC*,
    815 F. Supp. 2d 778 (S.D.N.Y. 2011), *aff'd*,
    479 F. App'x 375 (2d Cir. 2012) ......................................................... 71

*Coty* v. *Steigerwald*,
    692 N.Y.S.2d 556 (App. Div. 4th Dep't 1999) .................................... 29

*Credit Alliance Corp.* v. *Arthur Anderson Co.*,
    483 N.E.2d 110 (N.Y. 1985) ............................................................... 26

*Crigger* v. *Fahnestock & Co., Inc.*,
    443 F.3d 230 (2d Cir. 2006) ............................................................... 42

*Edgar* v. *MITE Corp.*,
    457 U.S. 624 (1982) ............................................................................ 61

*Emergent Capital Inv. Mgmt., LLC* v. *Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003) ............................................................... 42

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
    131 S. Ct. 2179 (2011) .......................................................................... 2

*In re Enron Corp. Sec.*, *Derivative & "ERISA" Litig.*,
    2005 WL 2230169 (S.D. Tex. Sept. 12, 2005) .................................... 68

# Table of Authorities
## (cont.)

**Page**

*Farrie* v. *Charles Town Races, Inc.*,
901 F. Supp. 1101 (N.D. W. Va. 1995) ................................ 57

*FDIC* v. *Ornstein*,
73 F. Supp. 2d 277 (E.D.N.Y. 1999) .................................... 29

*Feldman* v. *Cutaia*,
951 A.2d 727 (Del. 2008) .............................................. 66, 69

*In re Fosamax Prods. Liab. Litig.*,
248 F.R.D. 389 (S.D.N.Y. 2008) ........................................ 30

*Galef* v. *Alexander*,
615 F.2d 51 (2d Cir. 1980) ............................................. 59

*Gen. Tel. Co. of Sw.* v. *Falcon*,
457 U.S. 147 (1982) ..................................................... 3

*Greenspun* v. *Lindley*,
330 N.E.2d 79 (N.Y. 1975) ............................................. 62

*Hart* v. *Gen. Motors Corp.*,
517 N.Y.S.2d 490 (App. Div. 1st Dep't 1987) ...................... 61

*Holmes* v. *Grubman*,
691 S.E.2d 196 (Ga. 2010) ............................................. 52

*Hudson Riverkeeper Fund, Inc.* v. *Harbor at Hastings Assocs.*,
917 F. Supp. 251 (S.D.N.Y. 1996) ..................................... 64

*Hunt* v. *Enzo Biochem, Inc.*,
471 F. Supp. 2d 390 (S.D.N.Y. 2006) ................................. 52

*Hydro Investors, Inc.* v. *Trafalgar Power Inc.*,
227 F.3d 8 (2d Cir. 2000) ............................................. 25

*In re Initial Pub. Offerings Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006) ............................................ 32

## Table of Authorities
## (cont.)

**Page**

*Int'l Fund Mgmt. S.A.* v. *Citigroup Inc.*,
    822 F. Supp. 2d 368 (S.D.N.Y. 2011)...................................................... 31

*In re InterBank Funding Corp. Sec. Litig.*,
    629 F.3d 213 (D.C. Cir. 2010) .............................................................. 31

*Irvin* v. *Jones*,
    2012 WL 6634476 (N.Y. Sup. Ct. Suffolk Cnty. Dec. 13, 2012) ... 26, 50

*In re J.P. Jeanneret Assocs.*,
    769 F. Supp. 2d 340 (S.D.N.Y. 2011)...................................................... 70

*Krys* v. *Butt*,
    486 F. App'x 153 (2d Cir. 2012) .......................................................... 26

*Krys* v. *Sugrue (In re Refco Inc. Sec. Litig.)*,
    2010 U.S. Dist. LEXIS 33642 (S.D.N.Y. Mar. 1, 2010), *adopted*,
    2011 U.S. Dist. LEXIS 47688 (S.D.N.Y. May 4, 2011)...................... 63

*Laub* v. *Faessel*,
    745 N.Y.S.2d 534 (App. Div. 1st Dep't 2002) ...................................... 27

*Lee* v. *Marsh & McLennan Cos., Inc.*,
    2007 WL 4303514 (N.Y. Sup. Ct. Nassau Cnty.
    Dec. 7, 2007), *aff'd sub nom. Hribar* v. *Marsh
    & McLennan Cos.*, 900 N.Y.S.2d 449 (2d Dep't 2010).................. 51, 68

*Levitt* v. *PricewaterhouseCoopers*,
    2007 WL 2106309 (S.D.N.Y. July 19, 2007) ....................................... 55

*Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*,
    672 F.3d 155 (2d Cir. 2012) ................................................................ 58

*Lippes* v. *Atl. Bank of N.Y.*,
    419 N.Y.S.2d 505 (App. Div. 1st Dep't 1979).............................. 29, 42

*In re Livent, Inc. Noteholders Sec. Litig.*,
    211 F.R.D. 219 (S.D.N.Y. 2002)........................................................... 55

# Table of Authorities
## (cont.)

**Page**

*Lumbermens Mut. Cas. Co.* v. *Franey Muha Alliant Servs.*,
388 F. Supp. 2d 292 (S.D.N.Y. 2005)..................................................26

*Manzo* v. *Rite Aid Corp.*,
2002 WL 31926606 (Del. Ch. Dec. 19, 2002), *aff'd*,
2003 WL 21262118 (Del. May 29, 2003) ............................................68

*Marisol A.* v. *Giuliani*,
126 F.3d 372 (2d Cir. 1997) ................................................................23

*Mathews* v. *Eldridge*,
424 U.S. 319 (1976)..............................................................................56

*McCarthy* v. *Olin*,
119 F.3d 148 (2d Cir. 1997) ................................................................71

*McLaughlin* v. *Am. Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008), *abrogated in part by*
*Bridge* v. *Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008)........32, 54, 56

*Meseonznik* v. *Govorenkov*,
2012 WL 4017363 (N.Y. Sup. Ct. Kings Cnty. Sep. 10, 2012) ...........71

*Mizrahi* v. *Chanel, Inc.*,
746 N.Y.S.2d 878 (Sup. Ct. N.Y. Cnty. Dec. 17, 2001) .......................58

*NAF Holdings, LLC* v. *Li & Fung (Trading) Ltd.*,
2013 WL 489020 (S.D.N.Y. Feb. 8, 2013)......................................60, 71

*In re Nat'l Century Fin. Enters.*,
846 F. Supp. 2d 828 (S.D. Ohio 2012) ..........................................50, 51

*Nelson* v. *Adams USA, Inc.*,
529 U.S. 460 (2000)..............................................................................34

*Newman* v. *Family Mgmt. Corp.*,
748 F. Supp. 2d 299 (S.D.N.Y. 2010), *aff'd*,
2013 WL 3712404 (2d Cir. July 16, 2013) (summary order)..59, 63, 69

## Table of Authorities
## (cont.)

**Page**

*Newman* v. *Family Mgmt. Corp.*,
    2013 WL 3712404 (2d Cir. July 16, 2013) (summary order)...... passim

*Norlin Corp.* v. *Rooney, Pace Inc.*,
    744 F.2d 255 (2d Cir. 1984) ................................................................ 62

*In re Optimal U.S. Litig.*,
    813 F. Supp. 2d 351 (S.D.N.Y. 2011)....................................... 59, 62, 69

*Parker* v. *Time Warner Entm't Co.*,
    331 F.3d 13 (2d Cir. 2003) ................................................................ 23

*Pension Comm. of Univ. of Montreal Pension Plan* v. *Banc of Am.*
    *Sec., LLC*, 446 F. Supp. 2d 163 (S.D.N.Y. 2006) ................................ 51

*Prickett* v. *N.Y. Life Ins. Co.*,
    896 F. Supp. 2d 236 (S.D.N.Y. 2012)........................................... 58, 59

*In re Rezulin Prods. Liab. Litig.*,
    210 F.R.D. 61 (S.D.N.Y. 2002)......................................................... 30

*Saltz* v. *First Frontier, LP*,
    782 F. Supp. 2d 61 (S.D.N.Y. 2010), *aff'd*,
    485 F. App'x 461 (2d Cir. 2012)............................................. 59, 63, 69

*San Diego Cnty. Emps. Ret. Ass'n* v. *Maounis*,
    749 F. Supp. 2d 104 (S.D.N.Y. 2010).................................................. 67

*Schuster* v. *Gardner*,
    25 Cal. Rptr. 3d 468 (Cal. Ct. App. 2005) .......................................... 68

*Sec. Inv. Prot. Corp.* v. *BDO Seidman*,
    746 N.E.2d 1042 (N.Y. 2001) ........................................................... 33

*Seidl* v. *Am. Century Cos., Inc.*,
    713 F. Supp. 2d 249 (S.D.N.Y. 2010), *aff'd*,
    427 F. App'x 35 (2d Cir. 2011).......................................................... 60

# Table of Authorities
## (cont.)

**Page**

*Shao* v. *Holder*,
    424 F. App'x 13 (2d Cir. 2011) ........................................... 64

*Small* v. *Fritz Cos., Inc.*,
    65 P.3d 1255 (Cal. 2003) ............................................. 51, 52

*Smith* v. *Waste Mgmt. Inc.*,
    407 F.3d 381 (5th Cir. 2005) ............................................. 68

*Solis* v. *Beacon Assocs. Mgmt.*,
    2011 WL 3586129 (S.D.N.Y. Aug. 10, 2011) ...................... 29

*Solutia Inc.* v. *FMC Corp.*,
    456 F. Supp. 2d 429 (S.D.N.Y. 2006) ............................... 29

*In re Sonus Networks, Inc. Sec. Litig.*,
    247 F.R.D. 244 (D. Mass. 2007) ....................................... 57

*Starr Found.* v. *AIG, Inc.*,
    901 N.Y.S.2d 246 (App. Div. 1st Dep't 2010) ........... 50, 51, 52

*Starr ex. rel. Estate of Sampson* v. *Georgeson S'holder, Inc.*,
    412 F.3d 103 (2d Cir. 2005) .............................................. 31

*Stephenson* v. *Citco Grp. Ltd.*,
    700 F. Supp. 2d 599 (S.D.N.Y. 2010), *aff'd*
    *on other grounds sub nom. Stephenson* v.
    *PricewaterhouseCoopers, LLP*,
    482 F. App'x 618 (2d Cir. 2012) .......................... 59, 63, 69, 70

*Stephenson* v. *PricewaterhouseCoopers, LLP*,
    482 F. App'x 618 (2d Cir. 2012) ....................... 20, 59, 65, 66

*Teamsters Local 445 Freight Div. Pension Fund* v.
    *Bombardier Inc.*, 546 F.3d 196 (2d Cir. 2008) ................... 23

*Tooley* v. *Donaldson, Lufkin, & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004) ................................................ 66

# Table of Authorities
## (cont.)

**Page**

*UFCW Local 1776* v. *Eli Lilly & Co.*,
620 F.3d 121 (2d Cir. 2010) ................................................................. 32

*United States* v. *Chestman*,
947 F.2d 551 (2d Cir. 1991) ............................................................... 26

*Wal-Mart Stores, Inc.* v. *Dukes*,
131 S. Ct. 2541 (2011) ......................................................... 3, 34, 55, 56

*Wilson* v. *Merrill Lynch & Co.*,
671 F.3d 120 (2d Cir. 2011) ............................................................... 24

*In re WorldCom Sec. Litig.*,
336 F. Supp. 2d 310 (S.D.N.Y. 2004) ................................................ 51

*Yudell* v. *Gilbert*,
949 N.Y.S.2d 380 (App. Div. 1st Dep't 2012) ..................................... 71

*Zervos* v. *Verizon N.Y., Inc.*,
252 F.3d 163 (2d Cir. 2004) ............................................................... 23

*Zion* v. *Kurtz*,
405 N.E.2d 681 (N.Y. 1980) ............................................................... 61

*Zutty* v. *Rye Select Broad Mkt. Prime Fund, L.P.*,
2011 WL 5962804 (N.Y. Sup. Ct. N.Y. Cnty. Sept. 28, 2012) ............ 60

CONSTITUTION

U.S. Const. amend. V. ................................................................................ 5

STATUTES

Rules Enabling Act, 28 U.S.C. § 2072(b) ....................................... 5, 55, 56

Securities Exchange Act of 1934 § 10(b),
15 U.S.C. § 78j(b) ................................................................. 8, 24, 42, 70

15 U.S.C. § 78aa.......................................................................................... 6

# Table of Authorities
## (cont.)

**Page**

15 U.S.C. § 78t ................................................................. 8

28 U.S.C. § 1331 ............................................................. 6

28 U.S.C. § 1332(d)(2)(B) ............................................... 6

28 U.S.C. § 1367(a) ........................................................ 6

N.Y. C.P.L.R. § 1411 ................................................. 28, 29

N.Y. P'ship Law § 121-901 ........................................ 58, 62

## OTHER AUTHORITIES

17 C.F.R. § 240.10b-5 ..................................................... 8

Fed. R. Civ. P. 23(b)(3)(B) ......................................... 5, 64

Fed. R. Civ. P. 23(b)(3)(D) .............................................. 3

Fed. R. Civ. P. 23(b)(3) ......................................... passim

Fed. R. Civ. P. 23(f) ...................................................... 6

Fed. R. Evid. 201(b)(2) ................................................. 64

4 J. Weinstein, H. Korn & A. Miller, *New York Civil Practice: CPLR* ¶ 1411.02, at 14-A-4 (2d ed. 2013) ......................... 29

1 McLaughlin on Class Actions § 5:43 (9th ed. 2012) ........... 56

## Introduction

This class action arises from the revelation that Bernard L. Madoff Investment Securities (the "Madoff Firm") operated a Ponzi scheme.  Mr. Madoff concealed his frauds for at least eighteen years from regulators, sophisticated investment professionals, and investors. Members of the putative plaintiff class (the "Class") were investors in four investment funds (the "Funds") created and managed by the Fairfield Greenwich Group ("FGG").  The Funds, in turn, placed those assets into accounts held by the Madoff Firm.  When the Madoff Firm collapsed in December 2008, the Funds lost billions and the investors' shares became worthless.

After the Madoff Firm's collapse, the Class sued FGG, individuals and entities affiliated with FGG, the auditors of the Funds, and other service providers to the Funds, including the Citco Defendants.[1]  The Citco Defendants acted as administrator, custodian,

---

[1]  The Citco Defendants—collectively, "Citco"—are The Citco Group Ltd., Citco Fund Services (Europe) B.V., Citco (Canada), Inc., Citco Global Custody N.V., Citco Bank Nederland N.V. Dublin Branch, and Citco Fund Services (Bermuda) Ltd.

1

bank, or depository for certain Funds at various times.  The Class seeks

damages potentially exceeding $5 billion from Citco.[2]

      The district court entered an order certifying the Class

under Federal Rule of Civil Procedure 23(b)(3) (the "Certification

Order").  That order was erroneous.

      *First*, reasonable reliance is an element of the Class's central

claims against Citco and is relevant in various ways to all of the Class's

claims.  The fraud-on-the-market presumption of reliance is concededly

inapplicable, because interests in the Funds were not traded in an

efficient market and because the presumption does not apply at all to

the state-law claims.  Each individual Class member must therefore

"attempt to establish reliance through the 'traditional' mode of

demonstrating that she was *personally* aware of [the alleged

misrepresentation], and engaged in a relevant transaction . . . based on

that specific misrepresentation."[3]  Each individual Class member must

also prove that her alleged reliance was reasonable in light of the

---

[2]  Joint Appendix A-3237 & n.3 (hereinafter cited as A-__).

[3]  *Amgen Inc.* v. *Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1199
(2013) (quoting *Erica P. John Fund, Inc*. v. *Halliburton Co*., 131
S. Ct. 2179, 2185 (2011) (emphasis added)).

sophistication of the Class member, other facts independently known to the Class member bearing on the credibility and significance of the alleged misrepresentation, and similar individual facts.

A class cannot be certified under Rule 23(b)(3) unless the district court affirmatively finds, following a "'rigorous analysis,'"[4] that "questions of law or fact common to class members predominate over any questions affecting only individual members," Fed. R. Civ. P. 23(b)(3).  The manageability of the proposed class action is pertinent to the predominance inquiry.  Fed. R. Civ. P. 23(b)(3)(D).  Common issues do not predominate here because, among other reasons, each member of the Class must prove that she reasonably relied on the misrepresentations at issue, and because the Class, which includes approximately 1,000 members (A-3238), is too numerous to permit manageable discovery and evidentiary hearings on the individual issues concerning reasonable reliance.  As the Supreme Court recently reiterated,

> [a]bsent the fraud-on-the-market theory, the requirement
> that [fraud] plaintiffs establish reliance would ordinarily

---

[4]  *Wal-Mart Stores, Inc.* v. *Dukes*, 131 S. Ct. 2541, 2551-52 (2011) (quoting *Gen. Tel. Co. of Sw.* v. *Falcon*, 457 U.S. 147, 161 (1982)).

preclude certification of a class action seeking money
damages because individual reliance issues would
overwhelm questions common to the class.

*Amgen*, 133 S. Ct. at 1193; *see also id*. at 1199.

Limited discovery has confirmed that these well-established
principles fully apply here.  Some Class members were not exposed to
the alleged misrepresentations of the Citco Defendants *at all* before
making the investment decisions that are the basis for their claims.
Different Class members were exposed to different alleged
misrepresentations at different times.  The documentary and
testimonial evidence concerning whether a specific Class member was
exposed to any particular alleged misrepresentation, whether the Class
member actually knew of and relied on that alleged misrepresentation
in making a particular investment decision, and whether the Class
member acted reasonably in doing so will be *highly* individual.  The
evidence on comparative fault will also be individual.  Citco, if granted
the discovery and evidentiary hearings to which it is entitled, might
well defeat—indeed, probably would defeat—many claims by individual
Class members on these grounds.

4

Citco is therefore entitled to obtain individual evidence related to reasonable reliance and comparative fault through discovery, and to litigate those issues on motions for summary judgment or at evidentiary hearings. Citco's entitlement to litigate these individual issues precludes findings of predominance, manageability, or superiority under Rule 23(b)(3). For similar reasons, the certification order violates the Rules Enabling Act, 28 U.S.C. § 2072(b), and the Due Process Clause, U.S. Const. amend. V.

*Second*, the common-law holder claims asserted against Citco are derivative in nature. Consequently, a class action is not "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). A derivative action or a direct action on behalf of the Funds would be more appropriate. Such actions are in fact pending, and that circumstance further weighs against certification. *See* Fed. R. Civ. P. 23(b)(3)(B). Certification of the common-law holder claims was therefore improper on the independent ground that the superiority requirement cannot be satisfied.

The Certification Order should be reversed.

## Jurisdictional Statement

The district court (Marrero, J.) had jurisdiction of the underlying action pursuant to 15 U.S.C. § 78aa, 28 U.S.C. § 1331, 28 U.S.C. § 1332(d)(2)(B), and 28 U.S.C. § 1367(a).

This Court has jurisdiction over Citco's appeal from the Certification Order[5] pursuant to Federal Rule of Civil Procedure 23(f). On March 11, 2013, Citco filed a timely petition for permission to appeal.  (A-13109-38.)  This Court granted the petition.  (A-14320.)

---

[5]    *Anwar* v. *Fairfield Greenwich Ltd.*, 289 F.R.D. 105 (S.D.N.Y. 2013) (reproduced at Special Appendix 1-40 (hereinafter cited as SPA-__)).

6

## Statement of Issues

1.    Do individual issues concerning whether each Class member reasonably relied on the alleged misrepresentations at issue, and related individual issues concerning comparative fault, preclude certification of plaintiffs' claims under Federal Rule of Civil Procedure 23(b)(3), the Rules Enabling Act, and the Due Process Clause?

2.    Under New York's internal affairs doctrine, does the law of the jurisdiction where each of the relevant Funds was organized or incorporated govern whether claims by investors in that Fund are direct or derivative in nature?

3.    Are the common-law holder claims of Class members against Citco derivative in nature?  Is certification of claims that are derivative in nature precluded because a class action is not "superior" for purposes of Rule 23(b)(3) to a derivative action by investors or a direct action brought on behalf of the Funds?

## Statement of the Case

Plaintiffs commenced this putative class action on December 19, 2008, by filing a complaint in the Supreme Court of the State of New York against FGG and other defendants.  (*See* Dist. Ct. ECF (hereinafter ECF) No. 1.)  The action was removed to the United States District Court for the Southern District of New York.  (*Id*.)

On September 29, 2009, plaintiffs filed their Second Consolidated Amended Complaint (the "Complaint"). (A-104.)  Citco moved to dismiss the Complaint for failure to state a claim.  (ECF Nos. 329, 334, 340, 344.)  On August 18, 2010, the district court granted in part and denied in part Citco's motion to dismiss.  *Anwar* v. *Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 421 (S.D.N.Y. 2010) ("*Anwar I*"), *reconsideration granted in part*, 884 F. Supp. 2d 92 (S.D.N.Y. 2012) ("*Anwar II*") (dismissing certain additional claims).

Plaintiffs' remaining statutory causes of action against one or more of the Citco Defendants allege violations of Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t.  Plaintiffs' remaining common-law

8

causes of action against Citco consist of a claim for aiding and abetting FGG's alleged frauds and breaches of fiduciary duty, and claims for third-party beneficiary breach of contract, breach of fiduciary duty, negligence, gross negligence, and negligent misrepresentation.

On February 25, 2013, the district court entered the Certification Order, which certified the Class under Federal Rule of Civil Procedure 23(b)(3).  (SPA-1, 39.)

On March 11, 2013, Citco filed a timely petition seeking permission to appeal from the Certification Order.  (A-13109.)  This Court granted the petition.  (A-14320.)

## Statement of Facts

### A.    The Fairfield Greenwich Group and Its Relationship with the Madoff Firm

FGG created and managed the four funds at issue in this action.  (A-162-64 ¶¶ 168-73.)  Those funds placed almost all of their assets, directly or indirectly, in accounts held and purportedly invested by the Madoff Firm.  (*Id.*)  Two of those funds, Greenwich Sentry, L.P., and Greenwich Sentry Partners, L.P. (collectively, the "Onshore Funds"), were limited partnerships registered in Delaware and organized under Delaware law.  (A-164 ¶¶ 172-73.)  The other two funds, Fairfield Sentry Limited and Fairfield Sigma Limited (collectively, the "Offshore Funds" and, together with the Onshore Funds, the "Funds"), were incorporated under the laws of the British Virgin Islands ("BVI").  (A-163-64 ¶¶ 170-71.)

Mr. Madoff—a well-known figure on Wall Street—used his firm to implement what that firm called its "split-strike conversion" (or "SSC") strategy.  (A-343.)  This strategy purportedly involved (i) purchasing a "basket" of equity securities that were highly correlated with the S&P 100 Index and (ii) hedging these purchases by purchasing put options and selling call options.  (*Id.*)

10

FGG, through various affiliates, was the investment manager for the Funds. FGG exercised discretion over the management of the Funds' investment activities, monitored and selected the Funds' investments, and maintained the Funds' relationships with various service providers. (A-138-41 ¶¶ 117-23.)

FGG was also responsible for raising money for the Funds, marketing the Funds to potential investors, and answering questions from potential and existing investors. (*Id*.; A-166-67 ¶ 180.) To perform those functions, FGG created numerous different documents purportedly describing the Funds. FGG distributed many of those documents to certain potential and existing investors. (A-166-67 ¶ 180, A-171 ¶ 190.) These documents included private placement and confidential offering memoranda about the Funds, fund updates, performance reports, and other marketing and sales materials. (A-167 ¶ 181.) FGG met frequently with potential investors and investors. (*E.g.*, A-7345, A-9260.) In some cases, FGG arranged for them to meet with Mr. Madoff. (*E.g.*, A-7872-73.)

### B.    The Funds' Service Providers

#### 1.    Citco

Through various contracts, FGG hired Citco to provide specified financial services to the Funds, including hedge fund administration services, custodial services, and bank and depository services. (A-350-51.) As is relevant here, the services that some of the Citco Defendants provided to the Funds can be divided into two types: administrative services and custodial services. (*Id*.)

*The Citco Administrators*. Citco Fund Services Europe and Citco Canada provided administrative services to the Funds at various times. The specific administrative services provided to each Fund were governed by contract. (A-351, A-415-16, A-496-97, A-582-83.) Under the contracts, the Citco Administrators agreed to calculate the net asset value ("NAV") of the Funds on a monthly basis, process subscription documents, keep the Funds' books and records, and maintain the Funds' shareholder registries. (*Id*.)

*The Citco Custodians*. Citco Bank Nederland served as a custodian for the Offshore Funds, and Citco Global served as the

depository for the Offshore Funds.[6]  The services they provided to each Offshore Fund were governed by a contract between the particular Fund and the relevant Citco entity.  As a custodian, Citco Bank Nederland agreed to record the assets held in its possession and in the possession of any sub-custodian.  The Madoff Firm—at the Offshore Funds' direction—served as a sub-custodian, which meant that the Madoff Firm held the vast majority of the Offshore Funds' assets. (A-163-64 ¶¶ 170-71.)

### 2. GlobeOp

GlobeOp is a hedge fund administration company.  (A-160-61 ¶ 165.)  From 2004 until August 2006, GlobeOp provided administrative services to one of the Funds—Greenwich Sentry.  (*Id.*)

### 3. PricewaterhouseCoopers

Defendants PricewaterhouseCoopers LLP ("PwC Canada") and PricewaterhouseCoopers Accountants N.V. ("PwC Netherlands") are international accounting firms.  (A-156 ¶¶ 154-55.)  Each provided independent auditing services to the Funds.  (*Id.*)

---

[6]  No Citco-related company ever served as a custodian for the Onshore Funds.  The Madoff Firm was the custodian for the Onshore Funds. (*See* A-158-59 ¶¶ 159-60.)

## C.   Plaintiffs and the Class

The Court appointed five lead plaintiffs in the action.  (ECF No. 178.)  Plaintiffs' counsel designated three additional class representatives.  (A-3236.)  The Complaint, together with subsequent stipulations, also includes in the caption and identifies an additional 365 purported "named plaintiffs," who are neither lead plaintiffs nor class representatives.  (ECF Nos. 540, 600, 611, 1169; A-122-37 ¶¶ 1-116.)[7]

The Class consists of holders of equity interests in the Funds "who suffered a net loss of principal invested in the Funds."  (SPA-3.)

## D.   Madoff's Massive Fraud

In 1960, Bernard L. Madoff founded the Madoff Firm. (A-161 ¶ 166.)  Over the course of its nearly 50-year history, the Madoff Firm became a well-known and well-established registered broker-dealer and investment advisor.  (A-9554, A-9556.)  The Madoff Firm served a worldwide client base, maintained offices in New York and London, and was regulated by, among others, the SEC and the NASD (now known as FINRA).  (A-9527, A-9557.)  Prior to December 11, 2008,

---

[7]   This brief refers to lead plaintiffs, representative plaintiffs, and "named" plaintiffs collectively as "plaintiffs."

the Madoff Firm passed numerous regulatory inspections, including SEC investigations. (*See* A-1012.)

Beginning no later than 1990, however, Mr. Madoff was secretly perpetrating a massive Ponzi scheme through the branch of his firm that purportedly implemented the SSC strategy. (A-161 ¶ 166.) The Madoff Firm created the illusion of consistent, positive returns by generating fictitious account statements and trade tickets reflecting purported trading activity in securities and options. (*Id*.) In reality, the Madoff Firm had made no securities trades "for years." (*Id*.) On December 11, 2008, Mr. Madoff publicly admitted that his investment advisor business was "all just one big lie" and "basically, a giant Ponzi scheme." (A-161-62 ¶ 167.)

## E.    **The Complaint**

Following the public revelation of Mr. Madoff's fraud, investors in the Funds learned that their shares and interests were, in fact, worthless. (*See* A-121 ¶ 8.) This putative class action was filed on behalf of the owners of shares and interests in the Funds. (A-119 ¶ 2.) These plaintiffs sued a number of FGG entities and FGG executives,

PwC Canada, PwC Netherlands, GlobeOp, and Citco. (A-138-53 ¶¶ 117-46, A-156-61 ¶¶ 153-65.)

The gravamen of plaintiffs' claims against the Citco Defendants is that those defendants allegedly failed to fulfill their duties as administrator, custodian, bank, and depository for one or more of the Funds by making numerous misrepresentations and by ignoring warning signs (or "red flags"). These red flags supposedly should have put Citco on notice that the Madoff Firm might be a Ponzi scheme. (A-246-47 ¶ 338.) Plaintiffs allege that if "Citco had not breached its duties . . . , Plaintiffs would not have invested in the Funds, or retained their investments in the Funds. Plaintiffs could have redeemed their investments and recovered their principal at any time during the many years in which the Funds were making redemptions, prior to the revelation of Madoff's fraud in December 2008." (A-248 ¶ 340.)

The Complaint identifies a variety of alleged misrepresentations, which were supposedly made by a variety of actors in a variety of forms. FGG, for example, allegedly misrepresented:

(1)    that investors' "assets were being invested using a split-strike conversion strategy" (A-167-68 ¶ 182),

(2)  "that assets in the Funds were earning substantial, consistent returns" (*id*.),

(3)  that FGG and other "financial services providers and auditors were conducting extensive due diligence and monitoring of Madoff's operations" (*id*.),

(4)  that the Funds had a "historical track record of profitability" (A-170 ¶¶ 187-88),

(5)  that FGG performed "strict risk management principles" (A-171 ¶ 190),

(6)  that FGG had "strict oversight of Madoff's operations" (A-175 ¶ 193),

(7)  that FGG "independently verified [the Madoff Firm's] transactions" (*id*.),

(8)  that the Funds "actually made the represented trades and . . . held the represented assets" (A-269-70 ¶ 389),

(9)  that FGG had "full transparency and privileged access to Madoff" (A-175 ¶ 193),

(10)  that FGG "conducted daily monitoring of Madoff's activities and compliance with Fund guidelines" (A-177 ¶ 196),

(11)  that FGG conducted "regular on-site visits [of Madoff's firm]" (A-177 ¶ 197) (brackets in original),

(12)  that "Madoff's operations and accounts were audited by reputable, independent auditors" (A-269-70 ¶ 389), and

(13)  that "the net asset values of Plaintiffs' investments were true and correct reflections of the value of their investments in the Funds" (*id*.).

Plaintiffs allege that all of these statements, and others, were factually false.  (A-181-82 ¶ 205.)

17

Citco allegedly knew of some unspecified quantity of FGG's allegedly false statements and "substantially assisted . . . in the fraud perpetrated on Plaintiffs." (A-307 ¶¶ 518-19.) Plaintiffs also allege that the "Citco Defendants issued false statements containing inflated NAV calculations and account balance information. In issuing the statements, the Citco Defendants acted recklessly because they knew or had access to information suggesting that their public statements were not accurate, including that the values and profits reported to Plaintiffs were not attainable under the circumstances." (A-308 ¶ 523.)

## Summary of Argument

1.    Reasonable reliance by each Class member is an element of the claims asserted by Class members against Citco under the federal securities laws and the common law of fraud and negligent misrepresentation.  Other claims by the Class, as pleaded, seek to impose liability at least in part for alleged misrepresentations.  In order to show proximate cause, injury, and damages on such claims, each Class member must prove that it actually relied on some specific misrepresentation.  Certain claims are subject to a comparative fault defense, which Citco could establish by showing unreasonable or negligent conduct by a Class member.

No presumption of reliance applies to any of the claims asserted against Citco.  Accordingly, each Class member must individually prove that she was aware of some specific misrepresentation and that she made a particular investment decision in actual reliance on the misrepresentation.  Citco is entitled to obtain evidence through discovery on these issues, and to present its evidence on motions for summary judgment or at evidentiary hearings.

Under a long line of decisions from the Supreme Court, this Court, and many other courts, a class may not be certified if, as here, (i) reliance is an individual issue, and (ii) the class is too numerous to permit manageable individual discovery and evidentiary hearings on reliance.  In that event, common issues do not predominate for purposes of Rule 23(b)(3), and a class action is not superior to individual actions.  Issues concerning whether any alleged reliance was reasonable and concerning comparative fault also preclude certification here.

2.    If a class action purports to assert direct claims that are in fact derivative in nature, the putative class should not be certified.  Such a putative class action does not meet the superiority requirement of Rule 23(b)(3).

Class members here have asserted, among other claims, common-law "holder" claims—i.e., claims that they refrained from selling their interests in the Funds in alleged reliance on misrepresentations and related misconduct.  Those claims (assuming that they exist under New York law at all) are derivative in nature under this Court's decisions in *Stephenson* v. *PricewaterhouseCoopers, LLP*, 482 F. App'x 618 (2d Cir. 2012), and *Newman* v. *Family*

20

*Management Corp.*, 2013 WL 3712404 (July 16, 2013) (summary order).
Those claims therefore should not have been certified.

Analysis of the direct/derivative issue involves a threshold
choice-of-law inquiry and a merits inquiry. Under New York's internal
affairs doctrine, whether claims by Class members are direct or
derivative in nature is governed by the law of the jurisdiction in which
the relevant Fund was organized or incorporated. The Onshore Funds
are Delaware limited partnerships, and the Offshore Funds are
corporations incorporated in the BVI.

Under Delaware law—and under the New York law that the
district court erroneously held to be applicable—the Class members'
common-law holder claims are derivative in nature. That is so
primarily because the claims here arise from alleged injuries sustained,
if at all, directly by the Funds, and only secondarily and derivatively by
the investors.

Citco demonstrated in the district court that the common-
law holder claims by investors in the Offshore Funds are also derivative
in nature under BVI law. The district court erroneously applied New
York law on this issue, and erroneously concluded that under New York

21

law, these investors' claims might be direct.  This Court should correct

those errors.

## Standard of Review

A district court's decision granting class certification is reviewed for an abuse of discretion, but this Court "review[s] de novo the district court's conclusions of law that informed its decision." *Parker* v. *Time Warner Entm't Co.*, 331 F.3d 13, 18 (2d Cir. 2003); *see also Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008) ("We review *de novo* any issues of law underlying the Rule 23 ruling, including the question of whether the district court applied the correct standard of proof."). "A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law . . . or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Zervos* v. *Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001). "[F]ailure to follow the proper legal standards in certifying a class . . . is an abuse of discretion." *Marisol A.* v. *Giuliani*, 126 F.3d 372, 375 (2d Cir. 1997).

This appeal presents questions of law that should be decided de novo.

23

## Argument

### I.   Individual Issues Concerning Reasonable Reliance Preclude Any Finding that Common Issues Predominate, and Accordingly Preclude Certification

#### A.   Plaintiffs' Claims Would Require the Trier of Fact to Adjudicate Whether Each Class Member Reasonably Relied on a Specific Misrepresentation at Issue

*Sections 10(b) and 20(a)*.  Reasonable reliance is an element of a private claim for securities fraud under Section 10(b) and Rule 10b-5.  *E.g.*, *Ashland* v. *Morgan Stanley & Co. Inc.*, 652 F.3d 333, 337-38 (2d Cir. 2011).  Proof of plaintiffs' claim under Section 20(a), which imposes liability on certain "controlling persons," requires proof of an underlying primary violation of Section 10(b) and Rule 10b-5, including proof of reasonable reliance.  *See Wilson* v. *Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011).

*Aiding and abetting fraud*.  Proof of a claim for aiding and abetting a fraud requires proof of the elements of the underlying fraud, including proof of justifiable reliance.  *E.g.*, *Cash* v. *Titan Fin. Servs.*, 873 N.Y.S.2d 642, 645 (App. Div. 2d Dep't 2009).

*Negligent misrepresentation*.  Reasonable reliance is an element of a claim for negligent misrepresentation.  Such a claim

24

requires plaintiff to prove, among other elements, that it "intended to rely and act upon [the alleged misrepresentation]" and that it "reasonably relied on [the alleged misrepresentation] to [its] detriment." *Hydro Investors, Inc.* v. *Trafalgar Power Inc.*, 227 F.3d 8, 20-21 (2d Cir. 2000).

> *Breach of fiduciary duty*, *negligence, and gross negligence*. These claims raise individual issues of reasonable reliance for at least two reasons.

First, plaintiffs seek to establish Citco's supposed fiduciary duty and duty of care through allegations that Class members subjectively "reposed their trust and confidence in Citco" and "relied on Citco." (A-245 ¶ 334, A-302 ¶ 493; *see also* A-304-05 ¶¶ 503, 506.) Whether Citco owed such a fiduciary duty is a "fact-specific inquiry." *Anwar I*, 728 F. Supp. 2d at 415; *see also id.* at 438. That inquiry would require an assessment of individualized facts concerning the relationship (if any) between each Class member and each Citco Defendant, including an inquiry into whether the Class member "reposed confidence . . . and reasonably relied on [Citco's allegedly]

25

superior expertise or knowledge."[8]  Inquiry into whether Citco owed a

duty of care would be similarly fact-specific.  The district court held that

Citco owed Class members a duty of care under *Credit Alliance Corp.* v.

*Arthur Anderson Co.*, 483 N.E.2d 110, 118 (N.Y. 1985), which requires

"reliance by a known party" on the alleged misrepresentations.  *See*

*Anwar I*, 728 F. Supp. 2d at 432.  *Credit Alliance* also requires conduct

by the defendant "linking [it] to the [relying party], which evinces the

[defendant's] understanding of that party['s] . . . reliance."  483 N.E.2d

at 118.  For reasons explained further in the brief of the PwC

defendants on this appeal, these elements are highly plaintiff-specific.

        Second, Citco's alleged breaches of duty include its alleged

misrepresentations concerning the Funds' NAVs.  (A-301-02 ¶¶ 488-89,

495.)  According to the complaint, "Plaintiffs necessarily relied on

---

8   *Lumbermens Mut. Cas. Co.* v. *Franey Muha Alliant Servs.*, 388
    F. Supp. 2d 292, 305 (S.D.N.Y. 2005) (citation and internal quotation
    marks omitted); *Krys* v. *Butt*, 486 F. App'x 153, 155 (2d Cir. 2012)
    ("At the heart of the fiduciary relationship lies reliance . . . .")
    (quoting *United States* v. *Chestman*, 947 F.2d 551, 568 (2d Cir.
    1991)); *Irvin* v. *Jones*, 2012 WL 6634476, at *7 (N.Y. Sup. Ct. Suffolk
    Cnty. Dec. 13, 2012) (stating that fiduciary duty arises as a result of
    "reasonable reliance," among other elements); *see also Ashland*, 652
    F.3d at 339 (affirming dismissal of claim for breach of fiduciary duty
    based on failure to plead reasonable reliance).

Citco's NAV calculations."  (A-245 ¶ 335.)  In order to prove proximate cause, injury, and damages, each Class member would need to prove reasonable reliance on the alleged misrepresentations.  *See Laub* v. *Faessel*, 745 N.Y.S.2d 534, 536 (App. Div. 1st Dep't 2002); *see also Braddock* v. *Braddock*, 871 N.Y.S.2d 68, 84 (App. Div. 1st Dep't 2009) (Lippman, J., dissenting).

> *Aiding and abetting breach of fiduciary duty.*  Plaintiffs also allege that FGG owed fiduciary duties to Class members because the Class members reasonably relied on FGG.  (A 274-75 ¶ 404.)  And FGG's alleged breaches of fiduciary duty included alleged misrepresentations.  (A-167-81 ¶¶ 181-204.)  According to the Complaint, Citco substantially assisted FGG's breaches of fiduciary duty by, among other acts, "calculating the Funds' NAV and disseminating the NAV values."  (A-306 ¶ 513.)  Proximate cause, injury, and damages would require proof of reasonable reliance.

> *Third-Party Breach of Contract.*  Citco allegedly breached the relevant contracts by, "among other omissions, grossly failing to discharge its responsibility to calculate accurately the Funds' NAVs."

27

(A-300 ¶ 484; *see also* A-295 ¶ 475.)  Here too, proximate cause, injury, and damages would require proof of reliance.

       *Comparative fault.*  According to plaintiffs, Citco should be held liable for Mr. Madoff's fraud because Citco allegedly ignored "red flags" suggesting that the Madoff Firm might be operating a Ponzi scheme.  The "red flags," however, consisted of information that was available to anyone, and that as limited discovery has revealed, was actually known to some Class members.  *See infra*, pp. 45-49.  *See also Anwar I*, 728 F. Supp. 2d at 423-24 (noting that some investors "did read the Madoff red flags properly").  Citco is therefore entitled to assert a comparative fault defense to plaintiffs' common-law tort claims based on Citco's contention that if it was at fault in supposedly disregarding or misapprehending the "red flags," which it denies, the evidence may reveal that at least some Class members were at fault in the same or similar ways.  *See* N.Y. C.P.L.R. § 1411; *see also Arbegast* v. *Bd. of Educ. of S. New Berlin Cent. Sch.*, 480 N.E.2d 365, 369 (N.Y. 1985) (noting that § 1411 applies "'to all actions brought to recover damages for personal injury, injury to property or wrongful death *whatever the legal theory* upon which the suit is based.'"  (quoting 1976 Report of the

28

Judicial Conference to the Legislature on the CPLR) (emphasis added by the court)); *FDIC* v. *Ornstein*, 73 F. Supp. 2d 277, 287 (E.D.N.Y. 1999) (allowing defendants to assert comparative negligence defense under § 1411 to claims of negligence, gross negligence, and breach of fiduciary duty); *Coty* v. *Steigerwald*, 692 N.Y.S.2d 556, 557 (App. Div. 4th Dep't 1999) (breach of fiduciary duty); *Bank Brussels Lambert* v. *Chase Manhattan Bank, N.A.*, 1999 WL 710778, at *1-2 (S.D.N.Y. Sept. 10, 1999) (gross negligence and breach of fiduciary duty).[9]  Such a

---

[9]  Some courts, based on dicta in passing from *Conway* v. *Icahn & Co., Inc.*, 16 F.3d 504, 511 (2d Cir. 1994), have suggested that a comparative fault defense does not apply to a claim for breach of fiduciary duty.  *See Solutia Inc.* v. *FMC Corp.*, 456 F. Supp. 2d 429, 452 (S.D.N.Y. 2006) (citing *Conway*); *Solis* v. *Beacon Assocs. Mgmt.*, 2011 WL 3586129, at *5 (S.D.N.Y. Aug. 11, 2011) (citing *Conway* and *Solutia*).  These cases, however, do not cite the New York Court of Appeals' decision in *Arbegast* and do not examine the plain text of § 1411, which speaks broadly of "the culpable conduct attributable to the claimant."  As one New York court explained, § 1411 was intended "to broaden [the doctrine's] application flexibly 'to reach any breach of legal duty or fault by the defendant, including *but not limited to* negligence, in any degree, breach of warranty, strict liability and violation of a statutory duty.'"  *Lippes* v. *Atl. Bank of N.Y.*, 419 N.Y.S.2d 505, 511 (App. Div. 1st Dep't 1979) (quoting Hamburger, *The 1975 New York Judicial Conference Package*, 25 Buffalo L. Rev. 415, 434 (1976) (emphasis added by the court)); *see also* 4 J. Weinstein, H. Korn & A. Miller, *New York Civil Practice: CPLR* ¶ 1411.02, at 14-A-4 (2d ed. 2013) ("By its language, [§ 1411] is to apply to any action for personal injury, property damage or wrongful death.").  In Citco's respectful view, the courts in *Conway*,

29

defense obviously involves individual issues concerning each Class

member's sophistication and knowledge.[10]

### B. No Presumption of Reliance Applies to This Case, and Individual Issues Concerning Reasonable Reliance Therefore Preclude Certification

It is undisputed that the fraud-on-the-market presumption

of reliance does not apply here.  (*See* SPA-13.)  The district court also

properly declined to apply the presumption of reliance established in

*Affiliated Ute Citizens* v. *United States*, 406 U.S. 128 (1972), which is

limited to certain claims based predominantly on omissions under the

---

*Solutia*, and *Solis* were wrong to suggest that comparative fault is not a defense to a claim for breach of fiduciary duty.

[10] *See In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 401-02 (S.D.N.Y. 2008) (noting that "class members may be subject to individual defenses" such as comparative negligence and assumption of risk and concluding that "[t]hese defenses must be resolved on a case-by-case basis"); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 67 (S.D.N.Y. 2002) (declining to certify class where "the claims of many class members may be subject to individual defenses such as comparative or contributory negligence and the statute of limitations"); *Cohn* v. *Mass. Mut. Life Ins. Co.*, 189 F.R.D. 209, 219 (D. Conn. 1999) (noting that "the issue of comparative negligence undoubtedly would require individualized treatment"); *see also Calcano* v. *Rodriguez*, 936 N.Y.S.2d 185 (App. Div. 1st Dep't 2012) (denying plaintiff summary judgment because defendant's comparative negligence defense raised genuine issues of fact concerning comparative fault.).

federal securities laws. (SPA-13.) That is so because plaintiffs' claims against Citco turn predominantly on alleged misrepresentations.[11] (A-246-47 ¶ 338, A-308 ¶ 523, A-311 ¶¶ 534, 536.) In addition, the *Affiliated Ute* presumption does not apply to plaintiffs' common-law claims.[12]

Under Rule 23, plaintiffs must demonstrate that their claims can be proven on a classwide basis. An extensive body of case law demonstrates that when, as here, (i) reliance is an individual issue, and (ii) the class is too numerous to permit manageable individual discovery and evidentiary hearings on reliance, common issues do not predominate and certification of that proposed class is improper. In *Basic Inc.* v. *Levinson*, 485 U.S. 224, 242 (1988), which is the fount of this jurisprudence, the Supreme Court noted that "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented [plaintiffs] from proceeding with a

---

[11] *See Black* v. *Finantra Capital, Inc.*, 418 F.3d 203, 209 (2d Cir. 2005); *Starr ex. rel. Estate of Sampson* v. *Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005); *see also In re InterBank Funding Corp. Sec. Litig.*, 629 F.3d 213, 219-20 (D.C. Cir. 2010) (collecting cases).

[12] *See, e.g., Int'l Fund Mgmt. S.A.* v. *Citigroup Inc.,* 822 F. Supp. 2d 368, 386-87 (S.D.N.Y. 2011).

31

class action, since individual issues then would have overwhelmed the common ones." The Supreme Court recently reiterated this principle in *Amgen*, 133 S. Ct. at 1193 (quoted *supra*, pp. 3-4).

In *In re AIG, Inc. Securities Litigation*, 689 F.3d 229, 241 (2d Cir. 2012), this Court agreed that "a litigation class's failure to qualify for [the] *Basic* presumption typically renders trial unmanageable, precluding a finding that common issues predominate." In *UFCW Local 1776* v. *Eli Lilly & Co.*, 620 F.3d 121, 135 (2d Cir. 2010), the Court rejected purported generalized proof of reliance and reversed an order granting class certification. In reversing another order granting class certification, the Court in *McLaughlin* v. *American Tobacco Co.*, 522 F.3d 215, 223 (2d Cir. 2008), *abrogated in part by Bridge* v. *Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 640 (2008), explained that "[i]ndividualized proof" of reliance was "necessary to overcome the possibility that a member of the purported class purchased" the product at issue—there, "light" cigarettes—for reasons other than the defendants' alleged misrepresentations. *In re Initial Public Offerings Securities Litigation*, 471 F.3d 24, 43 (2d Cir. 2006), declared that "[w]ithout the *Basic* presumption, individual questions of reliance

32

would predominate over common questions." *See also Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co. Inc.*, 269 F.R.D. 252, 260-66 (S.D.N.Y. 2010).  Nor is a proposed class action superior to individual actions if the class action would deprive defendants of their substantive rights.

These principles are fully applicable here.  In order to recover, each Class member must prove (1) that she was aware of some particular alleged misrepresentation; (2) that she actually relied, as a matter of historical fact, on that alleged misrepresentation in specifically deciding either (i) to purchase shares in the Funds (as to the inducement-to-purchase claims) or (ii) to forbear from selling shares in the Funds (as to the holder claims); and (3) that her alleged reliance was reasonable.  *E.g.*, *Amgen*, 133 S. Ct. at 1199; *Sec. Inv. Prot. Corp.* v. *BDO Seidman*, 746 N.E.2d 1042, 1047 (N.Y. 2001).  "Only the statements actually relied on can give rise to a claim . . . ." *Am. Fin. Int'l Grp.—Asia, L.L.C.* v. *Bennett*, 2007 WL 1732427, at *10 (S.D.N.Y. June 14, 2007) (New York law). Proof of reasonable reliance is necessarily individual.

These considerations, without more, require reversal of the Certification Order. As the cases just cited establish, Citco is entitled not to be held liable unless each Class member proves the necessary elements and factual predicates for her claims through fair procedures, including procedures affording Citco the right to obtain evidence on individual issues and to present that evidence to the court or the trier of fact. Plaintiffs cannot properly ask the district court to assume, without discovery or the presentation of evidence, that "Plaintiffs *necessarily* relied" on Citco's alleged misrepresentations (A-245 ¶ 335 (emphasis added)), or that plaintiffs' alleged reliance was reasonable. As the Supreme Court has said in another context, "judicial predictions about the outcome of hypothesized litigation cannot substitute for the actual opportunity to defend that due process affords every party against whom a claim is stated." *Nelson* v. *Adams USA, Inc.*, 529 U.S. 460, 471 (2000); *see also Wal-Mart Stores*, 131 S. Ct. at 2561.

The currently available evidence, moreover, underscores the gravity of the prejudice that the Certification Order inflicts on Citco. As is shown below, limited discovery has demonstrated the existence of many highly litigable individual issues in this case.

34

### C.  Actual Reliance Raises Numerous Individual Issues of Fact

#### 1.  Many Class Members Did Not Rely on Any Representation Made by Citco

Limited discovery from 29 plaintiffs for purposes of class certification (A-3974 n.2) has shown that many plaintiffs did not rely on any representation by any Citco Defendant in making the investment decisions at issue.

*First*, some plaintiffs expressly acknowledged that they did not rely on any representation directly made by Citco.  For example,



*Second*, many plaintiffs did not receive a single document from Citco prior to making their investment decision.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

*Third*, many plaintiffs testified that they had no contact or communication with Citco prior to making their investment decision.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

*Fourth*, some plaintiffs testified that they had never even heard of Citco prior to making their investment decision. For example,

████████████████████████████████████████

████████████████████████████████████████

██████████████

*Fifth*, prior to making their decision to invest in one of the Funds, many plaintiffs testified that they never received any NAV statements, which are the same documents that plaintiffs allege were "fundamental to Plaintiffs' initial investment decisions." (A-245-46 ¶ 335.) ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ This, of course, is consistent with other plaintiffs' testimony that that they had no communications with Citco and received no documentation from Citco prior to making their investment decision.

*Finally*, some plaintiffs testified that they made their decisions to invest for reasons entirely independent of the Funds' NAV.

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████

37

2.    **Many Class Members Made Their Investment Decisions Based on Information and Representations from Sources Independent of Citco**

Discovery also demonstrated that Citco had nothing to do with some plaintiffs' decisions to invest in the Funds.  Some plaintiffs' investment decisions were based solely on their favorable evaluation of the Madoff Firm.  ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

Other plaintiffs met directly with Mr. Madoff, were able to ask him any questions they wanted about the investment under consideration, and decided to invest in the Funds because they believed that the meeting with Mr. Madoff confirmed ██████████████

████████████████████████████████████████

████████████████

Further, many plaintiffs received information only from entities other than Citco and FGG.  ████████████████████

████████████████████████████████████████

38

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████

Moreover, the record is replete with examples of plaintiffs receiving and relying on unique information and representations from others, such as FGG. ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████ FGG provided some plaintiffs with unique materials about the Funds—███████████████

████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

39

████████████████████████████

████████████

And in some cases, plaintiffs may have received no information about the Funds prior to investing. ████████████

████████████████████████████

████████████

### 3. Plaintiffs' Aiding and Abetting Claims Raise Individual Issues Concerning Reliance on FGG's and Citco's Alleged Misrepresentations

Individual issues also predominate for plaintiffs' aiding and abetting claims against Citco based on FGG's alleged misrepresentations and breaches of fiduciary duty.  FGG's alleged misrepresentations include a variety of statements in offering memoranda, semi-annual reports, monthly reports, marketing materials, and related documents.  (A-167-81 ¶¶ 181-204.)  But a number of plaintiffs testified that ████████████████████

████████████████████████████

████████████████████████████

*supra* pp. 38-39.)  Different Class members will have received different written and oral representations from FGG at different times, on which

40

Class members may or may not have relied in making investment decisions.  Citco is entitled to litigate which Class members received and relied on which alleged FGG misrepresentations; whether Citco was aware of the specific representation at issue and its alleged falsity; and whether Citco substantially assisted FGG in making the alleged misrepresentation.  Furthermore, because plaintiffs allege that Citco substantially assisted FGG's purported breaches of fiduciary duty by itself misrepresenting the Funds' NAVs (A-306 ¶ 513), whether Class members reasonably relied on *those* misrepresentations is also relevant to the aiding and abetting claims.

**D.** **Whether Any Alleged Reliance Was Reasonable Raises Numerous Individual Issues of Fact**

Whether a Class member's alleged reliance was reasonable also involves litigable issues.  According to the Complaint, the purported "red flags" that should have put Citco on notice of Mr. Madoff's fraud were "the lack of any transparency into Madoff's operations, that key positions [at the Madoff Firm] were held by Madoff family members, the lack of segregation of important functions [at the Madoff Firm], such as investment management, brokerage, and custodianship, inadequate auditing, Madoff's use of paper trading

41

records, and the implausibly consistent positive returns for a fund

pursuing a market-based strategy." (A-186 ¶ 217; *see also* A-246-47

¶338.)  Information concerning these "red flags," however, was available

to Class members and actually known by some of them.  If, as plaintiffs

charge, Citco negligently disregarded these red flags, Citco is entitled to

litigate whether each Class member was similarly negligent in allegedly

relying on the representations at issue.  Evidence of such negligence by

a Class member would bear directly on Citco's efforts to rebut any

attempted showing of reasonable reliance[13] and to establish its

comparative fault defenses.[14]

---

[13]  *See Ashland*, 652 F.3d at 338-39 (discussing plaintiff-specific factors
relevant to the reasonableness of reliance under § 10(b) of the
Exchange Act and New York common law, such as "[t]he
sophistication and expertise of the plaintiff in financial and
securities matters," "access to the relevant information," and "the
opportunity to detect the fraud" (quoting *Brown* v. *E.F. Hutton Grp.,
Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993)); *Crigger* v. *Fahnestock &
Co., Inc.*, 443 F.3d 230, 234-35 (2d Cir. 2006) (noting that justifiable
reliance under New York common law requires examination of "'the
entire context of the transaction, including . . . the sophistication of
the parties'") (quoting *Emergent Capital Inv. Mgmt., LLC* v.
*Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003)).

[14]  *See*, *e.g.*, *Lippes*, 419 N.Y.S.2d at 510-13 (holding that trial court
properly charged jury on issue of plaintiff's comparative fault, where
plaintiff, as unknowing purchaser of forged promissory notes, failed
to verify the genuineness of the notes with their purported makers).

42

## 1. The Class Members' Sophistication Varies Greatly

Many Class members are highly sophisticated, experienced investors. ███████████████████████████ For example,

███████████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████████████

█████████████████████████████

██████████████████████ And investors in the Funds include clients advised by some of the largest, most sophisticated financial institutions in the world—███████████████████

██████████████████

In contrast, discovery has shown that other class members were less sophisticated. For example, ██████████████

███████████████████████████████

████████████████████████████████████

█████████████████████████

### 2. Many Class Members Performed Extensive Due Diligence Prior to Investing in Any of the Funds

Discovery revealed vast differences in the amount of diligence a plaintiff performed prior to deciding to invest in one of the Funds.  Some plaintiffs performed extensive due diligence, while others did nothing at all.  (*Compare* A-6108-09 *with* A-9239-40.)

███████████, for example, scrutinized a potential investment in one of the Funds in a number of different ways.  ██████

44

 took similar steps.

In contrast, other plaintiffs testified that

### 3. Many Class Members Were Aware of the "Red Flags" Associated with the Madoff Firm and Still Invested

Many investors were aware of the same "red flags" that allegedly should have triggered greater inquiry by Citco.

*Transparency*.  Many plaintiffs knew that Mr. Madoff ran a secretive operation and were expressly warned to redeem their investments or not to invest in the Funds because of transparency

45

issues.  (A-9553, A-10239.) 

████████████████████████████████████████

███████████████████████████████

*Madoff's Multiple Roles.*  Discovery has also confirmed that many plaintiffs knew that the Madoff Firm served in a number of roles for the Funds, including knowledge that it acted as a broker, sub-custodian, and custodian, and that it implemented the SSC strategy.

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████

████████████████████████

That the Madoff Firm served in multiple roles for the Funds was also not a secret. ████████████████████████

████████████████████████████████████████

████████████████████████████████████

47



*Madoff family members*.  Nor was it a secret that the Madoff

Firm employed Mr. Madoff's family members.  For example,

*Consistent Returns*.  The consistency of the returns

generated by Mr. Madoff was well-known; indeed, this fact attracted

48

many investors to the Funds. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

### E. Plaintiffs' Holder Claims Raise Additional Individual Issues of Reliance

Plaintiffs' common-law holder claims raise special and acutely individual issues relating to reliance. According to the Complaint, Class members decided not to sell their interests in the Funds in reliance on Citco's alleged misrepresentations. (A-245 ¶ 335; A-311 ¶¶ 534-35.) These holder claims are distinct from Class members' claims that they were fraudulently induced to purchase interests in the Funds.

As a threshold matter, Citco respectfully submits that New York law does not recognize holder claims at all.[15]  This Court could appropriately so determine on this appeal.  That is so because whether New York law recognizes holder claims at all is inextricably intertwined with this Court's inquiry into what facts concerning reliance Class members would need to prove to establish their holder claims.[16]  The latter inquiry, in turn, is necessary to decide the predominance issues.

Holder claims are universally recognized to be speculative and subject to fabrication.  A plaintiff can readily claim, after the fact, that it had previously decided to sell an investment, but refrained from doing so in alleged reliance on a misrepresentation.  For that and other reasons, "holder claims are generally disfavored . . . ."[17]  Courts have

---

[15]  *See Starr Found*. v. *AIG, Inc*., 901 N.Y.S.2d 246 (App. Div. 1st Dep't 2010) (refusing to recognize specific holder claim and suggesting through its reasoning that New York would not recognize any such claims); *Irvin*, 2012 WL 6634476 at *11  (interpreting *Starr* as demonstrating that holder claims "are not actionable under New York law").

[16]  *See City of New York* v. *Beretta U.S.A. Corp.*, 524 F.3d 384, 391-92 (2d Cir. 2008) (explaining that, in context of an interlocutory appeal, this Court may "assume jurisdiction over the entire order" and answer questions that are fairly included within that order).

[17]  *In re Nat'l Century Fin. Enters.*, 846 F. Supp. 2d 828, 884 (S.D. Ohio 2012).  The *National Century* court believed that New York law

50

therefore ruled that—assuming New York recognizes holder claims at all—New York would join other jurisdictions that have imposed special reliance-related requirements of pleading and proof on holder actions:

> "Because of the inherent difficulty of proving reliance and damages in such actions," the holder must prove "specific reliance" upon a "direct communication" from the defendant. A securities holder satisfies its burden by proving that it had a plan to sell the security but decided not to sell in reliance upon a misrepresentation directly communicated from the defendant. Further, the holder must show that the defendant acted with intent to induce him not to sell.[18]

---

recognized holder claims "in limited circumstances" based on a 2006 decision by a federal district court. *See id.* at 884 (citing *Pension Comm. of Univ. of Montreal Pension Plan* v. *Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 204 (S.D.N.Y. 2006)). *National Century* did not cite the Appellate Division's subsequent 2010 decision in *Starr Foundation*. *National Century* accordingly erred in ruling that New York recognizes holder claims, but was correct in ruling that if New York were to recognize those claims, it would subject them to restrictive reliance-related requirements.

[18] *Nat'l Century*, 846 F. Supp. 2d at 884 (New York law) (quoting *In re WorldCom Sec. Litig.*, 336 F. Supp. 2d 310, 318-21 (S.D.N.Y. 2004)) (citations omitted); *see Lee* v. *Marsh & McLennan Cos., Inc.*, 2007 WL 4303514, at *7-9 (N.Y. Sup. Ct. Nassau Cnty. Dec. 7, 2007) (ruling that even assuming plaintiffs could state a holder claim under New York law, plaintiffs' "attenuated theories . . . fall short of adequately demonstrating reliance in accord with the more exacting requirements uniformly required by Courts which have authorized so-called 'holder' actions"), *aff'd sub nom. Hribar* v. *Marsh & McLennan Cos.*, 900 N.Y.S.2d 449 (2d Dep't 2010); *see also Starr Found.*, 901 N.Y.S.2d at 259 (Moskowitz, J., dissenting) (arguing that if New York recognized holder claims, it should adopt the "sound" reasoning of *Small* v. *Fritz Cos., Inc.*, 65 P.3d 1255, 1265-66 (Cal.

In light of the reliance-related requirements that New York would impose, holder claims brought by Class members could not be litigated fairly within the confines of this putative class action. Evidence of a Class member's plan to sell a particular quantity of her investment at a particular time, some relevant direct communication by Citco to that Class member, and the Class member's abandonment of the plan in actual reliance on a specific alleged misrepresentation contained in the direct communication will necessarily be individual.

In this case, the district court declined to apply the foregoing principles, did not discuss whether the obvious skepticism towards holder claims shown by the *Starr Foundation* majority suggested that at a minimum New York would apply heightened reliance-related

---

2003), which Justice Moskowitz described as "impos[ing] a heightened standard of pleading for the element of reliance in holder actions," and should therefore require a holder plaintiff "to plead with particularity, at the very least, how many shares it would have sold and when it would have sold them"). Other jurisdictions that recognize holder claims impose special reliance-related requirements on them. *See, e.g.*, *Small,* 65 P.3d at 1265-66 (California law); *Holmes* v. *Grubman*, 691 S.E.2d 196, 199-200 (Ga. 2010); *Hunt* v. *Enzo Biochem, Inc.*, 471 F. Supp. 2d 390, 411-13 (S.D.N.Y. 2006) (California, Florida, Massachusetts, and South Carolina law) (cited with approval in Justice Moskowitz's dissent in *Starr Foundation*, 901 N.Y.S.2d at 259).

standards to such claims, and dismissed Justice Moskowitz's dissent in

*Starr Foundation*, which advocated adoption of those standards, with a

"[b]ut see" citation. *Anwar I*, 728 F. Supp. 2d at 444. The district

court's decision was erroneous. Common issues do not predominate for

the holder claims asserted by the Class.

### F. The District Court's Stated Basis for Rejecting Defendants' Reliance-Related Arguments Rested on Errors of Law

The district court certified the Class, notwithstanding

defendants' contentions concerning reliance, for the following reason:

> [E]ven assuming Defendants' claims that certain communications to class members may not have been uniform, they allegedly were uniformly misleading. The variations are therefore immaterial and will not defeat class certification.

(SPA-13 (internal quotation marks omitted).) This observation has no

logical bearing on issues of reasonable reliance.

Whether alleged misrepresentations were "uniformly

misleading" is not at all the same issue as whether the evidence bearing

on reasonable reliance is uniform. The district court did not say, and

could not have said, that all Class members were exposed to the same

misrepresentations, or even to similar misrepresentations. It merely

commented that the misrepresentations were "allegedly . . . uniformly misleading"—in other words, that according to plaintiffs, the quite different alleged misrepresentations at issue were misleading for allegedly related reasons.

But it would make no difference even if all Class members had been exposed to the same misrepresentation, although that is not at all what limited discovery has revealed.  "[P]roof of misrepresentation—even widespread and uniform misrepresentation— only satisfies half of the equation; the other half, reliance on the misrepresentation, cannot be the subject of general proof." *McLaughlin*, 522 F.3d at 223.

Many courts have refused to certify claims because reliance raises individual issues, even though the misrepresentations at issue were made "uniformly" to all class members.[19]  That conclusion is equally warranted here.

---

[19] *E.g.*, *McLaughlin*, 522 F.3d at 223; *Abu Dhabi Commercial Bank*, 269 F.R.D. at 261 (denying class certification where plaintiffs claimed certain misrepresentations were uniform because "the record evidence reveal[ed] material differences among investors with regard to their decision making processes, investment guidelines, due diligence inquiries, and communications with those involved," such that "an assessment of reliance [was required] on an investor-by-

### G. The Certification Order Violates the Rules Enabling Act and the Due Process Clause

For reasons stated above, the Certification Order "'abridge[s]'" Citco's "'substantive right'"[20] not to be held liable unless each member of the Class has proven each element of her claims, including reasonable reliance, through fair procedures affording Citco an opportunity to obtain and present evidence. The order also abridges Citco's substantive rights (i) not to be held liable unless each Class member has proven, through fair procedures, the factual predicates for her claims, including factual predicates involving reasonable reliance,

---

investors basis"); *Levitt* v. *PricewaterhouseCoopers*, *LLP*, 2007 WL 2106309, at *2-3 & n.5 (S.D.N.Y. July 19, 2007) (denying class certification and holding that, unless the fraud-on-the-market presumption applies, individual questions of reliance predominate over common questions, even where "uniform misrepresentations [were] made to all potential class members"); *In re Livent, Inc. Noteholders Sec. Litig.*, 211 F.R.D. 219, 221 (S.D.N.Y. 2002) (rejecting plaintiffs' argument that "alleged individual issues of reliance do not predominate, where the complaint alleges a scheme embodying common misrepresentation to the entire class" and denying class certification because individual issues of reliance predominated).

[20] *Wal-Mart Stores*, 131 S. Ct. at 2561 (quoting Rules Enabling Act, 28 U.S.C. § 2072(b)); *see also Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 613 (1997).

and (ii) to present its comparative fault defenses.  The order therefore violates the Rules Enabling Act, 28 U.S.C. § 2072(b).

"[T]he Due Process Clause guarantees every litigant the opportunity to present their case and have the merits fairly judged. This guarantee includes the right to present a defense to each claim, even in the context of a class action."  1 McLaughlin on Class Actions § 5:43 (9th ed. 2012) (citing *Mathews* v. *Eldridge*, 424 U.S. 319, 333 (1976)); *see also Wal-Mart Stores*, 131 S. Ct. at 2561 ("[A] class cannot be certified on the premise that [a defendant] will not be entitled to litigate its statutory defenses to individual claims."); *McLaughlin*, 522 F.3d at 231-32.  The Certification Order deprives Citco of a fair opportunity to litigate individual issues presented by the case, and therefore violates the Due Process Clause.

## II.    Plaintiffs' Common-Law Holder Claims Are Derivative in Nature, and a Class Action Is Therefore Not a Superior Method of Adjudicating Those Claims

If purportedly direct claims asserted in a putative class action are derivative in nature, the putative class cannot be certified. In that event, a class action is not "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ.

56

P. 23(b)(3).  A derivative action or a direct action by the entity would be more appropriate.[21]

Plaintiffs' common-law holder claims are derivative in nature, and certification of those claims was therefore erroneous.  As Section A below explains, whether a claim is direct or derivative in nature depends on the law of the jurisdiction where the entity was organized or incorporated.  And as Section B explains, claims by investors in the Onshore Fund are derivative in nature under the governing Delaware law, as well as under the New York law that the district court erroneously applied.  The district court should address if necessary whether, as Citco contends, claims by investors in the Offshore Funds are derivative in nature under the governing BVI law.

## A.    Choice of Law

This Court reviews the district court's choice-of-law determination de novo.  *Caruolo* v. *John Crane, Inc.*, 226 F.3d 46, 57 (2d Cir. 2000).  New York choice-of-law principles apply to plaintiffs' state-

---

[21] *See In re Sonus Networks, Inc. Sec. Litig.*, 247 F.R.D. 244, 253 (D. Mass. 2007) (assessing whether claims are direct or derivative in nature in context of superiority inquiry); *City P'ship Co.* v. *Jones Intercable, Inc.*, 213 F.R.D. 576, 589-91 (D. Colo. 2002) (same); *Farrie* v. *Charles Town Races, Inc.*, 901 F. Supp. 1101, 1110-11 (N.D. W. Va. 1995) (same).

57

law claims.  *See*, *e.g.*, *Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012).

The Onshore Funds are limited partnerships registered in Delaware (A-164 ¶¶ 172-73) and organized under Delaware law (A-13468, A-13496).  New York's Partnership Law provides that "[s]ubject to the constitution of this state, the laws of the jurisdiction under which a foreign limited partnership is organized govern its organization and internal affairs . . . ."  N.Y. P'ship Law § 121-901.[22]

Whether a claim is direct or derivative in nature is unquestionably an issue concerning the Onshore Funds' "organization and internal affairs" within the meaning of the Partnership Law.  The issue, after all, concerns whether the claim belongs to the Funds themselves or to Class members as limited partners.  The allocation of rights and obligations between an entity and its owners clearly involves

---

[22] *See Prickett* v. *N.Y. Life Ins. Co.*, 896 F. Supp. 2d 236, 248 (S.D.N.Y. 2012) (ruling that under § 121-901, whether Madoff-related claims by investor in Delaware limited partnership were direct or derivative in nature was governed by Delaware law); *Mizrahi* v. *Chanel, Inc.*, 746 N.Y.S.2d 878, 881 (Sup. Ct. N.Y. Cnty. 2001) (applying § 121-901 to partnership dispute).

58

the entity's "organization and internal affairs." *See*, *e.g.*, *Galef* v.

*Alexander*, 615 F.2d 51, 57-58 (2d Cir. 1980).

This Court has recently applied the internal affairs doctrine

in indistinguishable circumstances. *Newman* v. *Family Management*

*Corp.*, 2013 WL 3712404 (2d Cir. July 16, 2013) (summary order), *aff'g*

748 F. Supp. 2d 299 (S.D.N.Y. 2010), involved claims by a putative class

of investors in a sub-feeder fund.  The sub-feeder fund invested in a

feeder fund, which in turn invested with the Madoff Firm.  748 F. Supp.

2d at 302, 311.  This Court ruled that "[t]o determine whether [the

plaintiff investors] can assert direct claims, we look to the state of

organization of the [sub-feeder fund] limited partnership," which was

Delaware.  2013 WL 3712404, at *4.  This Court's ruling is in accord

with rulings by four judges in the Southern District of New York in

Madoff-related cases (including *Newman*)[23] and with many other

---

[23] *See Prickett,* 896 F. Supp. 2d. at 248-49 (Griesa, J.); *In re Optimal U.S. Litig.*, 813 F. Supp. 2d 351, 376 (S.D.N.Y. 2011) (Scheindlin, J.); *Saltz* v. *First Frontier, LP*, 782 F. Supp. 2d 61, 80 (S.D.N.Y. 2010) (Sand, J.), *aff'd,* 485 F. App'x 461 (2d Cir. 2012); *Newman*, 748 F. Supp. 2d at 313-14 (Sand, J.), *aff'd,* 2013 WL 3712404 (2d Cir. July 16, 2013); *Stephenson* v. *Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 608 (S.D.N.Y. 2010) (Holwell, J.), *aff'd on other grounds sub nom. Stephenson* v. *PricewaterhouseCoopers*, 482 F. App'x 618 (2d Cir.

59

decisions.[24]  Whether claims by Class members who invested in the

Onshore Funds are direct or derivative in nature is governed by

Delaware law.

The Offshore Funds are incorporated in the BVI.  Under

New York's common-law internal affairs doctrine, whether claims by

Class members who invested in the Offshore Funds are direct or

derivative is governed by BVI law.  *See supra* pp. 57-59 & nn. 22, 23.

The district court's decision not to apply the internal affairs

doctrine[25] is incompatible with the Partnership Law, which does not

authorize ad hoc judicial exceptions.  The district court's decision also

disregarded important policy and practical considerations animating

---

2012); *see also Zutty* v. *Rye Select Broad Mkt. Prime Fund, L.P.*, 2011 WL 5962804, at *5 (N.Y. Sup. Ct. N.Y. Cnty. Apr. 15, 2011).

[24] *E.g.*, *NAF Holdings, LLC* v. *Li & Fung (Trading) Ltd.*, 2013 WL 489020, at *5 (S.D.N.Y. Feb. 8, 2013); *Seidl* v. *Am. Century Cos., Inc.*, 713 F. Supp. 2d 249, 255 (S.D.N.Y. 2010), *aff'd*, 427 F. App'x 35 (2d Cir. 2011); *Amusement Indus., Inc.* v. *Stern*, 2010 WL 2976199, at *4 (S.D.N.Y. July 26, 2010), *adopted*, No. 07-CV-11586-(LAK)(GWG), ECF No. 503 (S.D.N.Y. Sept. 9, 2010).

[25] *See Anwar I*, 728 F. Supp. 2d at 400 n.8.  The district court ruled on the derivative issue on the motions to dismiss but stated that the issue "is more properly decided at the class certification or summary judgment stage."  *Id.* at 402.  Defendants, including Citco, briefed the issue on class certification.  The Certification Order did not address the issue, even though analysis of the issue was essential to a proper class certification inquiry.

the doctrine: "only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands." *Edgar* v. *MITE Corp.*, 457 U.S. 624, 645 (1982). These relationships are created and defined by a limited partnership's partnership agreement, or a corporation's articles of incorporation and bylaws, as supplemented by the statutory and common law of the state of organization or incorporation. *See, e.g., Zion* v. *Kurtz*, 405 N.E.2d 681, 684 (N.Y. 1980). When an investor purchases an equity interest in a business entity, the investor agrees that this legal regime will govern her relationship with the entity in which she invests. *See Hart* v. *Gen. Motors Corp.*, 517 N.Y.S.2d 490, 493-94 (App. Div. 1st Dep't 1987).

Here, New York has no significant interest in whether the claims at issue belong to the Funds themselves, on the one hand, or directly to their investors, on the other. Those interests belong overwhelmingly to Delaware and the BVI. New York may have an interest in the substantive law governing those claims, but that interest concerns the relationship between investors in the Funds and the

61

defendants here, the latter of which are external to the Funds.  It is

entirely distinct from an interest in the internal relationships that are

governed by the internal affairs doctrine.  *See In re Optimal*, 813

F. Supp. 2d at 375-76; *see also BBS Norwalk One, Inc.* v. *Raccolta, Inc.*,

60 F. Supp. 2d 123, 128-29 (S.D.N.Y. 1999) ("[T]he internal affairs

doctrine is really a specialized application of the New York rule . . . that

the law of the state with the greatest interest in the issue governs."),

*aff'd*, 2000 WL 232805 (2d Cir. Feb. 24, 2000) (summary order).[26]

---

[26] The district court mistakenly relied in part on *Greenspun* v. *Lindley*,
330 N.E.2d 79 (N.Y. 1975), which applied Massachusetts law to a
Massachusetts business trust.  *Anwar I*, 728 F. Supp. 2d at 400 n.8.
*Greenspun* did not accept "automatic application" of the internal
affairs doctrine to the trust "by strict analogy to . . . a business
corporation."  330 N.E.2d at 81.  *Greenspun*, however, did not state
that the court would hesitate to apply the doctrine to corporations,
and it does not qualify the effect of Section 121-901 of the
Partnership Law, which was enacted in 1990.  *Norlin Corp.* v.
*Rooney, Pace Inc.*, 744 F.2d 255, 263-64 (2d Cir. 1984), concluded
that for highly case-specific reasons having no relevance here, a
foreign jurisdiction had determined that it lacked any interest
sufficient to warrant the application of its own laws, and New York
law therefore applied.  According to the district court, *Continental
Casualty Co.* v. *PricewaterhouseCoopers, LLP*, 933 N.E.2d 738 (N.Y.
2010), "appl[ied] New York law without comment to determine
standing of investors of hedge fund apparently incorporated in
Delaware."  *Anwar I*, 728 F. Supp. 2d at 400 n.8.  In fact, the hedge
fund at issue in *Continental Casualty* was organized under New York
law, and the parties to the appeal agreed that New York law
governed their dispute.  (A-13636, A-13660-61.)

The district court erroneously declined to apply the internal affairs doctrine based in part on the fact that the Offshore Funds are no longer operating entities. *Anwar I*, 728 F. Supp. 2d at 400 n.8. But that was also true in *Stephenson*, which involved one of the defunct Funds at issue in this case, and in *Newman* and *Saltz* as well. *See Stephenson*, 700 F. Supp. 2d at 608; *Newman*, 748 F. Supp. 2d at 305; *Saltz*, 782 F. Supp. 2d at 81 n.19. The rationale underlying the internal affairs doctrine remains highly relevant for defunct entities.[27] The unexpected insolvency of an entity often precipitates overlapping litigations in multiple forums brought by both investors in the entity and by trustees in bankruptcy or other representatives of the entity. In order to achieve consistency and predictability and to prevent duplicative recoveries, the single legal regime previously accepted by investors should be applied to determine which claims are owned by investors, and which claims are owned by the entity.

---

[27] *See Krys* v. *Sugrue (In re Refco Inc. Sec. Litig.)*, 2010 U.S. Dist. LEXIS 33642, at *112-13 (S.D.N.Y. Mar. 1, 2010) (applying internal affairs doctrine to insolvent corporation and discussing reasons and authorities for doing so), *adopted*, 2011 U.S. Dist. LEXIS 47688 (S.D.N.Y. May 4, 2011).

These considerations apply in full here:  actions brought on behalf of the Funds that are substantially similar to this one are currently pending in several other forums.  *See* Fed R. Civ. P. 23(b)(3)(B) ("the extent and nature of any litigation concerning the controversy already begun by . . . class members" is "pertinent" to superiority).  A bankruptcy trustee for the Onshore Funds has sued the Citco Administrators, GlobeOp, PwC Canada, and PwC Netherlands in state court in New York (A-13696, A-13753); those cases were originally brought as derivative actions.  Investors in one of the Offshore Funds brought a derivative action against several Citco Defendants, PwC Canada, and PwC Netherlands that was later transferred to bankruptcy court in New York.  (A-13812.)  The liquidator for the Offshore Funds has sued PwC Canada in the Ontario courts for the same claims.  (A-13913.)[28]  The same liquidator for the Offshore Funds

---

[28] The Court may take judicial notice of these complaints.  *See, e.g.*, *Shao* v. *Holder*, 424 F. App'x 13, 15 (2d Cir. 2011); *A.I. Trade Fin., Inc.* v. *Centro Internationale Handelsbank AG*, 926 F. Supp. 378, 387 (S.D.N.Y. 1996); *Hudson Riverkeeper Fund, Inc.* v. *Harbor at Hastings Assocs.*, 917 F. Supp. 251, 256 (S.D.N.Y. 1996); Fed. R. Evid. 201(b)(2).

has also sued PwC Netherlands in Amsterdam.[29]  Through these

lawsuits, the Funds seek billions of dollars for alleged injuries that are

indistinguishable from those at issue here.  One set of rules for each

Fund—the rules of the jurisdiction of organization or incorporation—

should govern which claims belong to the investors, and which claims

belong to the Fund.

> ### B.    Plaintiffs' Holder Claims Are
> ### Derivative in Nature

Whether claims are direct or derivative in nature is a

question of law that is reviewed de novo.  *Buckley* v. *Control Data Corp.*,

923 F.2d 96, 98 (8th Cir. 1991).

In *Newman*, this Court ruled that Madoff-related holder

claims indistinguishable from those presented here "can only be

asserted derivatively" under Delaware law.  2013 WL 3712404, at *4 &

n.1.  In *Stephenson,* 482 F. App'x at 621, this Court considered a

negligence-based holder claim brought by an investor in one of the

Funds at issue here against the Fund's auditors.  The *Stephenson* Court

held that under Delaware law, the investor's holder claim—to the

---

[29] *See* Rb. Amsterdam 30 mei 2012 (*Krys/PricewaterhouseCoopers Accountants*) (Neth.).

65

extent the investor had such a claim at all—"is a derivative claim that [the investor] lacks standing to assert directly." *Id.*  Plaintiffs' holder claims here are derivative in nature for precisely the same reasons.

*Tooley* v. *Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), sets forth the governing test under Delaware law.  *E.g.*, *Newman*, 2013 WL 3712404, at *4.  Under *Tooley*, whether a shareholder's claim is direct or derivative turns "*solely* on the following questions:  (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"  *Tooley* , 845 A.2d at 1033 (emphasis in the court's opinion).  "Where all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature."  *Feldman* v. *Cutaia*, 951 A.2d 727, 733 (Del. 2008).

In substance, plaintiffs allege that Citco failed to discharge its duties properly as administrators and custodians of the Funds. (*E.g.*, A-301-03 ¶¶ 489-90, 495-96, A-311 ¶ 534.)  These allegations are

66

"classic claim[s] of fund mismanagement." *San Diego Cnty. Emps. Ret.
Ass'n* v. *Maounis*, 749 F. Supp. 2d 104, 126-27 (S.D.N.Y. 2010)
(Delaware law).  As part of this mismanagement, Citco allegedly
miscalculated and misrepresented the Funds' NAV.

On plaintiffs' theory, Citco presumably should have
discovered and disclosed facts supposedly suggesting that the Madoff
Firm was not actually holding securities on behalf of the Funds.  But if
the market had learned of the Madoff Firm's frauds, the Madoff Firm
would have collapsed.  Investors would have recovered only the true
value of the Funds' actual assets, which would have depended primarily
on the Madoff Firm's actual assets (if any) at the time.  *See Anwar I*,
728 F. Supp. 2d at 445 (identifying alleged injury as continuing
dissipation of Madoff Firm's assets over time).  In other words, Citco's
alleged misrepresentations and other misconduct supposedly caused an
injury *to the Funds* through the continuing dissipation of the Madoff
Firm's assets, and injured Fund investors (if at all) only derivatively
and pro rata.  (*See* A-119-20 ¶¶ 1-3 (indicating that Class members seek
recovery of "net loss of principal invested in the Funds").)

Courts applying Delaware law have routinely held that
claims asserting damages to shareholders based on a decline in the
price of their shares are derivative.[30]  And the alleged harm to Class
members—the depreciation of their investment in the Funds—is a

---

[30] *See Manzo* v. *Rite Aid Corp.*, 2002 WL 31926606, at *5-6 (Del. Ch.
Dec. 19, 2002) ("To the extent that plaintiff was deprived of accurate
information upon which to base investment decisions and, as a
result, received a poor rate of return on her Rite Aid shares, she
experienced an injury suffered by all Rite Aid shareholders in
proportion to their pro rata share ownership."), *aff'd*, 2003 WL
21262118 (Del. May 29, 2003); *see also Smith* v. *Waste Mgmt. Inc.*,
407 F.3d 381, 385 (5th Cir. 2005) ("[W]hen a corporation, through its
officers, misstates its financial condition, thereby causing a decline in
the company's share price when the truth is revealed, the corporation
itself has been injured."); *Lee* v. *Marsh & McLennan Cos., Inc.*, 2007
WL 4303514, at *5 (N.Y. Sup. Ct. Nassau Cnty. Dec. 7, 2007) (finding
holder claims for breach of fiduciary duty, negligent
misrepresentation, and common-law fraud to be derivative in nature
because "the plaintiff here cannot prevail without showing an injury
to the corporation" (internal quotation marks omitted)), *aff'd sub
nom. Hribar* v. *Marsh & McLennan Cos.*, 900 N.Y.S.2d 449, 451 (2d
Dep't 2010) (finding that "the claimed injury—the decline in the
value of the plaintiffs' shares . . . after the Attorney General filed a
complaint against the corporation" gave rise to claims that were
derivative in nature); *Schuster* v. *Gardner*, 25 Cal. Rptr. 3d 468, 476
(Cal. Ct. App. 2005) (finding holder claim derivative where "the
alleged harms were to the corporation, and the harm to the
shareholders, dilution in stock value, was incidental thereto and
common to all shareholders"); *cf. In re Enron Corp. Sec.*, *Derivative &
"ERISA" Litig.*, 2005 WL 2230169, at *3 (S.D. Tex. Sept. 12, 2005)
(applying Oregon law and noting that "courts have . . . concluded
[that holder claims] were derivative claims under Delaware law").

harm suffered by *all* Class members "*pro rata* in proportion with their ownership . . . solely because they are [investors]." *Feldman*, 951 A.2d at 733.

The district court suggested that Class members had direct claims because they purchased their investments at different times and in different amounts, and because some Class members had redeemed portions of their investments. *See Anwar I*, 728 F. Supp. 2d at 402. These facts may be relevant to some purchase-based inducement claims, which in principle can be direct claims. In some circumstances, a purchaser, unlike a holder, can sustain a unique injury if it pays an inflated price for an investment and the investment subsequently loses value. The district court's observation, however, even if theoretically relevant to a purchaser claim, is irrelevant to the holder claims. Other than the court below, every district court in this Circuit to have faced substantially similar allegations by investors in Madoff feeder funds has concluded that the investors' holder claims were derivative in nature,[31] as this Court did in *Newman* and *Stephenson*.

---

[31] *See In re Optimal*, 813 F. Supp. 2d at 376-80 (New York law); *Saltz*, 782 F. Supp. 2d at 77-79 (Delaware law); *Newman*, 748 F. Supp. 2d at 315-16 (Delaware law); *Stephenson*, 700 F. Supp. 2d at 608-11

The district court here distinguished *Stephenson* based on its erroneous view that New York law, not Delaware law, governed the direct/derivative issue. *Anwar I*, 884 F. Supp. 2d at 98-99. The district court also suggested that *Stephenson* involved claims of mismanagement, not misrepresentation. *Id.* at 99. *Stephenson*, however, involved holder claims based in part on PwC's allegedly wrongful issuance of unqualified audit reports, including a claim for negligence based on misrepresentations. *See* 700 F. Supp. 2d at 604-05, 608.

Among other claims, *Newman* involved a claim for negligent misrepresentation, which this Court held was direct only "[t]o the extent [that] the claim . . . alleges fraudulent inducement" to purchase investments. 2013 WL 3712404, at *4 n.1. *Newman* thus held that plaintiffs' holder claims for negligent misrepresentation were derivative in nature. *Newman*, like *Stephenson*, demonstrates the error of the district court's view that the holder claims asserted in this case must be

---

(Delaware law); *cf. In re J.P. Jeanneret Assocs.*, 769 F. Supp. 2d 340, 369-70 (S.D.N.Y. 2011) (standing under § 10(b) of the Exchange Act).

direct because they are based in part on misrepresentations.  *See also supra*, p. 68 n.30.

Plaintiffs' holder claims would also be derivative in nature if, as the district court erroneously believed, New York law governed the issue.  The First Department recently decided, as a correct statement of New York law, to "adopt the test the Supreme Court of Delaware developed in *Tooley*."  *Yudell* v. *Gilbert*, 949 N.Y.S.2d 380, 381 (App. Div. 1st Dep't 2012).[32]  The First Department's decision is entitled to "great weight" in this Court.  *McCarthy* v. *Olin*, 119 F.3d 148, 154 (2d Cir. 1997).  And pre-*Yudell* decisions interpreting the direct/derivative distinction under New York law do not diverge in any way that is material here from the Delaware law explicated in *Tooley*.[33]

Citco demonstrated in the district court that under BVI law, holder claims brought by investors in the Offshore Funds are derivative in nature.  (A-1498-1507.)  Because the district court erroneously

---

[32] *See also, e.g.*, *NAF Holdings*, 2013 WL 489020, at *6 n.6 (noting that New York has adopted *Tooley*); *Meseonznik* v. *Govorenkov*, 2012 WL 4017363, at *10  (N.Y. Sup. Ct. Kings Cnty. Sep. 10, 2012) (applying *Tooley*).

[33] *See, e.g., Cordts-Auth* v. *Crunk, LLC*, 815 F. Supp. 2d 778, 786 (S.D.N.Y. 2011), *aff'd*, 479 F. App'x 375 (2d Cir. 2012).

applied New York law, it did not consider any issues under BVI law.

Citco believes it would be sensible for the district court, if necessary, to

address in the first instance whether, as Citco contends, claims by

investors in the Offshore Funds are derivative in nature under BVI law.

If this Court finds that New York law governs the direct/derivative

issue, it should rule that holder claims brought by investors in the

Offshore Funds are derivative in nature.

## Conclusion

For the foregoing reasons, and those set forth in the brief filed concurrently by the PwC defendants (which Citco joins and adopts by reference to the extent relevant), the Certification Order should be reversed.

Dated:   New York, New York
         August 16, 2013

Respectfully submitted,

PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP


By:   ___s/ Walter Rieman_____

Of counsel:                   Walter Rieman
   Brad S. Karp                  wrieman@paulweiss.com
   Leslie Gordon Fagen      1285 Avenue of the Americas
   Andrew G. Gordon         New York, New York  10019-6064
   Patrick J. Somers          (212)373-3260

*Attorneys for Defendants-Appellants*
*The Citco Group Ltd., Citco Fund Services*
*(Europe) B.V., Citco (Canada) Inc., Citco*
*Global Custody N.V., Citco Bank*
*Nederland N.V. Dublin Branch, and Citco*
*Fund Services (Bermuda) Ltd.*

73

## Certificate of Compliance

I, Walter Rieman, attorney for Defendants-Appellants The Citco Group Limited, Citco Fund Services (Europe) B.V., Citco (Canada) Inc., Citco Global Custody, N.V., Citco Bank Nederland N.V. Dublin Branch, and Citco Fund Services (Bermuda) Limited, hereby certify that this brief conforms to the requirements of Fed. R. App. P. 32(a)(7) because this brief contains 13,841 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in New Century Schoolbook 14-point font.

Dated:  New York, New York
         August 16, 2013

         s/ Walter Rieman
         Walter Rieman

74

# SPECIAL APPENDIX

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Decision and Order on Class Certification, dated February 25, 2013 ......................... SPA-1

Order Clarifying the February 25, 2013 Class Certification Order, dated
    March 6, 2013 ........................................................................................ SPA-41

Order Clarifying the February 25, 2013 Class Certification Order, dated
    March 11, 2013 ...................................................................................... SPA-43

SPA-1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
PASHA S. ANWAR, et al.,         :
                                :   09 Civ. 0118 (VM)
              Plaintiffs,       :
                                :
                                :
                                :
      -against-                 :
                                :
FAIRFIELD GREENWICH LIMITED,    :
et al.,                         :
                                :
                                :   DECISION AND ORDER
              Defendants.       :
------------------------------ X
```

**VICTOR MARRERO, United States District Judge.**

Lead plaintiffs AXA Private Management, Pacific West Health Medical Center Employees Retirement Trust, Harel Insurance Company Ltd., Martin and Shirley Bach Family Trust, Natalia Hatgis, Securities & Investment Company Bahrain, Dawson Bypass Trust, and St. Stephen's School (collectively, "Plaintiffs"), brought this class action on behalf of individuals and entities who invested large sums of money in four investment funds (the "Funds") created and operated by the Fairfield Greenwich Group ("FGG"). The overwhelming majority of Plaintiffs' money was in turn invested by FGG in the Ponzi scheme operated by Bernard Madoff ("Madoff") under the auspices of Bernard L. Madoff Investment Securities, Inc. ("BLMIS"), and for which Madoff was sentenced to 150 years in prison following his guilty

plea.  See United States v. Madoff, No. 09 Cr. 0213 (S.D.N.Y. June 29, 2009).

Plaintiffs are suing a number of FGG entities, executives, and other professional service providers who audited, administered, or served as custodians of the Funds.  In the Second Consolidated Amended Complaint (the "SCAC"), filed September 29, 2009, Plaintiffs allege violations of federal securities law and common law tort, breach of contract and quasi-contract causes of action against FGG and associated entities and individuals (the "Fairfield Defendants"),[1] several Citco entities (collectively, "Citco"),[2] two PricewaterhouseCoopers entities (collectively, "PwC"),[3] and GlobeOp Financial Services, LLC ("GlobeOp") (collectively, "Defendants"). Plaintiffs allegations are detailed more fully in this Court's prior opinions in this action, Anwar v. Fairfield

---

[1]  In addition to FGG, these entities and individuals include Fairfield Greenwich Advisors LCC ("FGA"), Fairfield Greenwich Ltd. ("FGL"), and three wholly-owned FGL subsidiaries: Fairfield Greenwich (Bermuda) Ltd. ("FGBL"), Fairfield Risk Services Ltd. ("FRS"), Fairfield Heathcliff Capital LCC ("FHC"), Walter M. Noel Jr. ("Noel"), Jeffrey H. Tucker ("Tucker"), Andres Piedrahita ("Piedrahita"), Amit Vijayvergiya ("Vijayvergiya"), Daniel E. Lipton ("Lipton"), and Mark McKeefry ("McKeefry").

[2]  Citco is defined to include defendants Citco Group Ltd. ("Citco Group"), Citco Fund Services (Europe) B.V. ("CFSE"), Citco (Canada) Inc. ("CCI"), Citco Global Custody N.V. ("Citco Global"), Citco Bank Nederland N.V. Dublin Branch ("Citco Bank,"), and Citco Fund Services (Bermuda) Ltd. ("CFSB").

[3]  Plaintiffs' surviving claims are against PricewaterhouseCoopers LLC ("PwC Canada"), and PricewaterhouseCoopers Accountants Netherlands N.V. ("PwC Netherlands").

Greenwich Ltd., 728 F. Supp. 2d 354 (S.D.N.Y. 2010) ("Anwar
I") and Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d
372 (S.D.N.Y. 2010) ("Anwar II").

    Plaintiffs now move, pursuant to Rule 23 of the
Federal Rule of Civil Procedure 23 ("Rule 23"), to certify
a class (the "Class" or "Proposed Class") comprised of:

> all shareholders/limited partners in Fairfield Sentry
> Limited, Fairfield Sigma Limited, Greenwich Sentry,
> L.P. and Greenwich Sentry Partners, L.P. (the "Funds")
> as of December 10, 2008 who suffered a net loss of
> principal invested in the Funds.

(Pls.' Mem. of Law in Supp. of Mot. for Class Cert. ("Pls.'
Mem.") at 1.)[4]  For the reasons discussed below, Plaintiffs'
proposed class definition is modified to exclude members of
the Proposed Class whose investments in the Funds were made
in the following countries: Switzerland, France,
Luxembourg, Israel, Kuwait, Korea, North Korea, Picairn,
Tokelau, Mongolia, China, Liechtenstein, Japan, Oman,
Taiwan, United Arab Emirates, Qatar, Saudi Arabia, Bosnia,
Andorra, San Marino, Namibia, Monaco, Germany, and South
Africa (collectively, the "Excluded Countries").  The Court
finds that the Proposed Class, modified as indicated,
satisfies all of the requirements of Rule 23(a) and the

---

[4]  Excluded from the Class definition are the Defendants, and any entity
in which the Defendants have a controlling interest, and the officers,
directors, affiliates, legal representatives, immediate family members,
heirs, successors, subsidiaries, and/or assigns of any such individual
or entity.

pertinent requirements of Rule 23(b). This Class is
subject to further adjustment or decertification as
warranted as facts develop.

## I. BACKGROUND[5]

The SCAC alleges a common course of wrongful conduct
by the Fairfield Defendants characterized by a continuous
series of false representations and material omissions that
began from the founding of the Funds in 1990 to Madoff's
confession of wrongdoing in December 2008. Specifically,
Plaintiffs claim that uniform marketing materials and the
periodic updates about the Funds' performance falsely
represented (1) that the Plaintiffs' investments were
actually invested by Madoff in the so-called "split-strike
conversion" strategy; (2) that Madoff's strategy resulted
in substantial, consistent returns; and (3) that FGG had
performed extensive due diligence, continually monitored
Madoff's operations and, as a result, had full access to
all of Madoff's operations. (SCAC ¶ 182.) The SCAC
contains myriad examples of these misrepresentations or
omissions, including the alleged investment via a "split-
strike conversion," an investment which never actually
occurred, (id. ¶ 184), information showing "substantial,

---

[5]  A more detailed description of the facts of this case is provided in
Anwar I and Anwar II. Unless otherwise indicated, all facts in the
Background section are taken from these opinions, and the documents on
which they relied.

-4-

consistent annualized rates of return for the Funds," (id. ¶ 187), and that FGG was simply recycling information that Madoff had provided and did nothing to independently verify whether investments occurred or whether the returns Madoff reported were accurate, (id. ¶ 189; see also id. ¶¶ 184-216, 229, 231, 233.)  Plaintiffs further allege that FGG made these misstatements or omissions despite numerous "red flags" that should have put FGG on notice that Madoff was not being honest.

The SCAC also brings claims against Citco, PwC, and GlobeOp related to the services that these entities allegedly provided to FGG.  Specifically, Plaintiffs claim that the Funds' administrators, Citco and GlopeOp, and auditor, PwC, failed to conduct any due diligence and wholly failed to fulfill their duties, thereby assisting the Funds in their fraud and breaches of fiduciary duties, and ultimately allowing Madoff to abscond with Plaintiffs' money.

Defendants moved to dismiss the SCAC and in two orders, as detailed in Anwar I and Anwar II, the Court denied in part and granted in part Defendants' motions to dismiss, familiarity with which is assumed.

## II.  DISCUSSION

A. <u>STANDARD OF REVIEW</u>

To certify the Proposed Class, Plaintiffs must satisfy all four of the requirements of Rule 23(a) and the relevant portions of Rule 23(b)(3). <u>See In re Livent Noteholders Sec. Litig.</u>, 210 F.R.D. 512, 514 (S.D.N.Y. 2002) ("<u>Livent</u>").

To meet Rule 23(a)'s prerequisites, Plaintiffs must demonstrate that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Rule 23(b)(3) further requires that Plaintiffs demonstrate that common questions of law or fact "predominate over any questions affecting individual members" and that maintaining a class action "is superior to other available methods" of adjudication. Fed. R. Civ. P. 23(b)(3).

Trial courts are given substantial discretion in determining whether to grant class certification because "'the district court is often in the best position to assess the propriety of the class and has the ability . . . to alter or modify the class, create subclasses, and decertify the class whenever warranted.'" <u>In re Nigeria</u>

-6-

Charter Flights Contract Litig., 233 F.R.D. 297, 301
(E.D.N.Y. 2006) (quoting In re Sumitomo Copper Litig., 262
F.3d 134, 139 (2d Cir. 2001) ("Sumitomo III") (alteration
in original)).  The Second Circuit has directed courts to
adopt a liberal interpretation of Rule 23 in order to
maximize the benefits to private parties and, in cases such
as this that involve alleged manipulation of public
markets, to maximize the benefits to the public provided by
class actions.  See In re Sumitomo Copper Litig., 182
F.R.D. 85, 88-89 (S.D.N.Y. 1998) ("Sumitomo I"); see also
In re Sumitomo Copper Litig., 194 F.R.D. 480, 481 (S.D.N.Y.
2000) ("Sumitomo II").  As the Second Circuit stated in
Green v. Wolf Corp., "'if there is to be an error made, let
it be in favor and not against the maintenance of the class
action, for it is always subject to modification should
later developments during the course of the trial so
require.'"  406 F.2d 291, 298 (2d Cir. 1968) (quoting
Esplin v. Hirshi, 402 F.2d 94, 99 (10th Cir. 1968)).

B.  RULE 23(a) REQUIREMENTS

    1. Numerosity

    To meet the requirements of Rule 23(a)(1), "the class
must be so large that joinder of all members would be
impracticable" (the "Numerosity Requirement").  Sumitomo
II, 194 F.R.D at 482 (citing In re Drexel Burnham Lambert

Grp., Inc., 960 F.2d 285, 290 (2d Cir. 1992)). Although
precise calculation of the number of potential class
members is not required, the Second Circuit has observed
that "numerosity is presumed at a level of 40 members." In
re Vivendi Universal, S.A. Sec. Litig., 242 F.R.D. 76, 83
(S.D.N.Y. 2007) (citing Consol. Rail Corp. v. Town of Hyde
Park, 47 F.3d 473, 483 (2d Cir.1995), cert. denied, 515
U.S. 1122 (1995)) (quotation marks omitted) ("Vivendi").

During the Proposed Class Period, approximately 1,000
members of the Proposed Class maintained accounts with the
Defendants and therefore Plaintiffs clearly meet the
Numerosity Requirement. (See Pls.' Mem. 3.)

    2.  Commonality of Law or Fact Questions

Rule 23(a)(2) requires plaintiffs to demonstrate that
common issues of law or fact affect all class members (the
"Commonality Requirement"), which has been characterized as
a "low hurdle." See Sumitomo II, 194 F.R.D at 482 (citing
In re Prudential Sec. Litig., 163 F.R.D. 200, 206 n.8
(S.D.N.Y. 1995)).

It is evident that common questions of law and fact
exist in this proceeding. Where plaintiffs allege that
class members have been injured by similar material
misrepresentations and omissions, the Commonality
Requirement is satisfied. See, e.g., Vivendi, 242 F.R.D.

at 84.  The claims of the Proposed Class clearly arise from a common course of conduct by Defendants and Plaintiffs specifically allege that certain actions and statements by the Defendants led to the concealment of Madoff's Ponzi scheme and were misleading with respect to material facts. Furthermore, there are numerous issues of law and fact that are common to the Proposed Class, including whether: (1) Defendants were complicit in Madoff's Ponzi scheme; (2) Defendants omitted or misrepresented material facts; (3) Defendants knew or recklessly disregarded that these statements were false or misleading; (4) Defendants breached duties owed to the Plaintiffs; and (5) Plaintiffs suffered damages and the extent and appropriate measure of damages.

Accordingly, because Plaintiffs allege a common course of fraudulent conduct, the Commonality Requirement is satisfied.

3.  <u>Typicality</u>

Rule 23(a)(3) requires that Plaintiffs' claims be typical of the class (the "Typicality Requirement"). "Rule 23(a)(3) is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's

liability." <u>Sumitomo I</u>, 182 F.R.D. at 94 (internal quotation marks and citation omitted).

Here, Plaintiffs allege that they will use common evidence to prove that Defendants "misrepresented the nature and extent of their due diligence and compliance with industry standards, which, if performed as represented, would have prevented the loss of billions of dollars" to the Class. (Pls.' Mem. 6.) Furthermore, Plaintiffs argue that individual members of the Class will not be subject to unique defenses because investments in the Funds were made only through private placement transactions, and nearly all the information related to the investments came from the Defendants.

Accordingly, Plaintiffs have sufficiently demonstrated that the potential class members' claims satisfy the Typicality Requirement of Rule 23(a)(3).

4.   <u>Adequacy</u>

Rule 23(a)(4) requires that the representative of the parties will "fairly and adequately protect the interests of the class" (the "Adequacy Requirement"). Fed. R. Civ. P. 23(a)(4).   To meet this requirement, the lead plaintiffs' counsel must be "qualified, experienced, and generally able to conduct the proposed litigation," and the class representatives must not have interests conflicting

with the class.  <u>Livent</u>, 210 F.R.D. at 517 (internal citations and quotation marks omitted).  The Court finds that both requirements are satisfied in the instant matter.

Plaintiffs' attorneys have vigorously pursued these claims to date and have adequately represented classes in other securities litigation and other complex class actions.  Therefore, counsel for the Plaintiffs are qualified for the purposes of Rule 23(a)(4).

Additionally, no conflicts of interest between the Plaintiffs and members of the Class have been raised by any of the parties here.

Accordingly, the Court finds that Plaintiffs have satisfied the Adequacy Requirement of Rule 23(a)(4).

D.    RULE 23(b)(3) REQUIREMENTS

In addition to satisfying Rule 23(a), Plaintiffs must also establish that this action is maintainable as a class action under Rule 23(b).  Plaintiffs seek to certify the Proposed Class pursuant to Rule 23(b)(3), which provides that an action is maintainable as a class action if "questions of law or fact common to class members predominate over any questions affecting only individual members" (the "Predominance Requirement"), and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (the

"Superiority Requirement"). Fed. R. Civ. P. 23(b)(3). "A
class certified under Rule 23(b)(3) is sometimes referred
to as an 'opt-out' class because Rule 23(c)(2) mandates
that members of a class certified pursuant to Rule 23(b)(3)
be afforded the opportunity to 'request exclusion' from
that class." Vivendi, 242 F.R.D. at 90. Should the Court
certify the Proposed Class, any investor — foreign or
domestic — who does not opt out of the class "is bound by
the final disposition of the case." Id.

    1. Predominance Requirement

    The Predominance Requirement is a more demanding
standard than the Commonality Requirement and is satisfied
if the "resolution of some of the legal or factual
questions that qualify each class member's case as a
genuine controversy can be achieved through generalized
proof, and if these particular issues are more substantial
than the issues subject only to individualized proof." Id.
(citing Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d
Cir. 2002)). The Predominance Requirement is "readily met
in certain cases alleging . . . securities fraud." Amchem
Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997).

    Defendants argue that the Proposed Class should not be
certified because individual issues of reliance foreclose a
finding of predominance. Specifically, Defendants claim,

-12-

among other things, that Plaintiffs allegedly relied on
certain non-uniform materials — or, on the flip-side, did
not uniformly rely on certain materials, uniform or
otherwise.   Defendants further allege that Plaintiffs
varied in their sophistication and access to information,
and that, in any event, the Defendants never actually
"made" these representations.   Plaintiffs counter that (1)
reliance can be demonstrated based on common,
circumstantial evidence and that, at the least, Plaintiffs
relied on core misrepresentations and omissions by
Defendants; (2) reliance can be shown because the fraud
created a market that would never otherwise have existed;
and (3) the presumption of reliance under Affiliated Ute
applies to Defendants' material omissions.   The Court
concludes that, even absent a "fraud created the market"
theory or the Affiliated Ute presumption of reliance,
common questions of law and fact clearly predominate over
any individual issues.

As this Court noted under similar circumstances in
another case, even assuming Defendants' claims that certain
"communications to class members may not have been uniform,
they allegedly were uniformly misleading.   The variations
are therefore immaterial and will not defeat class
certification."   Bresson v. Thomson McKinnon Sec. Inc., 118

F.R.D. 339, 343 (S.D.N.Y. 1988).  The use of third-party
investment agents by the Plaintiffs also does not create
individual issues of reliance that foreclose a finding of
predominance because "misrepresentations made to an agent
are deemed to [be] made to the principal."  In re Beacon
Assocs. Litig., 745 F. Supp. 2d 386, 408 (S.D.N.Y. 2010).
This conclusion is only buttressed by the fact that there
was little to no publically available information relating
to Madoff investments, and therefore any information
relating to the Funds, whether provided to Plaintiffs or
Plaintiffs' agents, was likely obtained through the
Defendants.

　　　　Furthermore, to the extent the Defendants' other
arguments in opposition to class certification relate to
the merits of the dispute and do not directly pertain to
the predominance inquiry or other Rule 23 requirements –
such as whether Defendants can be deemed to have "made" any
of the statements in the relevant materials – "despite
[the] parties' extensive briefing of the merits of the
case, [the Court] circumscribe[s] [its] present inquiry to
the essentials for class certification."  Dornberger v.
Metro. Life Ins. Co., 182 F.R.D. 72, 76 (S.D.N.Y. 1998)
("In considering the certification of a potential class,
the district court is not, at this stage, to assess the

-14-

merits or the substance of the claims at issue but, rather, is to limit its inquiry to the satisfaction of the requirements under [Rule 23].”); <u>Eisen v. Carlisle & Jacquelin</u>, 417 U.S. 156, 178 (1974) (“In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.” (internal quotation marks and citations omitted)).[6]  To the extent any of the merits-based arguments presented by Defendants necessitate the establishment of sub-classes or the severance of some Plaintiffs, Defendants are free to propose these remedies at the appropriate time.

The Court concludes that questions of law and fact common to the Proposed Class predominate over any questions affecting only individual members.  Plaintiffs’ claims arise out of Defendants’ alleged fraudulent conduct, which was directed at all investors.  Plaintiffs have also alleged a series of false and misleading statements and omissions by Defendants, in violation of federal securities

_____

[6]  As the Supreme Court has recently emphasized, the “rigorous analysis” required under Rule 23 necessarily “entail[s] some overlap with the merits of the plaintiff’s underlying claim.”  <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2551 (2011).  The Court has rigorously considered all of the Rule 23 requirements and the merits of the case, where appropriate, in reaching the conclusion that Plaintiffs Proposed Class satisfies Rule 23’s stringent requirements.  Under similar circumstances, other courts in this district have reached the same conclusion.  <u>See</u>, <u>e.g.</u>, <u>In re Beacon</u>, 282 F.R.D. 315.

-15-

laws, which Plaintiffs assert affected all investors.  The
critical issues for establishing liability in this case
include whether Defendants engaged in a fraudulent scheme
and made the false and misleading statements and omissions,
whether those statements and omissions were material,
whether Defendants acted with scienter, and whether
Defendants' conduct injured members of the Class.
Plaintiffs will likely rely on similar evidence when
establishing each of the foregoing issues at trial, and
thus, common issues predominate over individual issues.
See, e.g., In re Beacon, 282 F.R.D. at 328-331 (applying
Affiliated Ute presumption of reliance to certify class of
investors in funds that invested assets with Madoff).

Accordingly, Plaintiffs have satisfied the
Predominance Requirement.

### 2.   Superiority Requirement

When certifying a proposed class in accordance with
Rule 23(b)(3), courts must consider whether a class action
is "superior to other available methods for fairly and
efficiently adjudicating the controversy." Fed. R. Civ. P.
23(b)(3).  The Superiority Requirement asks courts to
balance, in terms of fairness and efficiency, the
advantages of a class action against those of alternative
available methods of adjudication.  See Fed. R. Civ. P. 23

-16-

**SPA-17**

Advisory Committee Notes, 1966 Amendment, 28 U.S.C.A. Rule 23, at 385 ("Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."). Rule 23(b)(3) identifies several factors to consider in determining whether a class action is in fact "superior to other available methods for for fairly and efficiently adjudicating the controversy":

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Courts may properly consider res judicata concerns when evaluating the Superiority Requirement with respect to a proposed class that includes foreign class members. <u>See</u> <u>Vivendi</u>, 242 F.R.D. at 95 (stating that "res judicata concerns have been appropriately grafted onto the superiority inquiry," but that the res judicata determination should not be "dispositive without either an evaluation of the likelihood of nonrecognition or a

consideration of other factors which impact a determination of the superiority requirement"). Defendants assert that foreign investors[7] should be excluded from the Proposed Class and that a United States class action is not a superior method for adjudicating Plaintiffs' claims because a resulting judgment would not be given preclusive effect by the courts in the approximately seventy countries in which Plaintiffs reside (collectively, the "Foreign Courts").

    a.   Standard

As this Court has stated previously, the appropriate standard for evaluating the likelihood of the Foreign Courts' recognition of a judgment rendered by this Court is whether "the Foreign Courts would probably recognize as preclusive any judgment rendered by this Court (the "Probability Standard")." In re Alstom SA Sec. Litig., 253 F.R.D. 266, 282 (S.D.N.Y. 2008). Under the Probability Standard,

> Plaintiffs carry the burden of demonstrating that "foreign court recognition is more likely than not," but if Plaintiffs are "unable to show that foreign court recognition is more likely than not, this factor weighs against a finding of superiority and, taken in consideration with other factors, may lead to the exclusion of foreign claimants from the class."

---

[7]  The Proposed Class included members from a large number of foreign countries which Plaintiffs have placed into eight groups. (See Decl. of Sashi Bach Boruchow, dated Mar. 2, 2011 ("Boruchow Decl.") Ex. 2.) The Court will therefore analyze them within these groups.

Id. (quoting Vivendi, 242 F.R.D. at 95).   However, even under the Probability Standard, Courts should "'evaluate the risk of nonrecognition along a continuum,'" in determining whether, along with other factors, plaintiffs satisfy the Superiority Requirement.   Vivendi, 242 F.R.D. at 95 (quoting In re Initial Pub. Offering Sec. Litig., 471 F.3d 24, 33 (2d Cir.2006)).   "When determining foreign law, courts 'may consider any relevant material or source,' including determinations by other courts, and the fact that United States courts have generally certified proposed classes which included [certain foreign] lead plaintiffs and class members, is particularly persuasive."   Alstom, 253 F.R.D. at 291 (quoting Fed. R. Civ. P. 44.1).

The Court is currently presented with extensive dueling expert reports from preeminent practitioners and scholars debating the likelihood of foreign recognition of a United States opt-out class action judgment.   The most contentious issue debated by these esteemed scholars is whether recognition of the judgment would violate a foreign country's public policy.   Undoubtedly, in certain jurisdictions that have affirmatively considered the efficiency and fairness concerns implicated by class action procedures, this discussion has substantive merit and will

likely determine whether a foreign court will grant
recognition to a judgment by this Court. However, in the
vast majority of countries that have not yet squarely
confronted the issue of class actions, much less explicitly
addressed recognition of a United States class action
judgment, the reams of esoteric legal analysis submitted by
the parties, citing as legal authority Baron Blackburn[8] and
his young-blooded contemporaries, ultimately amount to no
more than high-priced arm-chair oracles, conjecture that
provides little assistance to the Court, one way or
another, in analyzing the likelihood of foreign recognition
of this Court's judgment.

Therefore, the Court concludes that, where a plaintiff
sufficiently demonstrates that the stated policy of a
foreign country is to recognize and enforce foreign
judgments, or that its law is generally inclined to favor
that course of action, such a showing would create a
rebuttable presumption that, absent an affirmative showing

---

[8]  Baron Blackburn was an eminent eighteenth century British judge and
Lord of Appeal in Ordinary responsible for a number of influential
contract law decisions. However, like most of the authorities cited by
the parties, Baron Blackburn's opinion makes absolutely no mention of
class action litigation, which is unsurprising considering the absence
of class action litigation in the United Kingdom during the relevant
time period.   While the concept of "group litigation" may have
originated in medieval England, it had apparently "disappeared in
England by the middle of the nineteenth century."   Robert G. Bone,
Personal and Impersonal Litigative Forms, 70 B.U. L. Rev. 213, 223
(1990) (citing Stephen C. Yeazell, From Medieval Group Litigation to
the Modern Class Action (1987)).   In most of the foreign legal
authorities cited by the parties, reference to class action litigation
has yet to appear.

to the contrary, recognition of a particular United States
judgment, even in class action litigation, does not violate
a foreign country's public policy. Such a presumption is
especially warranted in situations where the relevant
Foreign Courts do not routinely address the underlying
substantive or procedural issues considered and embodied in
the United States court judgment, and therefore have not
had the occasion to explicitly embrace, or reject, a
particular question of procedure or substance. Following
certification of the Proposed Class, should the Defendants
find clear and convincing evidence that enforcement of a
class-action judgment rendered in this litigation would in
fact violate the public policy of any of the countries of
residence of the members of a certified class, thereby
calling into question the likelihood of enforcement of this
Court's judgment by the courts of that foreign country, the
Defendants may introduce such evidence and move to sever
those members from the class at that time.

    a.   Group 1: Netherlands and Curacao

Under Dutch law, a foreign judgment will not be
recognized unless the foreign court based its jurisdiction
on an "internationally acknowledged ground," that satisfied
domestic due process requirements, and comports with Dutch
public policy. (Decl. of Prof. Hans Smit, dated Mar. 1,

2011 ¶ 28 ("Smit Decl.").)   The Curacao legal system is
copied from the Netherlands and therefore any analysis of
the likelihood of a Dutch court to recognize judgment
applies equally to Curacao.  (Smit Decl. ¶¶ 71-72.)

     In the instant matter, Plaintiffs have sufficiently
demonstrated that a Dutch court would more likely than not
recognize a judgment rendered by this Court.  The January
25, 2007 Amsterdam Court of Appeals decision In re Dexia
Bank Nederland N.V., rekestnummer 1783/05 (Amsterdam Court
of Appeals, Jan. 25, 2007) ("Dexia") regarding the Mass
Damages Act (the "Damages Act") "demonstrates the Dutch
authorities' willingness to adopt opt-out class mechanisms"
and "the Dutch courts' likelihood for recognizing opt-out
mechanisms as generally consistent with Dutch treaties and
constitutional principles."  Alstom, 253 F.R.D. at 289-90.
After examining the expert declarations and considering the
parties' arguments concerning Dutch law, the Court
concludes that Plaintiffs have sufficiently demonstrated
that Dutch courts – and therefore those of Curacao as well
– would  more likely than not recognize, enforce, and give
preclusive effect to any judgment in this case rendered by
this Court involving absent Dutch class members.
Accordingly, the Court will certify a class which includes

class members from both the Netherlands and Curacao with
claims against Defendants.

    b.   <u>Group 2: United Kingdom, Canada and Common Law
        Jurisdictions</u>

    "There is no clear authority addressing the res
judicata effect of a [United States] class action judgment
in England," which is an issue of English common law.
<u>Vivendi</u>, 242 F.R.D. at 102; <u>see also</u> (Decl. of Prof.
Jonathan Harris, dated Feb. 26, 2011 ¶ 15) ("Harris
Decl.").)  Under English common law, British courts will
generally enforce a foreign judgment if the foreign court
that issued the judgment was "jurisdictionally competent."
(Harris Decl. ¶ 27.)  More specifically, British "courts
will regard the overseas court as jurisdictionally
competent either if the defendant had the requisite
territorial connection with the foreign state," which is
satisfied if a corporate defendant maintains a "fixed place
of business . . . at the [corporate defendant's] own
expense from which it has carried out its own business in
the overseas jurisdiction," or "if the defendant submitted
to proceedings in that state," which includes, but is not
limited to, "voluntarily pleading to the merits." (<u>Id.</u> ¶¶
27, 29-33.)

The English common law framework for adjudging the jurisdictional competence of foreign courts focuses on the circumstances of the defendant and not those of the plaintiff. (See id. ¶¶ 34-38.) If the foreign judgment meets the basic requirements for recognition and enforcement, the British court will likely consider two defenses — "that the foreign judgment is in breach of natural justice" or that "it is contrary to English public policy." (Id. ¶ 39.) Courts of other common law countries frequently look to the law of the United Kingdom for guidance on the recognition of foreign judgments, and the law of those countries is either substantially similar to, or even more favorable than, the law of the United Kingdom regarding the enforcement of foreign class action judgments. (See id. ¶¶ 177-199.)

To consider a particular action a breach of natural justice, the British courts again focus on the defendant, determining whether the defendant had the opportunity to adequately defend itself by having "been served with proper notice of the proceedings, been allowed properly to arrange his defence, and that the procedures of the foreign court must have been acceptable." (Id. ¶ 40.) British courts rarely refuse to recognize in personam foreign judgments as contrary to English public policy, and although there is no

-24-

formal analytical framework for determining a violation of English public policy, "'[t]he usual colourful examples are an order to pay damages for breach of a contract to kidnap or to sell narcotics, or those based on openly racist laws.'" (Id. ¶¶ 43, 88 (quoting Adrian Briggs et al., Civil Jurisdiction and Judgments 557 (5th ed. 2009)).) Defendants have submitted no credible evidence that British courts would consider a class-action judgment to be either a breach of natural justice or contrary to British public policy.

After examining the expert declarations and considering the parties' arguments concerning English law and other common law jurisdictions, the Court re-adopts the rationale set forth in Alstom and concludes that Plaintiffs have sufficiently demonstrated that the courts of the United Kingdom, Canada, and other common law countries would more likely than not recognize, enforce, and give preclusive effect to any judgment rendered in this case by this Court involving absent class members from these jurisdictions.  Furthermore, this Court has already concluded that both the United Kingdom and Canada would more likely than not recognize a United States class action judgment and bar absent class members from bringing later actions against the defendants.  Alstom, 253 F.R.D. at 289;

SPA-26

_Vivendi_, 242 F.R.D. at 103.  Accordingly, the Court will certify a class which includes British, Canadian, and other common law country class members.

    c.   Group 3: Switzerland

Under Swiss law, a foreign judgment will be recognized in Switzerland if (1) the foreign court has jurisdiction according to Swiss legal principles; (2) the decision is final; and (3) there is no ground to refuse recognition, such as a violation of public policy, under Art. 27 of the Swiss Private International Law Act ("SPILA").  (Decl. of Phillipp Kanzig, dated Mar. 1, 2011 ¶ 29 ("Kanzig Decl"); Decl. of Prof. Isabelle Romy, dated Sept. 13, 2011 ¶ 14 ("Romy Decl.").)  Plaintiffs' expert acknowledges that under the traditional Swiss legal doctrine's conception of a "party," "Absent Class Members would not . . . be bound by the U.S. class action judgment and could initiate duplicative litigation in Switzerland."  (Kanzig Decl. ¶ 22.)

Therefore, the Court concludes that Plaintiffs have not sufficiently demonstrated that Swiss courts would more likely than not recognize, enforce, and give preclusive effect to any judgment in this case rendered by this Court involving absent Swiss class members.  Finding otherwise would expose Defendants to the possibility that they may

-26-

have to relitigate the same or similar issues before a
Swiss court. Accordingly, the Court will not certify a
class which includes absent Swiss class members.

    d.   <u>Group 4: France and Luxembourg</u>

     Before a French court will recognize and give
preclusive effect to a judgment rendered in a foreign
court, the French court will analyze the foreign judgment
under the framework primarily set forth in <u>Munzer v.
Munzer</u>, which was issued by France's highest court. <u>See
Vivendi</u>, 242 F.R.D. at 96; (Decl. of Alexis Mourre, dated
Feb. 8, 2011 ¶ 12 ("Mourre Decl.").) The portion of the
<u>Munzer</u> framework which is currently valid law may be
summarized as follows: (1) the foreign court must have
jurisdiction pursuant to French rules on conflict of
jurisdictions (the "Jurisdictional Prong"); (2) the
judgment of the foreign court is not contrary to
international public policy (the "Public Policy Prong");
and (3) the action before the foreign court was not the
result of forum shopping (the "Forum Shopping Prong"). <u>See
Vivendi</u>, 242 F.R.D. at 96. According to Plaintiffs, courts
in Luxembourg "substantially follow the French approach"
for recognition and enforcement of foreign judgments.
(Mourre Decl. ¶¶ 18, 87.)

This Court previously held that French courts would
likely not enforce a foreign judgment in opt-out class
action because to do so would violate French constitutional
principles and public policy. See Alstom, 253 F.R.D. at
286-87. Recent developments have only served to confirm
this conclusion. For example in an amicus curiae brief in
Morrison v. Nat'l Australia Bank Ltd., --- U.S. ---, 130
S.Ct. 2869 (2010), the Republic of France stated that
"French courts would almost certainly refuse to enforce a
court judgment in a U.S. 'opt-out' class action because it
. . . violates French constitutional principles and public
policy" and approvingly cited this Court's decision in
Alstom. (See Mourre Decl. ¶¶ 16-17.)

Therefore, the Court concludes that Plaintiffs have
not sufficiently demonstrated that French or Luxembourgish
courts would more likely than not recognize, enforce, and
give preclusive effect to any judgment in this case
rendered by this Court involving absent class members
residing in France or Luxembourg. Finding otherwise would
expose Defendants to the possibility that they may have to
relitigate the same or similar issues before courts in
France or Luxembourg. Accordingly, the Court will not
certify a class which includes absent class members from
France or Luxembourg.

e.   Group 5: Spain

The United States and Spain do not have a bilateral treaty regarding the recognition and enforcement of foreign judgments.   (Decl. of Prof. Miguel Angel Fernandez-Ballesteros, dated Jan. 11, 2012 ¶ 31 ("Fernandez-Ballesteros Decl.").)   Under the Spanish legal principle of reciprocity, Spanish courts will recognize a foreign judgment if that country recognizes similar Spanish judgments.   (Fernandez-Ballesteros Decl. ¶ 32; Decl. of Prof. Fernando Gascón, dated Feb. 28, 2011 ¶ 19("Gascón Decl.").)   Spanish law also recognizes foreign judgments where the following "system of conditions" criteria are met: (1) the judgment is final; (2) the foreign court had jurisdiction; (3) the foreign judgment was rendered pursuant to an action in personam; (4) the judgment was not rendered in absentia of the defendant and did not violate defendant's due process rights; (5) the decision is not contrary to the public policy of Spain; and (6) the decision is "authentic," meaning that it complies with all requirements of the foreign state, and is not in conflict with any prior Spanish judgment.   (Fernandez-Ballesteros Decl. ¶ 35; Gascón Decl. ¶¶ 36-38.)   The parties do not dispute that any judgment here would likely satisfy most of these criteria; however, they do offer different opinions

-29-

as to whether recognizing an opt-out class action judgment
would violate Spanish public policy.

In certain situations, Spanish law provides for "group
actions" in which multiple plaintiffs can assert their
individual claims together in a single action. (Fernandez-
Ballesteros Decl. ¶¶ 47-49.) Specifically, plaintiffs may
bring a group action if (1) plaintiffs maintain their
status as individual claimants similar to "permissive
joinder"; (2) plaintiffs are similarly-situated consumers
or users; or (3) plaintiffs bring their claims as part of a
legally constituted association. (Id.) The ability to
bring group actions was first enacted in 2000 and was
subsequently broadened in 2002 to include injunctive relief
to enjoin harmful conduct, and in 2007 to include gender
discrimination claims. (Reply Decl. of Prof. Fernando
Gascón, dated Apr. 24, 2012 ¶¶ 14-16 ("Gascón Reply
Decl.").)

Defendants argue that members of the Proposed Class
would not fall within one of these explicitly enumerated
types of group actions under Spanish law and that the
absence of a United States-style opt-out class action
mechanism in Spain is evidence that the recognition of a
judgment in this case would violate material Spanish public
policy. However, Defendants fail to identify an explicit

-30-

conflict with Spanish public policy that would bar
recognition of the judgment. The mere fact that Spanish
law does not explicitly embrace a foreign legal mechanism
does not mean that it would find the judgment so repugnant
that it would reject it as violating Spanish public policy.
In fact, under Spanish law, certain situations exist in
which collective action to enjoin clauses in contracts of
adhesion may be brought without the opportunity to opt out
in the first place. (Gascón Reply Decl. ¶¶ 7-8, 33.)  It
is inevitable that the precise contours of the procedural
vehicle used to vindicate certain rights will differ
between countries, however, these differences do not by
definition constitute a conflict of material public policy.
Holding otherwise would allow the exception to swallow the
rule of comity and general recognition propounded in many
foreign jurisdictions, including Spain.  Based on this
backdrop of fundamental acceptance of group actions under
Spanish law and the explicit adoption of binding injunctive
collective actions in limited situations, the Court is not
persuaded that the recognition of an opt-out class action
judgment would violate material Spanish public policy.

Defendants also argue that recognition of the
judgment in this case would violate Spanish procedural
public policy due to (1) the inability of absent class

-31-

members to intervene, and (2) the binding effect of the
judgment on absent class members not afforded a full
opportunity to participate. However, the intricacies of
the Spanish collective action legal system appear to
demonstrate an attempt to balance the interests of finality
with the rights of individual litigants in a manner
markedly similar to that of the United States judicial
system. For example, in collective actions involving known
parties, potentially interested parties must be notified
and have the right to intervene. However, these notified,
potentially interested parties will be barred from active
participation if they fail to intervene prior to the filing
of the complaint. (Gascón Reply Decl. ¶¶ 38-39.) The
United States judicial system provides a similar mechanism
by which individual plaintiffs may participate: by filing
independent materials either prior to or following the
appointment of lead plaintiff. Moreover, a plaintiff in
the United States always has the opportunity to opt out of
the litigation, and absent class members may voice
objection to settlements at a fairness hearing — additional
safeguards and rights not necessarily present in the
Spanish system. (Id. ¶¶ 51-52; Gascón Decl. ¶ 95.) In
some cases where the interests at stake are diffuse,
Spanish courts do not require any notice whatsoever and

-32-

interested parties that fail to intervene during a certain specified waiting period will nevertheless be bound by the eventual judgment. (Id. ¶ 41.)

These situations persuasively suggest that Spanish procedural public policy does not always mandate that an interested party be required to intervene or opt out at all points during certain types of collective active litigation. Instead, these individual participation rights are balanced against other competing interests in much the same way as the United States class action system provides. Therefore, the Court concludes that the recognition of a United States opt-out class action judgment would not violate Spanish procedural public policy.

In the instant matter, Plaintiffs have sufficiently demonstrated that a Spanish court would more likely than not recognize, enforce, and give preclusive effect to a judgment in this action rendered by this Court. Accordingly, the Court will certify a class which includes class members from Spain with claims against Defendants.

f.   Group 6: Latin America

The Proposed Class includes members from certain Latin American countries, specifically, Panama, Colombia, Uruguay, Brazil, Chile, Venezuela, Argentina, Ecuador, El Salvador, Peru, Dominican Republic, Mexico and Bolivia,

that the Court will consider collectively for the purposes
of this analysis (the "relevant Latin American countries").
(Boruchow Decl. Ex. 2.)   Generally, the relevant Latin
American countries, regardless of whether they are
signatories, look to the principles embodied in the
Bustamante Code and Inter-American Convention on
Extraterritorial Validity of Foreign Judgments and Arbitral
Awards (the "Inter-American Convention") to determine
whether to recognize a foreign judgment. (See Decl. of
Prof. Michael Wallace Gordon, dated Mar. 1, 2011 ¶¶ 20-21
("Gordon Decl.").)   While the United States is not a party
to the Inter-American Convention and therefore its
provisions are not binding here, the Inter-American
Convention's principles reflect the general framework
characteristic of the approach Latin American courts take
to recognition of foreign judgments. (Gordon Decl. ¶ 25.)
Under the current circumstances, the essential issues for
determining the likelihood of recognition of foreign
judgments are: (1) whether adequate notice of the
litigation was provided to potentially interested parties,
including whether the parties had an opportunity to present
their claims and defenses, and whether the summons or
subpoena were issued in a substantially similar fashion to
that provided for in the procedures of the jurisdiction

-34-

where the judgment will take effect, and (2) whether the judgment is manifestly contrary to the state's public policy. (See Gordon Decl. ¶¶ 23-24; Inter-American Convention arts. 2(e), (f), (h).)

After examining the expert declarations and considering the parties' arguments concerning the law of the relevant Latin American countries, the Court concludes that, under the present circumstances, Plaintiffs have made a sufficient presumptive showing that courts in the relevant Latin American countries would more likely than not recognize a class-action judgment rendered in this case by this Court. While the majority of Latin American courts have not specifically addressed the enforcement of United States class-action judgments, the Court finds that the general policy of the relevant Latin American countries inclines to favor granting recognition to judgments of United States courts. The Court also takes into account the unlikely ability of plaintiffs from the relevant Latin American countries to bring a duplicative action in their home countries, and the absence in the record before the Court of any authority from the relevant Latin American countries expressly stating that the enforcement of a United States opt-out class action judgment would manifestly violate the public policy of any of the relevant

Latin American countries.  These considerations make it
more likely than not that the courts of the various
jurisdictions would recognize, enforce, and give preclusive
effect to a judgment in this action.  (See Gordon Decl. ¶¶
29, 100.)  Accordingly, the Court will certify a class
which includes class members from the relevant Latin
American countries.

    g.   Group 7: Belgium

    Generally, Belgian law provides for the automatic
recognition of United States judgments.  (Decl. of Jean-
Pierre Fierens & Bart Volders, dated Feb. 25, 2011 ¶ 11
("Fierens-Volders Decl.").)  However, in a number of
enumerated circumstances, Belgian courts must refuse to
recognize judgments rendered by courts in the United
States.  (Id. ¶ 12.)  In the instant case, Defendants argue
that Belgian courts would refuse to recognize a judgment
because (1) recognition would be manifestly incompatible
with Belgian public policy, and (2) recognition would
infringe upon the requirements of fair trial and due
process.  (Id.; Decl. of Prof. Dr. Hakim Boularbah and Dr.
Frédéric Georges, dated Nov. 28, 2011 ¶¶ 7, 8, 48, 49
("Boularbah-Georges Decl.").)

    Although Belgian law does not currently provide an
opt-out class action procedure, it does recognize a number

of different collective litigation mechanisms. (Fierens-
Volders Decl. ¶ 19.) The Belgian legislature has also
explored expanding the availability of class actions under
Belgian law, including opt-in and opt-out class actions.
(Fierens-Volders Decl. ¶ 21; Fierens-Volders Reply Decl. ¶¶
13-14.) Such developments are consistent with a general
policy that inclines to favor class action procedures by
other European Union member states, as reflected in the
finding of the Amsterdam Court of the First Instance that
United States opt-out class action procedures are not
incompatible with the requirements of the European Code of
Human Rights. (Fierens-Volders Decl. ¶¶ 22-23, 27.)

    Against this backdrop, which is complemented by the
absence of a showing of any controlling Belgian authority
holding that the recognition of an opt-out class action
judgment would manifestly violate Belgian public policy or
infringe on the Belgian requirements of a fair trial and
due process, Plaintiffs have made a sufficient presumptive
showing that a Belgian court would more likely than not
recognize a class-action judgment rendered in this case by
this Court. After examining the expert declarations and
considering the parties' arguments concerning Belgian law,
the Court concludes that Belgian courts would more likely
than not recognize, enforce, and give preclusive effect to

any judgment rendered in this action by this Court
involving absent Belgian class members. Accordingly, the
Court will certify a class which includes class members
from Belgium with claims against Defendants.

   i. Group 8: Other Jurisdictions

   "Although plaintiffs often submit expert declarations
regarding issues of foreign law, such declarations are not
necessary for plaintiffs to carry their burden of
establishing aspects of foreign law." Alstom, 253 F.R.D.
at 291 (citing Fed. R. Civ. P. 44.1). The Court finds that
Plaintiffs have met their burden of establishing that the
courts of countries that are members of the European
Community or signatories to the Lugano Treaty – with the
exception of France, Luxembourg, and Switzerland – will
more likely than not recognize, enforce, and give
preclusive effect to any judgment rendered in this action
by this Court involving absent class members. (See Smit
Decl. ¶ 73(4).) Accordingly, the Court will certify a
class which includes class members from Italy, Portugal,
Greece, Malta, Denmark, Norway, Sweden, and Finland with
claims against Defendants.

   However, the Court finds that the Plaintiffs have not
sufficiently demonstrated that the stated policy or general
inclination of the law of the following countries would

more likely than not favor recognizing, enforcing, and giving preclusive effect to any judgment rendered in this action by this Court involving absent class members: Israel, Kuwait, Korea, North Korea, Picairn, Tokelau, Mongolia, China, Liechtenstein, Japan, Oman, Taiwan, United Arab Emirates, Qatar, Saudi Arabia, Bosnia, Andorra, San Marino, Namibia, Monaco, Germany,[9] and South Africa (collectively, the "Additional Excluded Countries"). Therefore, the Court will not certify a class which includes absent class members from the Additional Excluded Countries.

### III. ORDER

For the reasons discussed above, it is hereby:

**ORDERED** that the motion (Docket No. 776) of lead plaintiffs AXA Private Management, Pacific West Health Medical Center Employees Retirement Trust, Harel Insurance Company Ltd., Martin and Shirley Bach Family Trust, Natalia Hatgis, Securities & Investment Company Bahrain, Dawson Bypass Trust, and St. Stephen's School for class

---

[9]    Although Germany is a member of the European Union and signatory to the Lugano Convention, other courts in this District have determined that it is not more likely than not that German courts would enforce a class action judgment. See Vivendi, 242 F.R.D. at 103-05; Borochoff v. GlaxoSmithKline PLC, 246 F.R.D. 201 (S.D.N.Y. 2007). The Court is persuaded by the findings and reasoning in those cases and will apply them here.

certification pursuant to Federal Rule of Civil Procedure 23 is GRANTED as modified herein.

**SO ORDERED.**

Dated: New York, New York
      22 February 2013

                      VICTOR MARRERO
                        U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
PASHA S. ANWAR, et al.,          :
                                 :    09 Civ. 0118 (VM)
                Plaintiffs,      :
                                 :
                                 :
                                 :
     -against-                   :
                                 :
FAIRFIELD GREENWICH LIMITED,     :
et al.,                          :
                                 :
                                 :
                Defendants.      :
--------------------------- X

**ORDER**

**VICTOR MARRERO, United States District Judge.**

     On November 30, 2012, the Court issued an order
granting preliminary approval to the proposed settlement
between the Plaintiffs and Defendants Fairfield Greenwich
Limited and Fairfield Greenwich (Bermuda) Limited
(collectively, the "Fairfield Greenwich Defendants") and
staying all litigation in this action between Plaintiffs
and the Fairfield Greenwich Defendants.  On February 25,
2013, the Court issued a decision and order granting in
part Plaintiffs' motion for class certification (the "Class
Certification Order").  As a result of the stay previously
imposed by the Court, the Class Certification Order does
not currently apply to the claims asserted by Plaintiffs
against the Fairfield Greenwich Defendants.

-1-

**SO ORDERED.**

Dated: New York, New York
      6 March 2013

_____
VICTOR MARRERO
U.S.D.J.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                              ::
ANWAR, et al.,                                ::
                                              ::
                           Plaintiffs,        ::
                                              ::          NO. 09-CV-0118 (VM)
           v.                                 ::
                                              ::              ORDER
FAIRFIELD GREENWICH LIMITED, et al.,          ::
                                              ::
                           Defendants.        ::
                                              ::
-------------------------------------------------------------x

**VICTOR MARRERO, United States District Judge**

        WHEREAS, on November 30, 2012, the Court issued an order granting preliminary

approval to the proposed settlement between Plaintiffs and Defendants Fairfield Greenwich

Limited and Fairfield Greenwich (Bermuda) Limited and staying all litigation in this action

between Plaintiffs and Defendants Fairfield Greenwich Limited, Fairfield Greenwich (Bermuda)

Limited, Fairfield Greenwich Group, Fairfield Greenwich Advisors LLC, Fairfield Risk Services

Ltd., Fairfield Heathcliff Capital LLC, Fairfield Greenwich (UK) Limited, Walter M. Noel, Jr.,

Jeffrey H. Tucker, Andrés Piedrahita, Lourdes Barreneche, Robert Blum, Cornelis Boele,

Gregory Bowes, Vianney d'Hendecourt, Yanko Della Schiava, Harold Greisman, Jacqueline

Harary, David Horn, Richard Landsberger, Daniel E. Lipton, Julia Luongo, Mark McKeefry,

Charles Murphy, Corina Noel Piedrahita, Maria Teresa Pulido Mendoza, Santiago Reyes,

Andrew Smith, Philip Toub and Amit Vijayvergiya (collectively, the "FG Entity and Individual

Defendants").

        WHEREAS, on February 25, 2013, the Court issued a decision and order granting in part

Plaintiffs' motion for class certification (the "Class Certification Order").

        WHEREAS, on March 6, 2013, the Court issued an order clarifying that, as a result of the

stay previously imposed by the Court, the Class Certification Order does not currently apply to

**SPA-44**

the claims asserted by Plaintiffs against the Fairfield Greenwich Defendants, defined as only Fairfield Greenwich Limited and Fairfield Greenwich (Bermuda) Limited.

NOW, THEREFORE, IT IS FURTHER HEREBY ORDERED:

1.   As a result of the stay previously imposed by the Court, the Class Certification Order does not currently apply to the claims asserted by Plaintiffs against each and all of the FG Entity and Individual Defendants.

IT IS SO ORDERED.

Dated:  New York, New York
        March 2013

                                    VICTOR MARRERO
                                    U.S.D.J.

2